# EXHIBIT A

**IIS March 22, 2022 Supplemental Infringement Contentions**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

ID IMAGE SENSING LLC,

      Plaintiff,

      v.

OMNIVISION TECHNOLOGIES, INC.,

      Defendant.

C.A. No. 20-CV-136-RGA

**PLAINTIFF'S AMENDED CLAIM CHART DISCLOSURES**

Plaintiff ID IMAGE SENSING LLC ("Plaintiff" or "IIS") makes the following Amended

Claim Chart Disclosures to Defendant OMNIVISION TECHNOLOGIES, INC. ("Defendant" or

"Omnivision").  These disclosures are based on the information that Plaintiff has been able to

obtain to date, and documents produced by Defendant in December of 2021 that should have been

produced much earlier as "core technical documents".  In addition, Plaintiff incorporates by

reference its First Amended Complaint (D.I. 22), as well as its Delaware Default ESI Rule 4.A

Disclosures served on April 19, 2021.

Claim 1 ("Asserted Claim") of U.S. Patent No. 7,333,145 ("the Asserted Patent" or "the

'145 Patent") has been infringed, either literally or under the doctrine of equivalents, by Defendant.

Attached as exhibits hereto are representative claim charts setting forth where in the Accused

Products each element of claim 1 is found.  Plaintiff expressly reserves the right to assert additional

patent claims against Defendant.

Defendant makes, uses, sells, and/or offers for sale certain Accused Products that directly

and indirectly infringe claim 1 of the '145 Patent. More specifically, Defendant makes, uses, sells,

and/or offers for sale image sensor products, including those falling within the 1 megapixel and

below, 2-5 megapixels, 8-13 megapixels, and above 13 megapixels products groupings as

1

categorized by Defendant, that include the components and functionality described in Plaintiff's Amended Complaint that are alleged to infringe the Asserted Claims of the '145 Patent. *See also*, D.I. 22 at paragraphs 12-18. The Accused Products include, but are not limited to, the models of image sensors listed in Exhibit O and any other image sensors with similar components and functionality, including those that support both LED and Xenon flash modes. The Accused Products include all future generations of the accused infringing design, as well as any successor products or later-released products that utilize a similar and/or identical infringing design that are offered by Defendant or any of its subsidiaries and/or affiliates. Plaintiff reserves the right to assert infringement against additional Omnivision products for which Defendant produces additional documents. The attached claim charts are illustrative rather than exhaustive. They are representative of, and apply to, all of Defendant's products comprising similar features, functions, and/or characteristics to those shown and described.

Defendant indirectly infringes the Asserted Claims of by inducing its customers to use the Accused Products in an infringing manner as described in the attached claim charts. *See also*, D.I. 22 at paragraph 22. Omnivision has had knowledge of the '145 patent and Plaintiff's infringement allegations against the Accused Products since at least as early as January 29, 2020 when the Original Complaint was filed in this case. With this knowledge, Omnivision and its Affiliates (both US and foreign Affiliates) have induced infringement by its direct and indirect customers by instructing them how to incorporate the accused image sensors into their customer's products, all with knowledge that a significant percentage of the accused image sensors will be imported into the United States. Omnivision encourages its customers to use the accused image sensors in an infringing manner by, at the very least, providing marketing and technical documents to its customers such as its product technical specifications, marketing requirements documents (MRDs),

2

and Product Requirements Documents (PRDs).

Defendant has done so by acts including but not limited to (1) selling such products including features that—when used or resold—infringe, either literally or under the doctrine of equivalents, the '145 patent; (2) marketing the infringing capabilities of such products; and (3) providing instructions, technical support, and other support and encouragement for the use of such products, including at least the documents referenced above. Portions of Defendant's publicly available website also include similar instructions and technical support encouraging the use of the Accused Products (see, for example: https://www.ovt.com/image-sensors/2-5-megapixels).  Such conduct by Omnivision was intended to and actually did result in direct infringement by Defendant's direct and indirect customers, including using, selling, offering for sale and importation of the Accused Products in the United States. By way of example only, Omnivision knows that the Microsoft Surface Pro 4 products sold by Microsoft in the United States include two of the accused image sensors, the OV5693 and OV8865 models. *See*: https://www.anandtech.com/show/9727/the-microsoft-surface-pro-4-review-raising-the-bar/8.

Further, Omnivision has admitted that it "provides datasheets to distributors under a non-disclosure agreement that precludes their publication for five years after the date of disclosure of the data sheet or the date of termination of the non-disclosure agreement. OmniVision employees will respond to inquiries from third parties about the operation or functionality of its products." *See* Omnivision response to Plaintiff's Interrogatory No. 12.

DATED:  March 21, 2022                    */s/ Corby R. Vowell*

3

Jonathan T. Suder (*pro hac vice*)
Corby R. Vowell (*pro hac vice*)
Dave R. Gunter (*pro hac vice*)
FRIEDMAN, SUDER & COOKE
Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
Telephone:  (817) 334-0400
Facsimile:  (817) 334-0401
Email:  jts@fsclaw.com
Email: vowell@fsclaw.com
Email:  gunter@fsclaw.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 Market Street, 12th Floor
Wilmington, DE 19801
T: 302-777-0300
F: 302-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com
Attorneys for Plaintiff, ID IMAGE SENSING LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 22, 2022, a true copy of the foregoing Plaintiff's Initial Claim Chart Disclosures was served via electronic mail to the following:

Kelly E. Farnan – farnan@rlf.com

David H. Bluestone – David.bluestone@bfkn.com

Michael D. Educate – michael.educate@bfkn.com

DATED:  March 22, 2022                    */s/ Corby R. Vowell*

4

# EXHIBIT B

**Anson Chan Deposition Transcript Portions**

CONFIDENTIAL ATTORNEY'S EYES ONLY

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE
 2                  CASE NO.:  20-136-RGA-JLH
 3
        ID IMAGE SENSING, LLC,
 4
                         Plaintiff,
 5      vs.
 6      OMNIVISION TECHNOLOGIES, INC.,
 7                       Defendants.
        _____/
 8
 9
10
11              CONFIDENTIAL ATTORNEY'S EYES ONLY
12
13              REMOTE VIDEOTAPED DEPOSITION OF
14
15                   ANSON HOIFUNG CHAN
16
17
18                 Thursday, March 24, 2022
19                 9:00 a.m. - 1:09 p.m. (PDT)
20
21
22
23              Stenographically Reported By:
24               Kimberly Fontalvo, RPR, CLR
25              Realtime Systems Administrator
```

Page 1

CONFIDENTIAL ATTORNEY'S EYES ONLY

1 APPEARANCES:
2
  On behalf of Plaintiff:
3
    FRIEDMAN SUDER & COOKE
4   604 East 4th Street, Suite 200
    Fort Worth, TX  76102
5   BY: CORBY R. VOWELL, ESQ.
    vowell@fsclaw.com
6
7 On behalf of Defendant:
8   BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG
    200 West Madison Street, Suite 3900
9   Chicago, IL  60606
    BY: DAVID BLUESTONE, ESQ.
10  david.bluestone@bfkn.com
11 --and--
12
13    Robert Cleary, Esq.,
      General Counsel, OmniVision
14
15
16 ALSO PRESENT:  CARLOS VELASQUEZ, Videographer
17
18
19
20
21
22
23
24
25
                                                    Page 2

1
  Exhibit 17    Bates number 97171        121
2
  Exhibit 18    Bates number 97184        125
3
4
5 **Exhibit 14 not referred to.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                    Page 4

1          I N D E X
2 Examination                     Page
3 ANSON HOIFUNG CHAN
    Direct      By Mr. Vowell      6
4
  Instruction not to answer       15
5
  Certificate of Oath             134
6 Certificate of Reporter         135
  Read and Sign Letter to Witness   136
7 Errata Sheet (forwarded upon execution)   137
8          EXHIBITS
9 No.                             Page
10 Exhibit 1   Notice of Taking      10
              Deposition
11
12 Exhibit 2   Bates number 95901    24
13 Exhibit 3   Bates number 95899    27
14 Exhibit 4   Bates number 97234    29
15 Exhibit 5   Bates number 97233    33
16 Exhibit 6   Bates number 17831    61
17 Exhibit 7   10-K              81
18 Exhibit 8   Bates number 97235    87
19 Exhibit 8A  Bates number 97242    90
20 Exhibit 9   Bates number 97297    95
21 Exhibit 10  Bates number 97349    96
22 Exhibit 11  Bates number 97397    98
23 Exhibit 12  Bates number 97420   102
24 Exhibit 13  Bates number 97425   106
25 Exhibit 15  Bates number 97446   114
   Exhibit 16  Bates number 97480   117
                                                    Page 3

1      VIDEOGRAPHER:  Give me a moment to get the
2  recordings going, and then I will do a read-on
3  and then we'll get it going.
4      Morning.  We are on the record at
5  9:03 a.m. on March 24, 2022.
6      This is the Media Unit 1 of the
7  video-recorded deposition of Anson Chan taken
8  by counsel for the Plaintiff in the matter of
9  ID Image Sensing LLC versus OmniVision
10 Technologies, Inc.
11     This case is filed in the U.S. District
12 Court, District of Delaware, and the case
13 number is 20-136-RGA-JLH.
14     This deposition is being held remotely via
15 Zoom.
16     My name is Carlos Velasquez from the firm
17 Veritext and I am the videographer.  The court
18 reporter is Kimberly Fontalvo from the firm
19 Veritext.
20     If there are any objections to proceeding,
21 please state them at the time of your
22 appearance, beginning with the noticing
23 attorney.
24     MR. VOWELL:  This is Corby Vowell, with
25 the law firm of Friedman Suder & Cooke,
                                                    Page 5

2 (Pages 2 - 5)

CONFIDENTIAL ATTORNEY'S EYES ONLY

1  representing the Plaintiff, ID Image
2  Sensing LLC.
3      MR. BLUESTONE:  David Bluestone, Barack
4  Ferrazzano Kirschbaum & Nagelberg, representing
5  OmniVision, Defendant.
6      THE COURT REPORTER:  Okay. Sir, would you
7  raise your right hand so I can swear you in,
8  please.  Mr. Chan.
9      Do you swear or affirm the testimony you
10  are about to give will be the truth, the whole
11  truth, and nothing but the truth?
12      THE WITNESS:  Yes.
13      THE COURT REPORTER:  Thank you.
14          DIRECT EXAMINATION
15  BY MR. VOWELL:
16   Q.  Good morning, Mr. Chan.  My name is
17  Corby Vowell, and as you know, I represent the
18  Plaintiff in this matter.  I'll be asking you a few
19  questions today.
20      Can you please state your name and -- your
21  full name for the record?
22   A.  Name's Anson Hoifung Chan.  Hoifung is my
23  middle name.  C-H-A-N.
24   Q.  And where do you currently reside?
25   A.  California.

Page 6

1   A.  I understand.
2   Q.  And if you don't understand the question
3  that I ask, will you please ask me to rephrase or
4  provide clarification.
5      Do you understand that?
6   A.  Yes, I will.
7   Q.  We'll take breaks from time to time.  I
8  know that this is not scheduled to be a long
9  deposition so there may not be many breaks.  But if
10  you do need a break at any time, please let me know.
11      Do you understand?
12   A.  Okay.  Yes.
13   Q.  I would just ask that if there's a
14  question pending, that you would answer the question
15  first before taking a break.
16   A.  You got it.
17   Q.  Do you understand that?
18   A.  Yes.
19   Q.  Is there any reason today that you cannot
20  give full and accurate testimony?
21   A.  No.
22   Q.  And do you understand you're here to
23  testify on behalf of OmniVision as a corporate
24  representative?
25   A.  Yes.

Page 8

1   Q.  And what city?
2   A.  San Jose.
3   Q.  And who is your current employer?
4   A.  OmniVision Technologies, Inc.
5   Q.  And what is your title there?
6   A.  VP of finance and CFO.
7   Q.  Have you ever been deposed before?
8   A.  Yes, I have.
9   Q.  About how many times?
10   A.  I cannot remember.  Handful.
11   Q.  Handful.
12      Were they all in connection with your
13  employment at OmniVision?
14   A.  Yes.
15   Q.  And were any of them patent cases?
16   A.  Yes, I think so.
17   Q.  Do you recall the name of the opposing
18  party in those cases?
19   A.  Not specifically, no.
20   Q.  Well, since you've been deposed before, I
21  can keep some of the basics pretty short here.  I'm
22  going to ask you some questions and you will need to
23  provide verbal answers because a head nod cannot be
24  recorded by the court reporter.
25      Do you understand that?

Page 7

1   Q.  Okay.  And have you seen the deposition
2  notice with the deposition topics for this case?
3   A.  Yes, I have.
4   Q.  All right.  Let me share my screen for a
5  moment and grab this.
6      So, Mr. Chan, this is the deposition
7  notice for this particular deposition.
8      Have you seen this before?
9   A.  Yes.
10   Q.  And I'll try to keep this quick.  I'm
11  going to scroll down to where the topics are.  And
12  there are a number of topics.  There's 21 topics.
13  Several of which you've been designated to testify
14  before -- or testify on.
15      MR. VOWELL:  David, I'm not sure how you
16  want to do this.  Because there are so many, I
17  can just list them out, or do you want me to go
18  through them with the witness one by one?
19      MR. BLUESTONE:  Can you guys hear me okay?
20      MR. VOWELL:  Yes.
21      MR. BLUESTONE:  I mean, you can list them
22  out.  We've gone through the topics and
23  prepared.  So if you want to just list the
24  ones, I can confirm that those are the correct
25  ones.

Page 9

3 (Pages 6 - 9)

Exhibit B
Anson Chan Deposition Transcript Portions                                    C.A. No. 20-136-RGA-JLH

CONFIDENTIAL ATTORNEY'S EYES ONLY

1    MR. VOWELL:  Very good.
2        So Topics Number 6, 7, 9 through 20, and
3    22.
4        MR. BLUESTONE:  Sorry, guys.  The space
5    bar is having issues.
6        Yes, that's correct.
7    BY MR. VOWELL:
8    Q.  Mr. Chan, can you please state -- well,
9    let me get this off the screen now.
10       (Thereupon, marked as Deposition
11    Exhibit I.)
12       THE COURT REPORTER:  Pardon me, Counsel.
13    Is that Exhibit 1?
14       MR. VOWELL:  Yes, that would be Exhibit 1.
15       And I have not remarked -- for the court
16    reporter, I have not premarked these.  I think
17    I know the order in which they're going to go,
18    but I will have to send them to you after the
19    fact.  We'll make a record by Bates number of
20    the other documents.
21    BY MR. VOWELL:
22    Q.  So, Mr. Chan, can you give me a sense of
23    your -- or can you just describe your educational
24    background since high school?
25    A.  Okay.  I went to college in University of

Page 10

1    Q.  Okay.  So you've been the CFO since --
2    since that time frame?
3    A.  That is correct.
4    Q.  And who do you report to directly?
5    A.  Currently, I report to our president.
6    Q.  And who is that?
7    A.  Henry Yang, Y-A-N-G.
8    Q.  And where is he located?
9    A.  Same office as me in Santa Clara,
10    California.
11    Q.  Mr. Chan, what did you do to prepare for
12    your deposition today?
13    A.  I reviewed the documents with our counsel
14    for the last two days.
15    Q.  And which documents are you referring?
16    A.  It would be various license agreements
17    that we produced, the Excel files that was produced,
18    as well as the Complaint, the company's response to
19    the Complaint, and the various topics that I am
20    responsible for.
21    Q.  And when you did you meet with your
22    counsel to prepare for today?
23    A.  Sorry.  You said today?
24    Q.  I'm sorry.  When did you meet with your
25    counsel to prepare for the deposition?

Page 12

1    Pennsylvania.  Got my business engineering degree
2    there.  Subsequently, I went to University of
3    Chicago.  Got my MBA there.
4    Q.  And did you ever work as an engineer?
5    A.  Yes, I did.
6    Q.  And when was that and for whom did you
7    work?
8    A.  Around 1987-ish for about four years.
9    Q.  And who were you working for?
10    A.  There's a company called Prophet 21 in
11    Pennsylvania.
12    Q.  And what did you do for them?
13    A.  I was a software engineer.
14    Q.  When did you join OmniVision?
15    A.  2006, I believe.
16    Q.  And what was your role at OmniVision when
17    you joined in 2006?
18    A.  I cannot remember exact job title, but it
19    was helping with the business strategy.
20    Q.  And what was your next job title at
21    OmniVision, or your next role?
22    A.  I got promoted as the VP of finance and
23    CFO.
24    Q.  When did that occur?
25    A.  Maybe 2008, 2009.

Page 11

1    A.  This past Tuesday and Wednesday.
2    Q.  And was anybody else there?
3    A.  Myself, David, and Robert, our general
4    counsel.
5    Q.  There were some -- I'm going to go through
6    a couple of topics that are not directly related to
7    sales but that that you've been designated to
8    testify about.
9        So Topic Number 6, when did OmniVision
10    first learn of the patent that is the subject of
11    this litigation?
12    A.  That's when the company received the
13    Complaint.
14    Q.  So OmniVision had no knowledge of the
15    patent in this case prior to the lawsuit being
16    filed?
17    A.  Not that we were aware of.
18    Q.  And throughout the deposition, I may refer
19    to the patent in this case or patent in suit, or I
20    may refer to it as the '145 Patent.
21        Do you understand that all of those would
22    refer to the patent that is the subject of this
23    litigation?
24    A.  Yes.
25    Q.  Have you ever reviewed the '145 Patent?

Page 13

4 (Pages 10 - 13)

Veritext Legal Solutions
800-336-4000

CONFIDENTIAL ATTORNEY'S EYES ONLY

1    A.  No, I have not read it myself.
2    Q.  What did OmniVision do when it learned of
3  this lawsuit?
4    A.  The company worked with the counsel and
5  also arranged for discussions with technical
6  personnels.
7    Q.  And by "technical personnels," do you mean
8  technical personnels at OmniVision?
9    A.  Yes, at OmniVision.
10    Q.  Okay.  And who were those technical people
11  that you talked to?
12    A.  I did not talk to them personally.  It's
13  through our counsel.
14    Q.  And who is your counsel?
15    A.  David Bluestone, here with me.
16    Q.  Did OmniVision obtain any kind of opinion,
17  legal opinion, regarding infringement or validity of
18  the '145 Patent?
19      MR. BLUESTONE:  We're going to object to
20    that to the extent it calls for attorney-client
21    privilege.  We're not waiving any privilege to
22    that.
23      MR. VOWELL:  Okay.  So the fact of whether
24    you got an opinion or not I don't think is it
25    privileged.  So I'm going to ask the witness
                                              Page 14

1    expert witness testimony.
2      You can answer in general, if you can, but
3    go ahead.
4    A.  Okay.  Well, in general, my understanding
5  of the patent is that the presence of certain type
6  of flash will set an indicator somewhere on the
7  image sensor.  And the image sensor, based on this
8  setting, will bring up the corresponding exposure
9  time and gain values stored in the sensor ahead of
10  time and act accordingly.
11      With that said, our sensors are passive
12  devices and -- and it's not designed to act in
13  accordance with the presence or not the presence of
14  any particular illumination device.
15      So that's the reason why the company does
16  not believe there's any infringement issue here.
17  BY MR. VOWELL:
18    Q.  And how did you come by that understanding
19  if you did not ever review the '145 Patent?
20      MR. BLUESTONE:  Again, object to the
21    extent it calls for attorney-client
22    communications.
23      You can answer in general, but I advise
24    you not to divulge any communications with
25    counsel.
                                              Page 16

1  again.
2  BY MR. VOWELL:
3    Q.  Did OmniVision obtain an opinion of
4  counsel regarding infringement or validity?
5      MR. BLUESTONE:  I'm going to instruct him
6    not to answer that question.  You and I can
7    talk offline on that.  I don't think there's a
8    date in which we'd have to waive any privilege
9    on that or determine that yet.
10  BY MR. VOWELL:
11    Q.  Mr. Chan, are you going to follow the
12  advice of your attorney?
13    A.  Yes.
14    Q.  Mr. Chan, you've also been designated to
15  testify on the basis for OmniVision's
16  non-infringement positions in this case.
17      Are you aware of that?
18    A.  Yes.
19    Q.  All right.  So can you describe for me why
20  OmniVision does not infringe the '145 Patent?
21      MR. BLUESTONE:  Again, I'm going to object
22    to form and object that that's outside the
23    scope to the extent you saw our objections on
24    that.  He can answer in general, but he is not
25    acting as an expert witness and it calls for
                                              Page 15

1    A.  Most of it is from reading the Complaint
2  itself.
3  BY MR. VOWELL:
4    Q.  And did you talk to anybody at OmniVision
5  to prepare for that topic?
6    A.  As in OmniVision employees?
7    Q.  Correct.
8    A.  It would be our general counsel.
9    Q.  Anyone else?
10    A.  No.
11    Q.  Did you talk to any engineers to prepare
12  for that topic today?
13    A.  No.
14    Q.  Do you know why you were designated for
15  this topic rather than an engineer or technical
16  person that could address is it in more detail?
17      MR. BLUESTONE:  Objection to the extent it
18    calls for attorney-client communications.
19      You can answer if you understand.
20    A.  I do understand some of the background
21  behind some of these license agreements that's
22  produced.  There's also some Excel files that I had
23  to prepare.
24  BY MR. VOWELL:
25    Q.  And you've also been designated to address
                                              Page 17

5 (Pages 14 - 17)

Veritext Legal Solutions
800-336-4000

CONFIDENTIAL ATTORNEY'S EYES ONLY



14 (Pages 50 - 53)

Exhibit B
Anson Chan Deposition Transcript Portions                    C.A. No. 20-136-RGA-JLH

CONFIDENTIAL ATTORNEY'S EYES ONLY



16    So is OmniVision Technologies, Inc., in
17 the United States responsible for the marketing of
18 all of OmniVision marketing?
19    A.   What do you mean by "all of"?
20    Q.   So -- strike that.
21    Let me -- so where are the accused
22 products in this case?  Where do the marketing
23 activities occur?
24    A.   The collection of information takes place
25 from different parts of the world, where it's

Page 54

Page 56

1    MR. BLUESTONE:  Object to the form.
2    You can answer.
3

Page 55

1 collated into a list of functionalities or
2 requirements that get shared with the design team.
3    Q.   So that -- this collection of information
4 from customers, that's done by marketing people in
5 the United States; is that right?
6    A.   No, not just people in the United States.
7    Q.   But there are -- go ahead.
8    A.   Market trends as to, you know, generally
9 what -- different -- the world needs, right, it's
10 collected from everywhere.
11    Q.   But does the marketing team in the U.S.
12 ultimately collect all of that information and then
13 provide it to the design team?
14    A.   I would say no, not primarily, because if
15 an application is predominantly used by somewhere
16 outside of United States, for instance, then the
17 marketing intelligence will not necessarily be
18 collected by the U.S.-based marketing team.
19    Q.   Mr. Chan, one of the topics you've been
20 designated to talk about relates to how many of
21 OmniVision's products get imported in the United
22 States.
23    Well, let me start with this:  As I
24 understand it, OmniVision sells products and its
25 affiliate sells products outside the United States

Page 57

15 (Pages 54 - 57)

**Exhibit B**

Anson Chan Deposition Transcript Portions                    C.A. No. 20-136-RGA-JLH

CONFIDENTIAL ATTORNEY'S EYES ONLY



Page 58

1 hands Canada; is that right?
2     A.
8     Q.  And so for products sold by OmniVision
9 Singapore, do you know whether those products ever
10 get imported in the United States in an end user
11 product?
12     A.  OmniVision Singapore, like OmniVision
13 Technologies, Inc., only sells components.  It's
14 impossible to find out what -- where these
15 components would go after they get shipped to our
16 respective customers.
17     Q.  You know that OmniVision chips ultimately
18 get imported in the United States, correct?
19         MR. BLUESTONE:  Object to the form.
20     A.  They may.  But as the company, we would
21 never know.
22 BY MR. VOWELL:
23     Q.  Wouldn't you want to know that?
24         MR. BLUESTONE:  Object to the form.
25     A.  Actually, no.  We would not want to know.

Page 60

1     A.  Their components do not go to cell phone
2 manufacturers.  Image sensors as a component go to
3 what I would refer to as module manufacturers.
4 Module manufacturers produce these miniaturized
5 cameras that then get incorporated into different
6 types of consumer devices such as phones.
7     Q.  And so wouldn't benefit OmniVision to have
8 its products incorporated into modules that go into
9 smartphones that would be imported into the United
10 States?
11         MR. BLUESTONE:  Object to the form.
12     A.  No.  It does not matter if the end product
13 goes into whatever country.  It only is meaningful
14 to the extent of reporting to investors, reporting
15 to the stock market, the overall profitability of
16 the business in terms of selling components.  Where
17 it will ultimately go has no meaning or bearing to
18 the company.
19 BY MR. VOWELL:
20     Q.  So you would not have any interest in
21 selling to a manufacturer that, for example, sold
22 its modules to Apple, given the amount of market
23 share that Apple has in the United States?
24     A.  As a component supplier, that information
25 is not meaningful.

Page 59

1 We do not need to know.
2 BY MR. VOWELL:
3     Q.  Does OmniVision ever try to sell products
4 to companies in the United States?
5     A.  We -- that's -- you have the detail, too.
6 We sell to companies in the United States.
7     Q.  When OmniVision sells products outside the
8 United States, whether it's OmniVision Technologies,
9 Inc., or OmniVision Singapore, doesn't it know and
10 intend for its products to get incorporated into
11 devices such as smartphones that are ultimately
12 imported into the United States?
13         MR. BLUESTONE:  Object to the form,
14     compound.
15         If you understand, you can answer.
16     A.  I do not understand why -- can you try one
17 more time?
18 BY MR. VOWELL:
19     Q.  Well let me ask you this:  As CFO of
20 OmniVision Technologies, Inc., wouldn't it benefit
21 your company if you could sell more products by
22 having them imported into the United States?
23     A.  Definitely not.
24     Q.  So does OmniVision sell to -- sell
25 products to smartphone manufacturers?

Page 61
1     Q.

16 (Pages 58 - 61)

CONFIDENTIAL ATTORNEY'S EYES ONLY



17 (Pages 62 - 65)

Exhibit B
Anson Chan Deposition Transcript Portions                    C.A. No. 20-136-RGA-JLH

CONFIDENTIAL ATTORNEY'S EYES ONLY



10    BY MR. VOWELL:
11       Q.  But you testified before that you have no
12    idea and you don't care where your products are
13    sold; is that your testimony on behalf of
14    OmniVision?
15       A.  I care where the products get sold to.
16    But we don't sell to these companies.  Again, the
17    supply chain for consumer products are fairly long.
18    Components, particularly for camera sensors, they go
19    to camera module integrators.  And none of these
20    names listed here are camera module integrators.
21
22

Page 67

Page 69

18 (Pages 66 - 69)

**Exhibit B**
Anson Chan Deposition Transcript Portions                                    C.A. No. 20-136-RGA-JLH

CONFIDENTIAL ATTORNEY'S EYES ONLY

**Page 70**

7        Mr. Chan, were you the CFO of OmniVision
8 in 2014 and 2015?
9   A.  Yes.
10   Q.  And during that time frame, I think we
11 discussed that OmniVision was a publicly traded
12 company in the United States?
13   A.  Yes.
14   Q.  And did it have an obligation, then, to
15 file annual reports with the Securities and Exchange
16 Commission, such as Form 10-K?
17   A.  Yes.
18   Q.  As CFO did you have any involvement in the
19 drafting or review of the Form 10-K for OmniVision?
20   A.  Yes, I do.
21   Q.  Are you familiar with the contents of the
22 10-Ks that OmniVision filed?
23   A.  Yes.
24   Q.  Would that also be form of Form 10-Q?
25   A.  Yes, that's a quarterly report.

**Page 72**

1   pinpointing specific statements out of context.
2      Go ahead.
3      MR. VOWELL:  I'm happy to do that.  Happy
4  to do that.
5  BY MR. VOWELL:
6   Q.  Mr. Chan, can you tell from what you are
7 seeing on the screen -- again, if you need to see
8 down further -- what this document is?
9   A.  It does appear to be the Form 10-K filed
10 for fiscal '14.
11   Q.  And you were the CFO at that time?
12   A.  Yes.
13   Q.  And you would have reviewed this document
14 at that time?
15   A.  Yes.
16   Q.  Did you author any portion of the 10-Ks at
17 that time?
18   A.  Not directly.
19   Q.  So I'm only going to go down a few pages
20 here, so I'm happy to scroll and just -- so that you
21 can verify that I'm not skipping through anything.
22 What I may do is -- if I make it that size, can you
23 read that text still?
24   A.  Yes, somewhat.
25   Q.  I'll have to zoom in in a moment.  But let

**Page 71**

1   Q.  So I'm going to share screen here again.
2      Mr. Chan, I've just put up on the screen a
3 Form 10-K that was downloaded -- I'll represent to
4 you this was downloaded from the Internet, and I'm
5 happy to scroll through as much of this for you to
6 be -- to at least see what it is and any other
7 information you feel you need to see.
8      Can you at least identify what type of
9 document this is?
10      MR. BLUESTONE:  Hold on.  Corby, I just
11  want to object to this because we had an
12  agreement before this that large-scale
13  documents be produced so he would have access
14  to them beforehand.  This is commensurate with
15  what our agreement was.  I understand you are
16  going to let him to take time to go through it.
17      But go ahead, Mr. --
18      MR. VOWELL:  I will do that in the future.
19  I did not realize that he would give the
20  answers he was giving, and this was only for
21  rebuttal purposes or to just kind of steer the
22  ship a bit.
23      MR. BLUESTONE:  Go ahead and proceed.  But
24  we might ask for an opportunity for him to look
25  at it natively to the extent that you are

**Page 73**

1 me skip to -- it's basically Page 5.
2      So does this appear to be the table of
3 contents or at least a portion of the table of
4 contents?
5   A.  Yes.
6   Q.  Then there is a part one.  And so I'm
7 basically going to this portion that's at the bottom
8 of Page 4 of this document.  I will zoom in because
9 that's fairly small on my screen, at least.
10   A.  Mine is also small.
11   Q.  Okay.  So can you read it -- do I need to
12 zoom it in more or can you read it from there?
13   A.  I can read it.
14   Q.  Let me direct your attention to -- do you
15 see a heading there called "Market Environment"?
16   A.  Yes.
17   Q.  And the first part it says, "We sell our
18 products worldwide directly to OEMs," at least the
19 first portion of that sentence.
20      Do you see that?
21   A.  Yes.
22   Q.  So it's clear that OmniVision does sell
23 products worldwide to OEMs?
24      MR. BLUESTONE:  Objection.  Lacks
25  foundation.  Object to form.

19 (Pages 70 - 73)

**Exhibit B**
Anson Chan Deposition Transcript Portions              C.A. No. 20-136-RGA-JLH

CONFIDENTIAL ATTORNEY'S EYES ONLY

1    A.   The context is different.  This is a
2  consolidated report filed with SEC.  The use of
3  "we," if you go back to the top, should define as
4  OmniVision Technologies, Inc., and all its
5  subsidiaries and affiliates.
6    BY MR. VOWELL:
7    Q.   Okay.  But with that definition, then
8  "we," with that group of entities, does sell
9  products worldwide directly to OEMs?
10    A.   That's correct, yes.
11    Q.   Okay.  Now let me -- and welcome to review
12  more of that.  I just have a couple of additional
13  questions.
14        Okay.  In the next paragraph, so the last
15  paragraph on the bottom of Page 4, in the first
16  sentence -- and I don't know if I can highlight it
17  here or not.
18        Can you see my highlighting there?
19    A.   Yes.
20    Q.   Okay.  It uses the term "design win."
21        Do you see that?
22    A.   Yes.
23    Q.   Is this the design win process we were
24  talking about earlier?
25    A.   That's correct.

Page 74

1    A.   Okay.
2    Q.   So this first sentence, "Many of the
3  products using our image sensors," and then there's
4  a list of products there, including mobile phones,
5  entertainments applications such as tablets,
6  notebooks, and webcams.
7        Is that at least an accurate list of a
8  portion of the ultimate consumer products that
9  your -- that OmniVision's products are incorporated
10  into?
11    A.   These are the types of applications that
12  image sensors can be used in.
13    Q.   And then let me direct you to another
14  portion here.  I don't know if this is going to let
15  me do it or not.  Let's see.
16        So the sentence I've highlighted, if you
17  could just read that to yourself briefly and then
18  I'm going to ask you a couple of questions.
19    A.   Okay.
20    Q.   So it addresses here that OmniVision, in
21  this report at least, and I understand -- well,
22  OmniVision here is defined as more than just the
23  U.S. entity.  I understand that.  But it does state
24  that "We" -- again, using the plural version of
25  "we," including all of the OmniVision entities --

Page 76

1    Q.   In the next sentence, that starts here, it
2  says, "The time lag" -- well, I guess you can read
3  that here.  But it discusses a time lag between the
4  design win and volume shipments.
5        Do you see that?
6    A.   Yes.
7    Q.   Do you know what that refers to?
8    A.   That refers to from the investors'
9  perspective when we can report -- when we have a
10  company agreeing to use the part to when we can
11  report sales on selling that part.  That's a time
12  lag.
13    Q.   And what generally causes that time lag?
14    A.   Many different things.  The biggest being
15  customer may not use just OmniVision product.  They
16  may use sensor from our competitors.  And depending
17  on the priority where they procure parts, we may or
18  may not even be able to ship the part based on a
19  design win, ever.  So that created a lot of that
20  issue.
21    Q.   Let me skip now to one other portion.  So
22  this is just a following page, and you are welcome
23  to read any of this that you want, but I'll direct
24  your attention to the last paragraph here at the
25  bottom of Page 5.

Page 75

1  "experienced the decline in sales of products that
2  were used in mobile phones made by end user
3  customers located in North America."
4        So OmniVision was able to determine that
5  there was a decline in sales of products or of
6  smartphones using OmniVision image sensors in
7  North America.
8        Do you see that?
9    A.   Yes.
10    Q.   How was OmniVision able to determine that
11  if it has no idea whether its products end up in the
12  United States?
13    A.   Module manufacturers, which is the direct
14  customers, will stop buying additional products when
15  their module cameras, in turn, cannot be shipped
16  into the consumer devices, and that's what happened
17  in 2014.
18 

Page 77

20 (Pages 74 - 77)

Veritext Legal Solutions
800-336-4000

CONFIDENTIAL ATTORNEY'S EYES ONLY

1 [REDACTED]

3    Q.  So marketing people or possibly
4 salespeople at OmniVision could determine, at least
5 to some extent, the amount of OmniVision products
6 that are ending up in North America?
7        MR. BLUESTONE:  Object to the form.
8    A.  Very different.  The way I understand your
9 question is what product will end up in United
10 States.  That's very different than what
11 manufacturer or OEM may buy the part.  OEM, they buy
12 the part but they may not necessarily ship into
13 United States.  And we don't have that information.
14  BY MR. VOWELL:
15    Q.  But you do have a way of determining,
16 based on sales to your direct customers, if there is
17 an increase or decrease in the amount of end user
18 devices that are sold in the United States?
19    A.  No.  If you read that sentence again, what
20 we are saying -- in an earlier document, we would
21 have defined end use customer being the name brands
22 that would sell consumer devices in different parts
23 of the world.  They outsource the manufacturing to
24 different manufacturers, who then outsource a
25 particular component called module, camera module,

Page 78

1 who then would procure image sensors from either
2 OmniVision Technologies, Inc., or OmniVision
3 Singapore, depending on whether or not they do title
4 transfer in United States or Canada, in which case
5 they buy the part from OmniVision Technologies, Inc.
6 Or if the module integrator is located outside of
7 U.S. and Canada, the title transfer would take place
8 outside, then they would have to buy the part from
9 OmniVision Singapore.
10       But after the module integrator received
11 the part and turn it into module integrators, they
12 would then go into different subcontractors and then
13 ultimately will end up in main subcontractor that
14 received the orders from these name brand OEMs.
15       That's what we mean by "end use
16 customers."  Some of these name brands may be
17 located in North America.  And if they order less
18 parts, the module integrators will order less camera
19 sensors from us.  We are not saying in this document
20 that consumers in the United States are buying less
21 phones.  We're never saying that in this document.
22    Q.  But you do have some way of correlating
23 end user devices such as smartphones using your
24 products with -- I'm sorry.  You do have some way of
25 correlating sales of end user products in

Page 79

1 North America with the sales of your products to the
2 camera module manufacturers?
3        MR. BLUESTONE:  Objection.  Misstates his
4    prior testimony.
5        You can answer if you understand his
6    question.
7    A.  Actually, we do not know.  We do not know
8 how many consumer devices comes back to the United
9 States.
10  BY MR. VOWELL:
11    Q.  So you don't know the exact amount.  But
12 do you know -- you do know that some do; is that
13 correct?
14    A.  Actually, no, it's not correct.
15    Q.  I guess I don't understand.  If you can
16 determine that there was a decline in number of end
17 user customer products using your chips being sold
18 in North America, then, I mean, how would you know
19 that it -- can you explain that?
20    A.  Sure.  Again, the context of this 10-K in
21 this specific paragraph you are showing on Page 5 is
22 saying that a particular brand name company located
23 in North America may be buying less devices for
24 their, in this case, mobile phones.  Okay?  But
25 these companies located in North America may or may

Page 80

1 not be selling a particular consumer product in the
2 United States.  The product that they manufacture or
3 design or ordered from the subcontractors can be
4 designated for sale only in, say, India, and we do
5 not have that information.
6    Q.  Just for the record, let me mark this as
7 Exhibit 7.
8       (Thereupon, marked as [REDACTED]



Page 81

21 (Pages 78 - 81)

Veritext Legal Solutions
800-336-4000

# EXHIBIT C

**Markman Hearing Transcript (D.I. 59)**

```
                                                    1

  1          IN THE UNITED STATES DISTRICT COURT

  2             FOR THE DISTRICT OF DELAWARE

  3

  4   ID IMAGE SENSING LLC,        )
                                   )
  5          Plaintiff,            )
                                   )  C.A. No. 20-136-RGA-JLH
  6   v.                           )
                                   )  JURY TRIAL DEMANDED
  7   OMNIVISION TECHOLOGIES, INC.,)
                                   )
  8          Defendant.            )

  9
                                J. Caleb Boggs Courthouse
 10                             844 North King Street
                                Wilmington, Delaware
 11
                                Tuesday, October 19, 2021
 12                             9:01 a.m.
                                Markman Hearing
 13

 14   BEFORE: THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

 15

 16   APPEARANCES:

 17          FARNAN LLP
             BY:  MICHAEL J. FARNAN, ESQUIRE
 18
                      -and-
 19
             FRIEDMAN SUDER & COOKE
 20          BY:  CORBY VOWELL, ESQUIRE
             BY:  DAVE R. GUNTER, ESQUIRE
 21
                           For the Plaintiff
 22

 23

 24

 25
```

```
                                                    2

  1   APPEARANCES CONTINUED:

  2          RICHARDS LAYTON & FINGER, P.A.
             BY:  KELLY E. FARNAN, ESQUIRE
  3
                      -and-
  4
             BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG, LLP
  5          BY:  DAVID H. BLUESTONE, ESQUIRE
             BY:  MICHAEL D. EDUCATE, ESQUIRE
  6
                           For the Defendant
  7

  8             ***  PROCEEDINGS  ***

09 00 48  9   DEPUTY CLERK:  All rise.  Court is now in
09 00 52 10   session.  The Honorable Richard G. Andrews pres ding.
09 00 55 11        THE COURT:  All right.  Please be seated.  If
09 00 59 12   you're fully vaccinated and you want to, you can take your
09 01 02 13   mask off, but you don't have to.
09 01 06 14        So this is the Markman in ID Image Sensing vs.
09 01 10 15   Omnivision Technologies.  I see, for the first time in my
09 01 16 16   nearly ten years of doing this, an all-Farnan presentat on.
09 01 21 17        Mr. Farnan, who have you got w th you?
09 01 23 18        MR. FARNAN:  Good morning, Your Honor.  Michael
09 01 28 19   Farnan on behalf of Plaintiff.  With me, Dave Gunter and
09 01 32 20   Corby Vowell from Friedman Suder & Cooke.
09 01 37 21        MR. GUNTER:  Good morning, Your Honor.
09 01 38 22        MR. VOWELL:  Good morning, Your Honor.
09 01 39 23        THE COURT:  All right.  Good morning.
09 01 40 24        And Ms. Farnan, who have you got with you?
09 01 43 25        MS. FARNAN:  Good morning, Your Honor.  Kelly
```

```
                                                    3

09 01 45  1   Farnan from R chards Layton & Finger on behalf of
09 01 46  2   Omnivision.  I'm joined by David Bluestone and M chael
09 01 50  3   Educate from Barack Ferrazzano.
09 01 55  4        THE COURT:  Good morning.  All right.
09 01 55  5        So I did read the briefs, and I have looked at
09 02 00  6   the patent, and you can do what you want to with the time
09 02 09  7   that you have.  But the one that I thought was the most
09 02 15  8   chance that I was unsure as to what to do was the last one
09 02 21  9   about store and exposure time and gain, blah, blah, blah in
09 02 27 10   response to blah, blah, blah.
09 02 29 11        So, and on that, I think it would probably make
09 02 37 12   sense for the -- well, in any event, so how do you want to
09 02 40 13   do this?
09 02 42 14        MR. VOWELL:  Good morning, Your Honor.  Corby
09 02 50 15   Vowell on behalf of the Plaintiff.  Let me see if I can --
09 02 58 16   and Your Honor, I'd like to just jump right to the term that
09 03 01 17   you suggested you might need the most discussion on.
09 03 03 18        THE COURT:  Okay.
09 03 04 19        MR. VOWELL:  So if you'll just give me a moment.
09 03 10 20   And actually, Your Honor, if I may approach, I have copies
09 03 12 21   of the slides --
09 03 13 22        THE COURT:  Sure, yeah.
09 03 14 23        MR. VOWELL:  -- that we'll be going through.
09 03 17 24        DEPUTY CLERK:  Thank you.
09 03 18 25        MR. VOWELL:  So Your Honor, for this term, it's
```

```
                                                    4

09 03 30  1   actually a larger phrase that includes several of the terms
09 03 33  2   that the Defendants want to construe separately.
09 03 36  3        THE COURT:  Yeah, and the part that I was most
09 03 38  4   interested in was the in response to part, but go ahead.
09 03 42  5        MR. VOWELL:  So on this slide, it just shows the
09 03 49  6   Defendant's construct on, and essentially what they're doing
09 03 49  7   here is trying to reorder the claim elements and essentially
09 03 54  8   turn this into a method claim.  This is an apparatus claim
09 03 59  9   that describes the components of the camera module.  And
09 04 02 10   what they've done in several of their terms, including this
09 04 06 11   one, is to attempt to put the elements in a part cular order
09 04 10 12   and require method steps.  And ultimately, they've included
09 04 16 13   or imported into the claim a limit to phrase the
09 04 16 14   construction, a lim tat on of causes calculat on.
09 04 23 15        So, as I said, this disputed phrase is part of a
09 04 29 16   larger claim limitation.  It's directed to the capability of
09 04 32 17   the plural ty of storage locat ons.  As wr tten, it's
09 04 37 18   supported by the specif cat on.  The claim describes the
09 04 40 19   storage locations are configured to store exposure time and
09 04 44 20   gain associated with a particular type of flash dev ce such
09 04 48 21   as, the two examples given in the patent, are LED and Xenon.
09 04 51 22        And the language in this phrase that is being
09 04 55 23   construed by the Defendants relates to the interrelationship
09 04 57 24   between the type of flash device, and ultimately, the
09 05 00 25   exposure or gain times that are going to or that are
```

Exhibit C
Markman Hearing Transcript (D.I. 59)                                      C.A. No. 20-136-RGA-JLH

5

```
09 05 03   1   appropriate for that type of flash.  And so the stored
09 05 08   2   exposure and gain are, therefore, in response to an
09 05 10   3   indicator set to indicate the use of the particular flash
09 05 13   4   device.
09 05 14   5          THE COURT:  So what's the relationship of those
09 05 16   6   two things?  What does in response to mean?  You know, tell
09 05 24   7   me some other words that would mean the same thing as in
09 05 26   8   response to.
09 05 27   9          MR. VOWELL:  Well, I think here, if you look at
09 05 30  10   the larger phrase, the type of flash -- I'm sorry.  Let me
09 05 34  11   back up just a minute.
09 05 38  12          So it's an indicator that's set to indicate the
09 05 41  13   type of flash device, and then, ultimately, the exposure
09 05 46  14   time and gain are associated with the flash device in
09 05 49  15   response to the indicator.
09 05 51  16          Now, we can come up with other language, but
09 05 53  17   it's ultimately that the result, the stored values are
09 05 57  18   associated with this and appropriate for.  So other language
09 06 03  19   would be they're specific to a particular type of flash
09 06 07  20   device or appropriate for the particular type of flash
09 06 09  21   device that's going to be in use in the camera module or
09 06 11  22   with the camera module.
09 06 12  23          THE COURT:  But you're not even really
09 06 15  24   addressing the phrase that's of the most interest to me
09 06 18  25   which is the in response to.  I'm not that concerned about
```

7

```
09 07 52   1   time and gain?
09 07 53   2          MR. VOWELL:  I don't think so, Your Honor, not
09 07 55   3   here in this apparatus claim.  If this were a method claim
09 07 58   4   and it were ordered --
09 07 59   5          THE COURT:  No, but it's a capability.  I
09 08 01   6   understand what you're saying, Mr. Vowell, about method
09 08 05   7   claims and apparatus claims, but nevertheless, if it's a
09 08 08   8   capability of doing something and the capability involves
09 08 10   9   one thing occurring before another, then t has to have that
09 08 15  10   capability; right?
09 08 16  11          MR. VOWELL:  Well, Your Honor, there is a
09 08 18  12   situation which the indicator could be set, but you have
09 08 21  13   default values, for example, for two different types of
09 08 24  14   flash devices.  And then once the indicator is set, you
09 08 27  15   already automatically know.  You don't have to calculate
09 08 29  16   those again, at least not at that time.
09 08 31  17          THE COURT:  But the indicator has to be
09 08 45  18   indicating something before the capability of storing, and
09 08 45  19   exposure time, and gain can actually be actuated; right?
09 08 45  20          MR. VOWELL:  Well, not if they're default
09 08 47  21   values.  If they're default values and you have default
09 08 51  22   values for two different types of flash devices --
09 08 53  23          THE COURT:  Does the claim say anything about
09 08 56  24   default values?
09 08 57  25          MR. VOWELL:  No, but that would be one
```

6

```
09 06 21   1   the associated with, but what I'm trying to figure out is
09 06 25   2   what's the relationship of the first larger phrase to the
09 06 31   3   second phrase of the indicator indicating the presence of
09 06 35   4   the first or second flash device?
09 06 38   5          MR. VOWELL:  So, Your Honor, those two things go
09 06 40   6   in conjunction, so I guess that's my point is that what the
09 06 43   7   Defendants have done is --
09 06 44   8          THE COURT:  No, don't tell me what the
09 06 45   9   Defendants have done, tell me what you believe it means.  In
09 06 50  10   conjunction with is not the same thing as in response to;
09 06 52  11   right?
09 06 53  12          MR. VOWELL:  Right, right.  So if you look at
09 06 57  13   the phrases together, associated with and in response to,
09 07 00  14   those go together to indicate that the result, the resulting
09 07 05  15   values for exposure time and gain are appropriate for or
09 07 10  16   specific to a particular type of flash device, and that
09 07 14  17   there is an indicator that's set to indicate which type of
09 07 18  18   flash device so that, ultimately, the values will be
09 07 21  19   appropriate for that type of flash.
09 07 24  20          THE COURT:  So the indicator indicating the
09 07 27  21   presence of the first or second flash device has nothing to
09 07 32  22   do with the storing and exposure time and gain, et cetera,
09 07 37  23   or does t have something that the indicator indicates the
09 07 44  24   presence of flash device, does t have -- you know, first
09 07 48  25   off, does that have to occur before the storing and exposure
```

8

```
09 09 00   1   embodiment that would be covered by the claim.  It could be
09 09 00   2   that they are set -- that they are calculated after the
09 09 02   3   indicator is set, but t could be that they're calculated --
09 09 06   4          THE COURT:  But they wouldn't occur -- even if
09 09 08   5   they're "calculated before," they don't actually do anything
09 09 14   6   or have the capability of doing anything until after the
09 09 17   7   indicator has done the indicating; right?
09 09 19   8          MR. VOWELL:  That's correct.  The rest of
09 09 26   9   software and circuitry would have to know which flash device
09 09 26  10   is present to know which set of values to use.
09 09 29  11          THE COURT:  Okay.  So the indicator indicating
09 09 32  12   the presence of a first or second flash device has to occur
09 09 36  13   before whatever stores the exposure time and the gain;
09 09 39  14   right?
09 09 41  15          MR. VOWELL:  I don't think that's actually true.
09 09 44  16   I do agree with you that for the software to then put those
09 09 48  17   values into use, the indicator would have to be set, but
09 09 53  18   they can already be stored as default values.
09 09 56  19          THE COURT:  Oh, okay.  But since t's a
09 09 58  20   capability, in the end, of doing something, the thing that
09 10 02  21   it's capable of doing has to, I guess, when it does do
09 10 11  22   something, work in a certain order that meets the rest of
09 10 15  23   the claim; right?
09 10 17  24          MR. VOWELL:  Well, again, I don't want to sound
09 10 19  25   like a broken record, Your Honor, but there's not an order
```

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                                C.A. No. 20-136-RGA-JLH

9

1  implied here other than at some point the ind cator has to
2  be set to indicate the flash dev ce in order for the camera
3  module to ultimately be operable and use the proper --
4          THE COURT: Okay.
5          MR. VOWELL: -- values for the flash type.
6          THE COURT: Okay. Hold on just one second. Go
7  ahead, Mr. Vowell.
8          MR. VOWELL: Well, Your Honor, I'm happy to
9  answer more quest ons about that, but I'd prefer if you have
10  any further, let me know.
11         THE COURT: Okay. Well, maybe I should hear
12  from the other s de.
13         MR. VOWELL: All right. Thank you, Your Honor.
14         THE COURT: Thank you, Mr. Vowell.
15         MR. BLUESTONE: Your Honor, we have copies as
16  well, if I may come up?
17         THE COURT: Sure.
18         MR. BLUESTONE: Thank you very much. Thank you,
19  Your Honor.
20         This is Slide 16 of our presentat on.  In
21  response to, as you said, clearly does call for something to
22  happen before. The issue that's being raised, if you can go
23  to Sl de 39, please, is this issue of, Hey, you're trying to
24  convert t into a method claim. There's nothing in the law
25  that says you can't have sequential steps.

10

1          THE COURT: Yeah. No, the running argument
2  about you're trying to convert things into method claims,
3  I'm not really buying that argument. I mean, maybe you are
4  trying to do that, but I think that, you know, even taking
5  this as an apparatus claim, when you have this long kind of
6  limitation, even if it's just a capability, it's a
7  capability to do var ous things as defined in the
8  limitation. So it's not -- but I am interested in, because
9  in the end, I think Mr. Vowell sort of got to the point that
10  I was trying to get to, and I'd be interested to know your
11  view on that.
12         MR. BLUESTONE: Sure. And I think on point is
13  this quest on of: Can they be default values? Does it have
14  to happen before?
15         And if you can put up Sl de 22, Mike. Before I
16  go on to this slide, as we did in our motion to dismiss
17  briefing, I think t's DI-9 and 10, any instance in wh ch a
18  digital camera is going to take an exposure, there's some
19  kind of calculation. It might well just be an interpolation
20  between knowing it's a bright scene or a cloudy scene, but
21  t has to know the present lighting environment.
22         So this question of, well, t can be default
23  values is not workable in a techn cal sense or in concert
24  w th what the invention is talking about. On Sl de 22 here,
25  we have the portion that's talking about the language of

11

1  associated w th, and I acknowledge that, but I think t's
2  highly relevant to why we're talking about in response to
3  from a techn cal standpoint.
4          At the top of this sect on, it's talking about
5  the view finder mode in Column 5. The view finder mode is
6  just saying, I'm taking -- I'm seeing what's coming into the
7  camera. This is the lighting environment now. And the
8  patent is talking about here, there's nothing special that
9  has to happen with the exposure and gain. I'm just going to
10  take it the normal way, calculate it normally.
11         The next step t's talking about, Hey, if I have
12  a flash and I have this image sensor, the image sensor
13  might, on a rolling shutter basis, take it chunk by chunk by
14  chunk. So if we imagine kind of a square array, t needs to
15  get all the slices processed with the light illumination
16  before it can do ts job appropriately.
17         So the second bullet point, if you will, on this
18  slide is saying, Okay, I need a longer exposure time for
19  this to work if I'm going to have a flash. Now, we get into
20  your question. Your Honor, thanks for your patience in
21  going through this.
22         Now, it's saying, Okay, when I'm going to take
23  this, I'm calculating the exposure time and gain to
24  compensate for the increased light of the flash. Right.
25  I'm not going to use the same time I keep the equivalent in

12

1  a film camera, the shutter open, right, if there's a flash
2  as if there was daylight.
3          The highlighted part at the bottom is why we're
4  getting to what the purported invent on is. It's not just
5  saying I'm going to calculate it gener cally. I want to
6  know the type of flash device.
7          So going back to Sl de 16, Mike, if you don't
8  mind. This is why it's saying in response to the yellow
9  language is what t's doing, and we can talk about
10  calculating differently when Your Honor wishes. But the
11  reason why t's saying ts response to is the stuff in pink,
12  the ind cator indicating a presence.
13         THE COURT: The stuff in pink which I would call
14  brown?
15         MR. BLUESTONE: Brown or salmon. Obv ously, our
16  color management needs to be improved.
17         THE COURT: No, colors never come out the way
18  you think they will come out.
19         MR. BLUESTONE: Yeah, of course. So the
20  ind cator part of t is where t's saying, okay, what do I
21  do to do this calculation? What do you need to tell me to
22  make this happen? I need to know from the indicator, are
23  you using a Xenon flash or are you using a LED flash? And
24  if we go through, for example, Figures 5, 7 --
25         THE COURT: But --

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                                          C.A. No. 20-136-RGA-JLH

13

09 15 27 **1**      MR. BLUESTONE:  Sorry.

09 15 28 **2**      THE COURT:  -- let's assume, yeah, okay, that's

09 15 31 **3** what the ind cator is going to do, tell you a different kind

09 15 33 **4** of flash device.  How does that impact the fact that the

09 15 40 **5** camera may have, you know, the equivalent of lookup tables?

09 15 47 **6** Does this kind of device do this or does that kind of dev ce

09 15 50 **7** do that?

09 15 51 **8**      MR. BLUESTONE:  So if we go to the next slide,

09 15 53 **9** Slide 20 or Sl de 23, it's not the next one.  I'm slightly

09 15 57 **10** out of order.  I know it's hard to see, but I'm just going

09 15 59 **11** to use the blue and yellow to address what's going on.

09 16 03 **12**      THE COURT:  Yeah.

09 16 03 **13**      MR. BLUESTONE:  The color things have to change.

09 16 06 **14**      THE COURT:  So I've also got the patent in front

09 16 09 **15** of me --

09 16 09 **16**      MR. BLUESTONE:  Great.

09 16 10 **17**      THE COURT:  -- so I can read t actually.

09 16 14 **18**      MR. BLUESTONE:  Terrific.  If we look at these

09 16 16 **19** port ons, basically t's Column 15, Column 7, and Column 9.

09 16 17 **20** They're each dealing with different circumstances.

09 16 20 **21**      One is saying:  Is it a Xenon light?  One is

09 16 23 **22** saying:  Is it a LED light?  What it's first going to do in

09 16 26 **23** that blue, and I apologize, it's a l ttle hard to read, it's

09 16 29 **24** going to say:  What's the current lighting environment?  Do

09 16 31 **25** I need a flash?

14

09 16 33 **1**      Then t's going to go and say -- and those kind

09 16 35 **2** of first yellow highlighted portions, Your Honor, and that's

09 16 39 **3** Column 5, Line 30; Column 7, Line 68; Column 9, Line, I want

09 16 46 **4** to say that's 37 or so, it's explaining exactly your

09 16 50 **5** question.  I'm going to go access this and tell me what

09 16 53 **6** flash type it is.

09 16 55 **7**      Why do I want to know this?  Well, the next of

09 16 57 **8** t talks about the mode of calculation it needs to use now.

09 17 00 **9** And that's the sections before.  It says referring to

09 17 03 **10** Figure 5, referring to Figure 7, referring to Figure 9.

09 17 06 **11** It's not calculating it in the same manner anymore.

09 17 09 **12**      If it's a Xenon light, it can't control -- it

09 17 13 **13** can't control the amount of time, the exposure.  It's just

09 17 16 **14** going to do a burst, right, like an old school flash, like

09 17 18 **15** with the guy with the powder.  That's basically what the

09 17 21 **16** Xenon is doing.  It's going to be a big bright bust, a LED

09 17 24 **17** light.  They can keep it going for a longer amount of time.

09 17 27 **18**      So as shown in Figure 5, for example, it's going

09 17 32 **19** to go and talk about the exposure time.  It's going to say,

09 17 35 **20** I can control that flash, how long it's on, if it's an LED,

09 17 38 **21** so I'm going to use this calculat on.  But if it's a Xenon

09 17 41 **22** light, I can't do much, so I'm going to focus on the gain.

09 17 44 **23**      Sorry if I went a little long, Your Honor.

09 17 46 **24**      THE COURT:  No, t's all right.

09 17 47 **25**      MR. BLUESTONE:  Okay.  So essentially to get

15

09 17 49 **1** back to your question, why are we doing this, because the

09 17 52 **2** whole purported invention and what the examiner says and

09 17 56 **3** first off ce action allowance is I'm doing these

09 18 01 **4** calculat ons depending on what type of flash device  t is.

09 18 03 **5** That's the purported innovation.  I have a small thing --

09 18 08 **6** sorry.

09 18 08 **7**      THE COURT:  So let's just stop for a second.  So

09 18 10 **8** the first office allowance, what that means is the inventor

09 18 13 **9** sent in their appl cation here, and by return mail or

09 18 17 **10** somewhere thereafter got something saying approved; right?

09 18 21 **11**      MR. BLUESTONE:  Right.

09 18 22 **12**      THE COURT:  So other than what the patentee put

09 18 25 **13** in the specificat on, there are no statements by the

09 18 33 **14** patentee, you know, disclaiming anything, explaining

09 18 37 **15** anything, et cetera; right?

09 18 39 **16**      MR. BLUESTONE:  That's absolutely fair.  So if

09 18 41 **17** we go to Slide 14, please, Mike.  And to be honest, it's

09 18 44 **18** kind of patent lawyer snark.  When we go and say t's a

09 18 49 **19** first off ce allowance, we're saying the examiner didn't

09 18 51 **20** give us any reject ons to get any insight or really apply

09 18 54 **21** it.  So without being negative about  t, I'll ignore the

09 18 59 **22** first off ce allowance part of  t.

09 19 03 **23**      But what he does say is highly relevant to what

09 19 01 **24** we're talking about because it's intrinsic ev dence that

09 19 04 **25** will inform a person of ordinary skill in the art what this

16

09 19 06 **1** invention is about.  So  t is highly relevant.

09 19 09 **2**      It's not a disclaimer.  We concede that.  That's

09 19 11 **3** not why we're using it, but it does help us to understand

09 19 14 **4** why t says in response to.

09 19 17 **5**      The last highlighted section, which in

09 19 20 **6** Plaintiff's arguments, they kind of ignore this, is really

09 19 22 **7** what's important.  Nowhere in the prior art is the concept

09 19 26 **8** of determining the gain and exposure based on wh ch of the

09 19 29 **9** several flash devices have been attached.  That's the whole

09 19 34 **10** purpose.

09 19 37 **11**      THE COURT:  But I guess, then, I don't see how

09 19 40 **12** that has anything to do with default values or anything else

09 19 43 **13** or what Mr. Vowell's arguing about.  It is, yeah, before you

09 19 51 **14** start doing things about gain and exposure, the indicator

09 19 55 **15** has to tell you whether t's a Xenon, or LED, or perhaps

09 19 59 **16** some other kind of flash device.

09 20 01 **17**      But once  t tells you that, if you've got,

09 20 11 **18** you know, your program that for Xenon does this, doesn't that

09 20 11 **19** meet the claim?  Isn't that, you know, captured by the

09 20 15 **20** limitat on?

09 20 16 **21**      MR. BLUESTONE:  No, I don't think so.  And can

09 20 19 **22** we go to Slide 8 real qu ck?  I think the issue at hand and

09 20 22 **23** the confus on is because Plaintiff's posit on is somewhat --

09 20 27 **24** well, it is substituting the flash signal for what the

09 20 31 **25** indicator is.  What they're essentially doing, and this is

**Exhibit C**

Markman Hearing Transcript (D.I. 59)                      C.A. No. 20-136-RGA-JLH

---

17

1  in DI-11 at 10, when they first said we can't dismiss this
2  case on the pleadings because we need to do claim
3  construct on, their argument is that there's this strobe
4  signal in the accused products. And obviously, we're not
5  going to talk about what a strobe signal is. This isn't
6  infringement.
7          But they're saying the thing that turns on the
8  flash device is what we're saying the indicator is.  If
9  that's the case, it has nothing to do with the invention
10  anymore.  The thing that turns on the flash device is the
11  flash signal.
12         Go to Slide 9, please.  And if you look at
13  dependent claim 6, it's not the case.
14         THE COURT:  But I don't understand.  I've lost
15  the thread of why do we care what turns on the flash device?
16         MR. BLUESTONE:  We don't, but the reason why I'm
17  saying that is their argument is essentially to try to
18  convert the claim to say if you can pre-program this device
19  to say I know there's a flash signal, and I'm going to put
20  in a setting to say  t's a Xenon flash, that's sufficient to
21  read on the claim.
22         It's not.  Dependent claim 6 is the only time
23  we're talking about a flash signal.  So all their default
24  values are trying to say what's turning on the flash, it's
25  wholly irrelevant.  That's why we think the confus on is

18

1  raised.
2          THE COURT:  You have to explain that to me
3  again.
4          MR. BLUESTONE:  Sure.
5          THE COURT:  Go back to claim 1.  I understand
6  what you're saying about claim 6, generally.
7          MR. BLUESTONE:  Okay.
8          THE COURT:  Go back to claim 1 and explain to me
9  what it is that you're concerned about here.
10         MR. BLUESTONE:  Sure.  Slide 16, please.
11         So in response to us where this all kind of
12  started from, we have an indicator set to ind cate.
13         THE COURT:  Yeah.
14         MR. BLUESTONE:  The exposure time and gain are
15  associated with the first flash device, wh ch we can talk
16  about later, means how  t's calculating differently in
17  response to indicator ind cating a presence in the first
18  device.  You can't have a default value in their
19  circumstance.
20         In theory, you could pre-program it, but that's
21  not the point of the invention.  The point of the invention
22  is these two cond tional wherein clauses, I'm going to do
23  this if that one is attached.  I'm going to do that if this
24  one is attached, first or second device.
25         So default value is not really the point at all.

19

1  I guess you could have one, but that doesn't satisfy the
2  first limitat on of indicator which is saying, what is  t
3  set to indicate, one or two?
4          THE COURT:  I'm still not following you.  So the
5  indicator says it's one.  The ind cator says  t's two.  Why
6  can't the program then say, okay, you sa d one, here's what
7  we do in response to one?
8          MR. BLUESTONE:  It can, absolutely.  Is your
9  quest on directed to indicator set or what the in response
10  to is, Your Honor?
11         THE COURT:  It was directed --
12         MR. BLUESTONE:  And sorry.
13         THE COURT:  -- more to the brown part, even
14  though I guess I don't understand why that would be -- in
15  other words, I'm not sure why it's not really directed to
16  the indicator set, but the indicator set is relevant to
17  this.  Tell me why.
18         MR. BLUESTONE:  Sure.  Can you go to Slide 35?
19  So  t says an ind cator is set to indicate.  And
20  for the wherein clause,  t says it's configured to.  The
21  indicator set to ind cate would espouse a different meaning
22  than configured to.  It's not saying capable to.  It's set
23  to indicate.  That's what I was trying to get to w th that,
24  Your Honor.
25         THE COURT:  But, in other words, I don't

20

1  understand because the -- imagine this is just an off-on
2  sw tch.  You could say the switch is set to indicate, you
3  know, whether it's on or it's off.  And then why can't you
4  then have other stuff that's configured to do things in
5  reaction to whatever the ind cator indicates?
6          MR. BLUESTONE:  Oh, so this is the quest on of,
7  hypothetically speaking, I have a product.  I've
8  pre-programmed the indicator set to be one.  Is that the
9  hypothetical is what the --
10         THE COURT:  Well, no.
11         MR. BLUESTONE:  Okay.
12         THE COURT:  I think, isn't -- an indicator set
13  to indicate whether a first flash device or second flash
14  dev ce is present means that basically the indicator will
15  tell you if there is a first flash dev ce or a second flash
16  dev ce?
17         MR. BLUESTONE:  I agree w th that, except to the
18  extent that we're talking about does it merely need to be
19  capable of.
20         THE COURT:  So what do you --
21         MR. BLUESTONE:  It doesn't say configured to
22  indicate.  It says set to ind cate.  And the reason why, as
23  we argued in our brief, is because this is a purely
24  functional limitation, something that ind cates this is
25  functional.  What's the structure for this is this -- there

---

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                                        C.A. No. 20-136-RGA-JLH

---

21

09 25 39  1  needs to be some structure.  It's not the register.  If you
09 25 42  2  look in the spec, it's saying the register stores an
09 25 44  3  indicator.  It's just a value.
09 25 47  4          THE COURT:  Okay.  Well, let's skip that for a
09 25 49  5  minute.
09 25 49  6          MR. BLUESTONE:  Of course.
09 25 50  7          THE COURT:  But what I was trying to get you to
09 25 56  8  explain so that I could understand, maybe you have already
09 26 00  9  explained, but I don't understand is if the ind cator has
09 26 08  10  the capability of indicating the presence of a particular
09 26 13  11  flash dev ce, what it is that is required by the phrase in
09 26 23  12  response to once the indicator has made that indication.
09 26 30  13  What's the minimum that's required thereafter by the claim?
09 26 34  14          MR. BLUESTONE:  So that, Your Honor, is then
09 26 36  15  relating to what associated with means.  The context of --
09 26 40  16          THE COURT:  Well --
09 26 41  17          MR. BLUESTONE:  So --
09 26 41  18          THE COURT:  -- maybe, but you're going to, like,
09 26 45  19  tie this into in response to?
09 26 48  20          MR. BLUESTONE:  Correct.  So if we go to Slide
09 26 49  21  16, and I'll just keep  t simple.  It's a cond tional
09 26 53  22  limitation.  If  t's set to one, something needs to happen.
09 26 57  23  This indicator needs to cause something to happen.  If this
09 27 02  24  indicator thing is -- this indicator is set for flash two,
09 27 07  25  then it has to cause something else to happen.

22

09 27 09  1          THE COURT:  Well, you know, cause is an
09 27 15  2  interesting word.  I mean, if the indicator is set to one
09 27 20  3  and the camera registers that and then does something, you
09 27 28  4  know, with exposure and gain, that would be in response to;
09 27 40  5  right?
09 27 42  6          MR. BLUESTONE:  Yes.  Can we go to Slide 26?
09 27 46  7  This might be more helpful.  This is what we're saying the
09 27 49  8  data operations are.
09 27 51  9          First, in one I have this ind cator that's set
09 27 55  10  to indicate.  Second is going to be in response to that.
09 28 00  11  These things are associated with each other.  So I'm
09 28 02  12  basically -- Your Honor, remember when I went back and I
09 28 04  13  said every dig tal camera has to do some calculation of
09 28 08  14  exposure time and gain.  This is interceding in between to
09 28 12  15  say, okay, I'm going to calculate this exposure time and
09 28 14  16  gain in this manner.
09 28 16  17          So the organization of the claim, which is not
09 28 19  18  in order, is one, there's this indicator that's set.
09 28 22  19          Two, these things are done in response to this.
09 28 26  20  They're associated with.
09 28 27  21          And then, three, that's the values I'm going to
09 28 30  22  put into the register that stores exposure time and gain.
09 28 33  23  Whereas, in the default mode of operat on, if there's no
09 28 36  24  lighting issue, if you're going to use daylight, it's never
09 28 38  25  going to two or three.  It's never going to -- one is

23

09 28 42  1  irrelevant because it's just going to do the normal way of
09 28 45  2  what step three is, putting exposure time and gain.  When
09 28 48  3  you're using the purported invention, you're stepping in to
09 28 52  4  say don't do it the normal way, do it this different way.
09 28 58  5          So in response to is a condit onal limitation,
09 29 00  6  an if-then that happens in the claim.  They're not
09 29 04  7  both happening at the same time.  Only one's happening
09 29 07  8  depending on what step one says.
09 29 11  9          THE COURT:  But I guess -- all right.  Do you
09 29 17  10  have anything further?
09 29 19  11          MR. BLUESTONE:  No, Your Honor.  I can go to the
09 29 21  12  other issues when they come up.
09 29 23  13          THE COURT:  Let me see if Mr. Vowell has
09 29 25  14  anything he wants to say in response.
09 29 25  15          MR. VOWELL:  Your Honor, I'll keep this very
09 29 31  16  brief.  It's just to say that Plaintiff believes the plain
09 29 35  17  and ordinary meaning should apply.  We had quite a b t of
09 29 37  18  discussion about what we think the plain and ordinary
09 29 39  19  meaning and what the Defendant thinks how the claim should
09 29 43  20  be limited.  So our view is that, instead of importing
09 29 47  21  limitat ons, it should take on the plain and ordinary
09 29 49  22  meaning and as it's written in the claim.
09 29 50  23          That's all I have, Your Honor, unless you have
09 29 52  24  any further questions on that term.
09 30 01  25          THE COURT:  And you agree, I think you've

24

09 30 12  1  already sa d this, but the capabil ties you're talking about
09 30 16  2  here is the ind cator indicates the presence of some flash
09 30 20  3  device; and thereafter, in response to that, the exposure
09 30 28  4  time and gain that would be connected with that dev ce,
09 30 46  5  there is some kind of exposure time and gain that are -- you
09 30 53  6  know, the verb doesn't matter so much, but identified,
09 31 00  7  developed, named that are then stored.  That's what sort of
09 31 02  8  the capability, how those things would work, what the
09 31 05  9  capability is, what  t's capable of doing?
09 31 08  10          MR. VOWELL:  They may already be stored at that
09 31 11  11  time when the ind cator is set to ind cate because you could
09 31 13  12  have values for different types of flash devices.
09 31 16  13          THE COURT:  Yeah, so I don't think -- so if
09 31 44  14  they're already stored, what is the signif cance of the
09 31 48  15  phrase in response to?
09 31 49  16          MR. VOWELL:  It would be if you have values for,
09 31 52  17  for example, two flash devices, two different types of flash
09 31 55  18  devices stored, it would be -- then you would know which set
09 31 59  19  of values you're going to be using in operation of the
09 32 02  20  camera.
09 32 02  21          THE COURT:  Okay.  All right.  Thank you.
09 32 06  22          MR. VOWELL:  Thank you, Your Honor.  And at this
09 32 07  23  point, Plaintiff would be prepared to argue the other terms.
09 32 09  24          THE COURT:  Well, since your view is plain and
09 32 14  25  ordinary meaning, why don't I let the Defendants go first.

---

Exhibit C
Markman Hearing Transcript (D.I. 59)                                    C.A. No. 20-136-RGA-JLH

25

1    MR. VOWELL:  Thank you, Your Honor.

2    THE COURT:  Defendant.  So you can p ck

3 wh chever one you want, Mr. Bluestone.

4    MR. BLUESTONE:  Thank you, Your Honor.  One

5 brief point I want to make.  Sure, we address here --

6 there's this statement that Plaintiff's counsel raised that

7 you can have values for different flashes.  From a techn cal

8 standpoint, you can't simply have values associated with the

9 flash's exposure time and gain.  Slide 23, I think it was,

10 exposure time and gain calculations need to know what's in

11 blue, the current lighting environment.

12    With that, I'll turn to -- or sorry, if you have

13 any quest ons on that, Your Honor?

14    THE COURT:  Well, I mean, why can't the values

15 that would be stored as if the lighting conditions are X,

16 then the value was Y?

17    MR. BLUESTONE:  It could.  That's correct.

18    THE COURT:  Okay.

19    MR. BLUESTONE:  You could have those things

20 stored, pre-stored.  My point is you can't have values that

21 are associated solely to a flash device.  Right.  I can go

22 and say if the lighting environment is exactly this much of

23 illumin on, do this.  In practical ty, you'll interpolate

24 between those two values, but it always needs to take a

25 measurement of the current lighting and apply it.

26

1    My point is, Your Honor, the argument of we can

2 just have values tied to a flash  tself, it doesn't work.

3 That's not -- it's not technically possible if you're taking

4 a p cture.

5    THE COURT:  And that goes to which of these

6 construct ons?

7    MR. BLUESTONE:  That goes to their argument that

8 in response to, you can just have default values for those.

9 It can't be just default values.  The values --

10    THE COURT:  The default values -- I mean, I

11 guess it depends on what you mean by default values, because

12 I think the default value is if this, then that.  And even

13 if you have to interpolate between the two of them, why

14 aren't those just stored values?

15    MR. BLUESTONE:  You can have stored exposure

16 time and gain values, in theory, is what they're saying.

18 But in a practical reality, your exposure time and gain is

18 calculated for every single time you take a p cture.  So if

19 you're standing w th your old-school SLR camera and you had,

20 you know, ISO 100, you know, this would be the old Nikon

21 camera, and you had  t in auto mode, it's figuring out how

22 long to keep that shutter open and closed.

23    You take a picture.  Here, it's taking an actual

24 light measurement.  A light sensor is going to say how much

25 light is here.  It's going to say keep the shutter open for

27

1 this long.  If we go outside and  t's sunny, it's going to

2 have that shutter speed slower.

3    That's my point, Your Honor.  These numbers,

4 exposure time and gain, are calculated at the time of the

5 snapshot irrespective.

6    THE COURT:  By the way, the claims here, the

7 claims themselves are not limited to mobile phones; right?

8    MR. BLUESTONE:  No, Your Honor.

9    THE COURT:  I mean, they could be just any

10 camera?

11    MR. BLUESTONE:  It's a camera module.

12    THE COURT:  Right, but I mean, it could be a

13 camera module in a camera?

14    MR. BLUESTONE:  Correct.

15    THE COURT:  Okay.

16    MR. BLUESTONE:  Our position is not -- it's not

17 limited by the structure that's accompanying the camera

18 module.  And the claim doesn't even call for a lens, for

19 example.  It's just this image sensor array, a gain

20 amplifier.  So bas cally the exposure time, the gain and

21 memory, that's  t.

22    THE COURT:  Okay.  All right.  So what are you

23 talking about now?

24    MR. BLUESTONE:  Can we talk about indicator,

25 Your Honor?

28

1    THE COURT:  Sure.

2    MR. BLUESTONE:  Let's go to Sl de 6, please.  So

3 this is the claim language we already discussed in the

4 brown, orange, or whatever color it may be.  Go to Slide 7.

5    There's two key issues I want to get across

6 here.  One is Plaintiff is saying we're going to apply the

7 plain meaning.  They're not applying any plain meaning that

8 could be ascribed to is present.

9    In their brief at Page 17, so DI-52 at 17,

10 they're saying is present means ultimately paired with.  So

11 as a first point, we just want to make sure that we're in a

12 posit on almost -- well, like 02 Micro where we're not

13 agreeing to the plain meaning.  This isn't a question of,

14 oh, they're trying to narrow it.  We don't even agree on

15 what the plain meaning is.

16    So under essentially 02 Micro, because we have a

17 claim dispute here, we can't just say plain meaning because

18 we don't know what their plain meaning is.

19    THE COURT:  Well, you might be wrong about that.

20    MR. BLUESTONE:  I might be, Your Honor, and I

21 would, obv ously --

22    THE COURT:  But tell me this, because I or I

23 remember reading this is present, but I don't think I

24 understood what your argument was or is.

25    MR. BLUESTONE:  We have no -- we say is attached

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                                        C.A. No. 20-136-RGA-JLH

---

### 29

09 36 55   1   because that's what the examiner says, and that is a plain
09 36 58   2   meaning of what is present means in the context of this
09 37 01   3   claim. We're proposing to you an understood, plain meaning.
09 37 05   4       If Plaintiff agreed that is present ascribes the
09 37 08   5   normal plain meaning, not what could be in the future, but
09 37 10   6   what is here right now, we wouldn't have a dispute as to the
09 37 14   7   plain meaning. In other words --
09 37 25   8       THE COURT: And I guess I'm not sure that I
09 37 29   9   understand the dispute here then because you could have an
09 37 39  10   indicator, I suppose, set to ind cate whether a first flash
09 37 43  11   device or second flash device is present. And if such a
09 37 48  12   device is attached, that's going to be is present. And it
09 37 54  13   will, I guess, indicate something. And if  t's not
09 37 58  14   attached, and it's not present, it's going to indicate
09 38 01  15   something else.
09 38 01  16       What other kinds of options are there?
09 38 04  17       MR. BLUESTONE: I think that's right, Your
09 38 05  18   Honor. The option that's being presented by Plaintiff is
09 38 08  19   that it's what may ultimately be paired with that we're
09 38 11  20   taking issue with.
09 38 11  21       THE COURT: Well, isn't this really, then, just
09 38 13  22   a question of, you know, what point in time are you looking
09 38 17  23   at this module? Because at some point in time is going to
09 38 24  24   have -- well, it could be just a question point of time
09 38 32  25   because if -- I guess if nothing is actually present at a

### 30

09 38 39   1   part cular instance in time, what is the significance?
09 38 44   2   Because if later on if something is present, and an
09 38 48   3   indicator indicates it's present, it at least at that time
09 38 51   4   is meeting the lim tation; right?
09 38 54   5       MR. BLUESTONE: Yes, Your Honor. By way of,
09 38 56   6   let's say, an analogy, an indicator is going to assess what
09 39 00   7   a condition is, right. I can have a speedometer that's
09 39 04   8   indicating how fast am I going.
09 39 05   9       THE COURT: Sure.
09 39 05  10       MR. BLUESTONE: You could have that in a plane.
09 39 07  11   It doesn't really -- like I could have that indicator in a
09 39 10  12   flight simulator that's saying it's 500 knots. It's still
09 39 13  13   saying  t's at 500 knots. So an indicator in this is: What
09 39 16  14   is the present condition? Tell me what the present
09 39 18  15   condition is.
09 39 19  16       Specifically here, flash device one or flash
09 39 22  17   device two, that's what the ind cator is. What they're
09 39 25  18   trying to indicate is it's almost a compatibility test, not
09 39 29  19   at all what is going on, but what may I use in the future.
09 39 31  20   What flash devices could I use?
09 39 33  21       THE COURT: Well, I guess what I don't
09 39 34  22   understand is this may I use in the future.
09 39 47  23       MR. BLUESTONE: Your Honor, that's their
09 39 48  24   argument. I'm happy to defer and let them explain why it's
09 39 53  25   what may ultimately be paired with. Our point is that's not

### 31

09 39 57   1   a plausible plain meaning. And if they're saying you have
09 39 58   2   to set forth a plain meaning, our concern is we have an
09 40 00   3   Order that says plain meaning. We go before the jury, and
09 40 04   4   now they're arguing before the jury, Oh, this thing shows
09 40 05   5   it's compatible, and that's as to what's present. That
09 40 08   6   can't be a plain meaning.
09 40 18   7       THE COURT: All right. Okay. So you sa d you
09 40 21   8   have two disputes here.
09 40 23   9       MR. BLUESTONE: Sure.
09 40 23  10       THE COURT: What's the other one?
09 40 24  11       MR. BLUESTONE: The other one is really like
09 40 27  12   low-hanging fruit. If we go to Slide 9, their argument, and
09 40 30  13   if they put up their Slide 9 -- Slide 7, pardon me, of their
09 40 34  14   pos tion. They're going to go and be highlighting this
09 40 37  15   flash signal, Figure 6 and 8. And I'll let them get to it,
09 40 41  16   but what's important here, Your Honor, is regardless of the
09 40 43  17   plain meaning, even if we don't know what any of these
09 40 45  18   things mean, we know for sure by virtue of dependent claim 6
09 40 49  19   and the supporting language in the spec that the indicator
09 40 52  20   is not a flash signal. They are two separate things.
09 40 56  21       The stuff in the brownish orange, whatever color
09 40 59  22   we want to say, is the indicator. The blue is a flash
09 41 01  23   signal. By virtue of just grammar and claim construction,
09 41 04  24   these two are not the same thing.
09 41 06  25       If we go to Slide 8, this --

### 32

09 41 10   1       THE COURT: Well, they're not the same thing in
09 41 12   2   the dependent claim. This doesn't necessarily mean they're
09 41 17   3   not the same thing on the independent claim; right?
09 41 19   4       MR. BLUESTONE: I disagree with that, Your
09 41 20   5   Honor, and here's why. If I have a claim that says A, B, C
09 41 23   6   and D, and I have a dependent claim that has element E, then
09 41 28   7   B is not the same thing as E. This is not a circumstance
09 41 31   8   where the dependent claim is modifying an existing one. For
09 41 34   9   example, if claim 6 says --
09 41 36  10       THE COURT: Because your point is flash --
09 41 41  11       MR. BLUESTONE: Flash signal is an addit onal
09 41 43  12   claim limitat on that's being added. So if I have a claim
09 41 46  13   on a pencil, and I have a dependent claim that says wherein
09 41 49  14   I add an eraser, the eraser is not the pencil. ==And what==
09 41 53  15   ==they're trying to do, under what we can glean from their==
09 41 57  16   ==pos tion, is say you infringe, or we're going to argue an==
09 41 57  17   ==infringement theory, rather, Your Honor, based on the flash==
09 42 04  18   ==signal. The flash signal has nothing to do with claim 1.==
09 42 06  19       If they're asserting claim 6, happy to go there.
09 42 08  20   And the evidence of this, Your Honor, is in Slide 8 where at
09 42 14  21   the in tial stage of this case we said, there's no basis for
09 42 16  22   this case. Sorry.
09 42 18  23       THE COURT: But what does flash signal have to
09 42 20  24   do w th the dispute on the first, the indicator term?
09 42 24  25       MR. BLUESTONE: Right. Exactly, Your Honor. We

---

---

**Exhibit C**

Markman Hearing Transcript (D.I. 59)                                C.A. No. 20-136-RGA-JLH

---

**33**

1 would glean from their proposal of plain meaning that
2 they're going to argue to the jury that you can satisfy the
3 indicator claim element by looking at the signal that turns
4 on and off a flash dev ce. And our pos t on is, by a matter
5 of law of claim construct on, they can't go -- Slide 9,
6 please -- they can't go and make that argument. They're
7 legally precluded from that because the flash signal cannot
8 be, as a matter of claim scope, the ind cator.
9 THE COURT: Yeah, that doesn't seem to me to be
10 so much a claim construction argument, as a summary judgment
11 argument.
12 MR. BLUESTONE: Well, Your Honor, I'd be happy
13 to entertain what Plaintiff's posit on is, whether they're
14 going to say t doesn't cover the claims of the flash
15 signal. Their posit on is with this, we don't have a
16 dispute here. But I think from what we've gleaned in the
17 non-responsiveness of this issue in the briefing is they
18 want to say the indicator can be this flash signal.
19 THE COURT: What is a flash signal?
20 MR. BLUESTONE: A flash signal is in any
21 instance you're turning on a flash, you need to have a
22 trigger that's going to say turn on, turn off. It's a light
23 switch. So when I go and I -- in the patent when t's
24 talking about the flash signal when they show their slide --
25 THE COURT: And as a matter of general --

---

**34**

1 leaving as de the claims, is there some reason why a flash
2 signal couldn't say, We got a Xenon device, let's go?
3 MR. BLUESTONE: That would not result in a
4 change in exposure time and gain without something else
5 happening. You could -- in theory, I think your argument
6 is, hypothetically speaking, what if I have a flash signal
7 that's telling me what type of flash I'm going to use. Is
8 that kind of what --
9 THE COURT: I mean, I guess. You know, based on
10 what you said a flash signal is, and your main argument
11 about it seemed to be that it couldn't be the same thing as
12 an ind cator because of the way the claim is set up. But in
13 terms of whether you could have, you know, an indicator that
14 decides for ind cating which device is attached or present
15 also says, okay, trigger t.
16 MR. BLUESTONE: You could have a hypothetical
17 dev ce in which the flash signal is not merely just
18 outputting. And this is the subject of what our motion to
19 dismiss was, Your Honor, but t is, again, relevant to the
20 claim construction here as well. You could hypothetically
21 have a flash signal that has output that says, I know this
22 is an LED, and then loops that information back in, and the
23 system calculates exposure time and gain.
24 It can't be something that is merely a light
25 switch that doesn't tell the system what to do at all. This

---

**35**

1 relates back to in response to. Right. It's got to
2 effectuate a change in the system. It can't be merely I'm
3 turning something on or off.
4 We argued this, just for background context, at
5 DI-11 at 10. Sorry. That's the Plaintiff's position to
6 avoid the ruling on mer ts. They said, Look, whether the
7 strobe signal, this light switch on or off is encompassing
8 the claims, is a matter of claim construction. Now, that
9 we're at claim construction, they are saying we don't need
10 to construe the claim.
11 So that was kind of my 02 M cro issue, Your
12 Honor. We clearly have a claim dispute. You can say plain
13 meaning, but we need to know, at a minimum, that it's not
14 the flash signal, which is what Slide 9 is showing.
15 So to your point, Your Honor, I think you raised
16 a very, very good point of, well, what about this
17 hypothet cal device that's combining both of them? Yes, you
18 could have both of those limitations be met in one accused
19 product, structure, absolutely, but the claim requires that
20 you have an ind cator that is going to tell you what that is
21 that's going to be used for the purpose of effectuating a
22 change.
23 THE COURT: Well, so if you agree that you could
24 have a device that does both at once, then if you have a
25 dependent claim that says this is a dev ce where it doesn't

---

**36**

1 do it both at once, haven't you then narrowed the scope from
2 the independent claim? And yet, it doesn't mean the
3 independent claim couldn't include devices that do it both
4 at once.
5 MR. BLUESTONE: The independent claim,
6 absolutely, could have a device that includes both at once,
7 but t has to absolutely do what claim 1 requires which is
8 serve as an indicator. It can't just be a light sw tch. It
9 has to tell you the light is on and it's this type and
10 effectuate a change in the system. It can't merely be an
11 output signal that's going to say lights are on.
12 THE COURT: All right. And I don't see how -- I
13 mean, part of t is I don't understand how your proposed
14 construct ons -- yeah, okay. They're different than the
15 plain meaning, but I don't understand how they tie into the
16 argument that you've actually been making.
17 MR. BLUESTONE: Fair enough, Your Honor. Let's
18 go to Slide 10. So our construct on is a stored value
19 identifying whether a first or second flash dev ce is
20 attached to the camera module.
21 Let's start from the end and go to the
22 beginning, if that's okay. Attached to the camera module is
23 saying, is t present? That's it. If Your Honor is fine
24 with is present and their position is not it may be
25 ultimately paired with, t's just something that's here,

---

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                                        C.A. No. 20-136-RGA-JLH

---

**37**

| | |
|---|---|
| 09:47:59 1 | we're fine w th is present.  We're using attached to try to |
| 09:48:02 2 | give us a word for what it means. |
| 09:48:06 3 | Identifying is what the indicator has to do. |
| 09:48:08 4 | It's effectuating knowledge to the system.  I know flash one |
| 09:48:13 5 | or flash two is there.  So indicate and  dentify, we're |
| 09:48:17 6 | using again a synonym.  Stored value is -- let's go to Slide |
| 09:48:21 7 | 11, please. |
| 09:48:23 8 | In Column 1, lines or Column 3, Lines 1 |
| 09:48:26 9 | through 6, it says register is configured to store a |
| 09:48:31 10 | flash-enabled flash-type indicator.  This is telling you in |
| 09:48:35 11 | the claim, it's not saying I want the physical structure of |
| 09:48:37 12 | a register.  That's what's in the stored -- in the |
| 09:48:40 13 | plurality of storage locations.  It's saying it's a stored |
| 09:48:43 14 | value.  In their brief, they said something like a register |
| 09:48:46 15 | may serve as an indicator. |
| 09:48:48 16 | No, the indicator is what's in the register.  So |
| 09:48:51 17 | stored value is our best attempt, Your Honor.  It's trying |
| 09:48:55 18 | to give some structure to what this value is. |
| 09:48:59 19 | Your question was, Your Honor, though, how does |
| 09:49:01 20 | this relate to the arguments we're making.  Our point is -- |
| 09:49:04 21 | go to Slide 10 again, please, and put the construction back |
| 09:49:07 22 | up.  Our point is a flash signal is not a stored value.  It |
| 09:49:12 23 | is a waveform that's going to turn on and off.  The waveform |
| 09:49:17 24 | meaning like a voltage that's going across. |
| 09:49:20 25 | Let's say, for a Xenon flash, all I have to do |

**38**

| | |
|---|---|
| 09:49:24 1 | to turn it on, and you'll probably see this in their SI de |
| 09:49:26 2 | 7, Your Honor.  In their figure, Figure 8 of the patent, the |
| 09:49:31 3 | Xenon flash trigger is just a burst.  It just goes high. |
| 09:49:34 4 | Turn on.  Right.  W th the LED flash, it signals a different |
| 09:49:39 5 | shape. |
| 09:49:40 6 | Those two things are not stored values |
| 09:49:42 7 |  dentifying what's there.  They're just the format of the |
| 09:49:45 8 | light switch turning on and off. |
| 09:49:48 9 | So our argument is this construct on makes sure |
| 09:49:53 10 | that claim 1 and what it is is not overreaching to claim 6, |
| 09:49:58 11 | flash signal. |
| 09:49:59 12 | THE COURT:  All right. |
| 09:49:59 13 | MR. BLUESTONE:  Thank you, Your Honor. |
| 09:50:00 14 | THE COURT:  Thank you.  Mr. Gunter. |
| 09:50:09 15 | MR. GUNTER:  Good morning, Your Honor. |
| 09:50:09 16 | THE COURT:  Good morning. |
| 09:50:10 17 | MR. GUNTER:  So if I could address just a few of |
| 09:50:13 18 | these points, if the Court would allow.  I think part of the |
| 09:50:16 19 | disconnect here is that we're wanting to focus on the |
| 09:50:20 20 | indicator and the capability of the indicator, whereas the |
| 09:50:25 21 | Defendants are wanting to focus on the flash device and the |
| 09:50:27 22 | presence of the flash dev ce. |
| 09:50:29 23 | ==So the claims are really directed towards the== |
| 09:50:32 24 | ==capabil ty of the ind cator.==  It's an indicator that is set |
| 09:50:35 25 | to ind cate, and  t doesn't require actual attachment. |

**39**

| | |
|---|---|
| 09:50:40 1 | So there was a lot -- Mr. Bluestone went through |
| 09:50:43 2 | quite a bit just a minute ago walking through some of these |
| 09:50:46 3 | steps that he sees happening, and he was kind of reordering |
| 09:50:51 4 | claim 1, one, two, and three steps.  Our point is that the |
| 09:50:54 5 | flash dev ce isn't actually even a claim limitation. |
| 09:50:58 6 | And if you go and look at, for example, one of |
| 09:51:00 7 | the preferred embodiments, Figure 1, it shows the camera |
| 09:51:08 8 | module of claim 1.  For example, this is one preferred |
| 09:51:11 9 | embodiment, and you'll see that the camera module is |
| 09:51:13 10 | highlighted in red or brown on the screen up here.  And the |
| 09:51:17 11 | flash dev ce 114 is down at the bottom.  It's not included |
| 09:51:20 12 | in claim 1.  It's not a part of claim 1.  It's not a |
| 09:51:23 13 | limitation of claim 1. |
| 09:51:24 14 | And so it's unnecessary and unfair to require |
| 09:51:29 15 | that the claim includes the flash device.  Instead, what |
| 09:51:34 16 | claim 1 is doing is it's directed towards the indicator set |
| 09:51:37 17 | to indicate, and the fact that it has the capability to |
| 09:51:40 18 | indicate a flash device. |
| 09:51:42 19 | So let's take, for example, Mr. Vowell earlier |
| 09:51:46 20 | gave a hypothetical to the Court of whether there's default |
| 09:51:48 21 | values or what if whenever this device is manufactured, you |
| 09:51:52 22 | could have something set at that time.  And it could be an |
| 09:51:56 23 | indicator that is set to indicate whether, let's say, |
| 09:51:59 24 | ultimately, to your point, Your Honor, can these devices be |
| 09:52:02 25 | used with phones, or tablets, or cameras. |

**40**

| | |
|---|---|
| 09:52:05 1 | Well, what if at the time of manufacture, your |
| 09:52:08 2 | setting that you think you want it to be on a tablet that |
| 09:52:10 3 | has a LED flash type, you could set it.  You could have an |
| 09:52:13 4 | indicator set to indicate that it would be used with LED. |
| 09:52:16 5 | It then, ultimately, could be paired with a tablet that has |
| 09:52:20 6 | an LED.  But what matters for purposes of claim 1 is that |
| 09:52:24 7 | it's an indicator set to indicate that it's going to |
| 09:52:26 8 | ultimately be w th an LED. |
| 09:52:29 9 | So I think that's where we saw the disconnect |
| 09:52:32 10 | happening.  It's really the actual attachment versus |
| 09:52:35 11 | capability. |
| 09:52:36 12 | And if I could also hit -- |
| 09:52:38 13 | THE COURT:  So I mean, basically is present, is |
| 09:52:41 14 | attached, your argument is the same no matter wh ch language |
| 09:52:44 15 | is used; right? |
| 09:52:45 16 | MR. GUNTER:  We see as attached as being actual |
| 09:52:47 17 | attachment and focusing on -- |
| 09:52:51 18 | THE COURT:  And how come is present isn't actual |
| 09:52:53 19 | presence? |
| 09:52:53 20 | MR. GUNTER:  I think, keeping it the way that |
| 09:52:58 21 | the plain and ordinary meaning as written for the claim |
| 09:52:58 22 | language, it's talking about the indicator set to indicate, |
| 09:53:02 23 | whether that's present. |
| 09:53:03 24 | THE COURT:  Yeah, well or set to indicate |
| 09:53:05 25 | whether it's attached, aren't those the same things? |

| | | | |
|---|---|---|---|
| 10/26/2021 08:38:10 AM | Page 37 to 40 of 65 | | 10 of 26 sheets |

**Exhibit C**

Markman Hearing Transcript (D.I. 59)                    C.A. No. 20-136-RGA-JLH

41

```
09 53 07   1        MR. GUNTER:  In our mind, they're not.  In our
09 53 09   2   mind, attached requires the actual attachment.  And I
09 53 13   3   believe that's what I heard Mr. Bluestone say is that he
09 53 15   4   wants there to be an actual attachment because he's wanting
09 53 19   5   to walk through a series of events of things that are
09 53 22   6   happening.  You're attaching a flash dev ce.  You're
09 53 24   7   dentifying a flash device.  You're calculating --
09 53 27   8        THE COURT:  Well, I don't understand bas cally
09 53 29   9   what you all are arguing about, because to me saying is
09 53 32  10   present or is attached is the same thing.  And because the
09 53 39  11   inventor sa d is present, I'm going to go with is present,
09 53 39  12   not is attached.  That doesn't mean there isn't a dispute
09 53 42  13   here, but I don't think it's over whether the word is
09 53 45  14   present or attached.
09 53 48  15        You know, it's not like the indicator is going
09 53 50  16   to say we think in the room somewhere there's a flash
09 53 56  17   dev ce.  So it's present.  You know, it may not be attached.
09 54 03  18   So I think that's -- I don't think there's any -- I don't
09 54 13  19   think what the Defendant is proposing is anything other than
09 54 13  20   doing a synonym, so I'm not going to do that.
09 54 16  21        But your view is indicator set to indicate
09 54 24  22   whether a device is present basically is referring -- not so
09 54 30  23   much is referring to -- I mean, essentially you're talking
09 54 38  24   about a computer program where, you know, somewhere in there
09 54 43  25   t says is the device attached; yes or no?  And at some
```

42

```
09 54 50   1   point when the computer program is in some kind of device,
09 54 56   2   then we're that much closer to being able to answer the
09 55 00   3   question.
09 55 01   4        Is that right?
09 55 02   5        MR. GUNTER:  I believe that's correct.  And I do
09 55 07   6   agree with your Honor when you noted that this really seems
09 55 10   7   to be a substitut on of words, which we think is improper at
09 55 14   8   this stage of claim construct on.
09 55 16   9        THE COURT:  Yeah, I'm not much for substituting
09 55 18  10   words that I think that, as far as I can see, don't really
09 55 21  11   change anything.  You know, the inventor picked is present.
09 55 25  12   That works for me.
09 55 27  13        So let me just go on a s de note.  I take t
09 55 39  14   that, I think Mr. Bluestone said this, you agree the claims
09 55 43  15   here, they don't require anything that this could actually
09 55 47  16   just be a dig tal camera; right?
09 55 47  17        MR. GUNTER:  Yes, Your Honor, it is.
09 55 50  18        THE COURT:  Or I mean, t could be in a digital
09 55 52  19   camera as well as a phone, or a tablet, or whatever?
09 55 56  20        MR. GUNTER:  Yes, Your Honor.  I think these
09 55 58  21   dev ces would find their way in a multitude of consumer
09 56 02  22   electronic products, tablets, laptops, phones, cameras.  I
09 56 06  23   don't think claim 1 is specific to --
09 56 10  24        THE COURT:  Well, none of the claims are
09 56 11  25   specific, are they?
```

43

```
09 56 12   1        MR. GUNTER:  No, Your Honor.
09 56 13   2        THE COURT:  Okay.  Do you have anything to say
09 56 31   3   about this, what Mr. Bluestone was talking about of flash
09 56 31   4   device versus indicator in claim 6?
09 56 39   5        MR. GUNTER:  So I would agree with you that that
09 56 42   6   does not appear to be really a claim construction argument
09 56 49   7   because it's not part of their proposed claim construction.
09 56 49   8   We don't see it as being a differentiation, part cularly not
09 56 53   9   a differentiat on of signals as a whole.  We've prov ded a
09 56 56  10   couple other examples here at the center of our screen.  The
09 57 00  11   second main bullet point of other examples in the
09 57 00  12   specificat on that an indicator could encompass.  The
09 57 07  13   specificat on talks about signals, for example, that can be
09 57 11  14   set.  That's in Column 3, Lines 33 to 36, and also shown in
09 57 15  15   Figure 1.  Those are examples of control signals that could
09 57 19  16   be set for indicating.  Also, instructions.  It's listed in
09 57 22  17   Column 2.
09 57 23  18        So we don't see it as being, you know, an
09 57 26  19   exclusion of an indicator only being the stored value in a
09 57 33  20   register.  It can be other things.  And we don't see claim 6
09 57 33  21   as reading those out.
09 57 35  22        THE COURT:  So, okay.  So, but in terms of the
09 57 38  23   phrase, which I guess is actually an ind cator set to
09 57 45  24   ind cate whether a flash device or a second flash dev ce is
09 57 52  25   present --
```

44

```
09 57 55   1        MR. GUNTER:  It's --
09 57 55   2        THE COURT:  -- there has to be present in the
09 58 08   3   module that ind cator.  What does it mean set to indicate?
09 58 19   4        MR. GUNTER:  Okay.  So there are several ways
09 58 22   5   that I think an ind cator can be set to ind cate.  One would
09 58 24   6   be in the preferred embodiment where t does talk about
09 58 27   7   registers, and t has ind cator in the register.  That's
09 58 32   8   shown at Figure 1 and 2.  But there are other examples that
09 58 36   9   the specif cat on gives, such as control signal, control
09 58 40  10   circu ts and signals.
09 58 42  11        THE COURT:  And I guess what I meant is up
09 58 54  12   there, you say, you know, something capable of ind cating,
09 58 54  13   but that's not the language of the claim.  The claim is an
09 58 58  14   ind cator is set to indicate, not an indicator capable of
09 59 02  15   ind cating; right?
09 59 04  16        MR. GUNTER:  It is an indicator set to indicate.
09 59 06  17   We think that goes towards the configurabil ty of capabil ty
09 59 10  18   of that indicator.  And so if you -- you know, from a high
09 59 13  19   level, I'll try to give another real-world example.
09 59 16  20        THE COURT:  Well, so before we get to the high
09 59 16  21   level, are you saying that it should be construed as an
09 59 23  22   ind cator capable to ind cate?
09 59 23  23        MR. GUNTER:  I think we'd be okay w th that or
09 59 27  24   an indicator to indicate --
09 59 30  25        THE COURT:  But where are you getting that from,
```

**Exhibit C**

Markman Hearing Transcript (D.I. 59)                                    C.A. No. 20-136-RGA-JLH

---

45

```
09 59 32    1   because that's not the language, as I think it is pointed out
09 59 36    2   in the briefing later on.  You know, the patentee talked
09 59 40    3   about something being configured to do something.  It talked
09 59 43    4   about it at least three times in the wherein clause, but
09 59 50    5   there's no capable of configured to indicate here.  And
09 59 59    6   there's all kinds of claim construction principles that
            7   suggest that if you have that kind of language one place,
10 00 03    8   and you don't have it some other place, they mean two
10 00 05    9   different sorts of things; right?
10 00 07   10           MR. GUNTER:  I would agree with you generally,
10 00 09   11   yes.  I think our view is that the claim as a whole is
10 00 13   12   really talking about the capability of the apparatus, and so
10 00 16   13   we don't see this limitation as being different.
10 00 18   14           THE COURT:  But it's really not.  You know, the
10 00 20   15   first thing is image sensory array.  Nothing about
10 00 22   16   capability there.  A gain amplifier, nothing about
10 00 24   17   capability there.  You know, a plurality of storage
10 00 28   18   locations.  I mean, you know, you all said, if you sa d t
10 00 34   19   once, you sa d t 50 times in the brief, this is an
10 00 36   20   apparatus claim.
10 00 39   21           And so an apparatus of an indicator set to
10 00 43   22   ind cate does not sound to me like an indicator capable of
10 00 47   23   ind cating.  It sounds like something more apparatus, but
10 00 54   24   I'm not sure exactly what that would be.
10 00 58   25           MR. GUNTER:  And I think t would be Plaintiff's
```

46

```
10 01 00    1   position that, for example, the two alternatives that you
10 01 03    2   gave earlier about operable to, for example, that's how we
10 01 07    3   would view this claim lim tation.  It's really going towards
10 01 09    4   the capability and configuration or configurability of the
10 01 14    5   ind cator set to indicate.
10 01 27    6           THE COURT:  All right.  Do you have anything
10 01 47    7   else on this?
10 01 48    8           MR. GUNTER:  Your Honor, very briefly.  I just
10 01 49    9   wanted to point the Court's atten on to the language that
10 01 53   10   was used by the examiner in the notice of allowabil ty.
10 01 55   11   There was some confus on in the briefing about what exactly
10 01 58   12   the Defendant was pointing to.  So we -- as Sl de 13 here,
10 02 01   13   we've just included a copy of the entire statement from the
10 02 04   14   examiner.  And our point here is that the examiner was not
10 02 07   15   making statements that were distinguishing the prior art at
10 02 11   16   issue on the basis of whether or not it was a camera or,
10 02 15   17   excuse me, a flash device that was actually attached.  What
10 02 17   18   the examiner was doing here was drawing a distinction
10 02 20   19   between the pr or art that showed one flash dev ce versus
10 02 23   20   the patent wh ch has operability with two flash dev ces.
10 02 28   21           And w th that, I'll sit down.
10 02 31   22           THE COURT:  All right.  Thank you.
10 02 35   23           All right.  Mr. Bluestone.
10 02 36   24           MR. BLUESTONE:  Thank you, Your Honor.  I think
10 02 44   25   we're on -- there's been much talk about that we're making
```

47

```
10 02 50    1   this argument that it has to be actually attached.  That's
10 02 53    2   not our posit on.  The first and second dev ces, it's never
10 02 56    3   been our pos tion.
10 02 57    4           In the joint brief on Pages 22 and 23, you see
10 03 00    5   us say indicator may or may not be set accurately, but it
10 03 00    6   must ind cate that there's a first or second flash device,
10 03 08    7   that a first or second flash device is present.  To put it
10 03 08    8   plainly, the flash devices are required, but the indicator
10 03 12    9   must be set to indicate the presence of a first and second
10 03 15   10   flash dev ce.
10 03 15   11           To the extent that Plaintiff keeps saying we're
10 03 19   12   requiring that there has to be one attached, that's not
10 03 22   13   correct.  That's not the position we've cited.
10 03 22   14           By way of the analogy we had before about an
10 03 25   15   airspeed indicator and some flight computer, I can be
10 03 28   16   putting t on a flight simulator on the ground and feeding
10 03 31   17   in some settings and have over 500 knots.  That system can
10 03 35   18   go and say, yes, it's set and run, even though I've never
10 03 37   19   left the ground and the plane isn't moving.  The indicator
10 03 40   20   is set that it's over 500 knots.  It doesn't matter whether
10 03 43   21   it's accurate to the real-world environment.  All it
10 03 45   22   requires is that indicator is set.  So to the extent that
10 03 47   23   we're hearing, oh, it has to be attached, that's not our
10 03 51   24   pos tion.
10 03 52   25           Second, we agree, Your Honor, with where you're
```

48

```
10 03 56    1   going w th is present is fine.  We agree that indicate is
10 03 59    2   fine.  The funct onal language of indicator seems to be in
10 04 03    3   agreement so long as they're not saying is present means
10 04 05    4   compatible or ultimately prepared -- ultimately paired with.
10 04 09    5           The question that we haven't heard from them is:
10 04 11    6   What is the structure of this indicator?  Is it a person
10 04 14    7   looking at the dev ce and saying, oh, I see there's a first
10 04 17    8   or second flash?
10 04 18    9           THE COURT:  I think Mr. Gunter just had some
10 04 24   10   various things that he sa d t could be.  I mean, you know,
10 04 29   11   I think it's the case that there's a specific embodiment in
10 04 40   12   the patent in the specification, and obviously, indicator is
10 04 46   13   a broader term.  And that the Plaintiff is saying, so
10 04 52   14   bas cally we've given you an example, and here's the broader
10 04 52   15   term, so it covers other things.
10 04 52   16           MR. BLUESTONE:  Right.  The quest on in my mind
10 04 57   17   is the converse:  What doesn't it include?  This is an
10 04 59   18   apparatus claim.  What is this indicator not?  They're
10 05 00   19   saying it could be circu try.  Okay.  Stored value is the
10 05 02   20   only thing we say supports t.  If they want to add
10 05 05   21   circu try, we can listen to that.
10 05 07   22           My quest on for them is:  What is the structure?
10 05 09   23   What's the bounds of this construction of what this
10 05 11   24   indicator is?  Is it a nonce word?  Are we at a
10 05 15   25   means-plus-function scenario?  So our best attempt at
```

---

---

**Exhibit C**

Markman Hearing Transcript (D.I. 59)                              C.A. No. 20-136-RGA-JLH

49

10 05 17 1 structure that scored value is to take the spec and put some
10 05 21 2 structure into what it is.
10 05 22 3 And the third point, Your Honor, I want to
10 05 25 4 address is the flash signal issue. Again, I just want to
10 05 29 5 make sure we understand what their position is now,
10 05 31 6 because if you go to Slide 8 of the presentation, this is
10 05 36 7 clearly an issue that is in dispute and has been in dispute
10 05 39 8 since the beginning of the case. Their own words are, t's
10 05 42 9 improper to resolve this issue on whether it can just be an
10 05 46 10 output signal, i.e. a flash signal until you do a claim
10 05 51 11 construction.
10 05 51 12 THE COURT: Well, just because they sa d
10 05 52 13 something in a brief, you know, a year ago doesn't mean it's
10 05 54 14 now something that I have to say, Okay, yeah, I agree with
10 06 01 15 you.
10 06 02 16 MR. BLUESTONE: I see your point to that, Your
10 06 04 17 Honor, but I raise this because of, again, and I don't want
10 06 08 18 to offend by referencing 02 Micro again, but --
10 06 10 19 THE COURT: No.
10 06 11 20 MR. BLUESTONE: -- this is where there's a clear
10 06 12 21 dispute.
10 06 13 22 THE COURT: I get used to people saying 02
10 06 15 23 Micro.
10 06 15 24 MR. BLUESTONE: I'm sure you do, Your Honor, but
10 06 17 25 this is one of those very clear instances where this is in

50

10 06 19 1 dispute. Sl de 9, please. This is a claim construction
10 06 23 2 issue.
10 06 23 3 If you look at their Slide 11, they're saying
10 06 26 4 this is a non-infringement position. Whether or not the
10 06 29 5 blue --
10 06 29 6 THE COURT: But you know, I really don't think
10 06 31 7 that the way your construction, your proposed construction,
10 06 35 8 I don't think, to the extent you're talking about flash
10 06 38 9 signals, you resolve your claim dispute. So I don't think
10 06 48 10 that I'm going to be giving your proposed construction.
10 06 53 11 That's not to say there might not be some
10 06 55 12 dispute buried in there, but I don't think your construction
10 06 58 13 is identifying what the dispute is.
10 07 00 14 MR. BLUESTONE: Your Honor, if it goes the way
10 07 03 15 of you want to adopt plain meaning for ind cator set to
10 07 07 16 indicate, et cetera, we would still venture that even if you
10 07 10 17 want to adopt the plain meaning, there is a claim
10 07 13 18 construction issue via this claim 6, even though t's not
10 07 16 19 asserted, as to whether or not they can do -- as I think
10 07 18 20 they said, that they can argue that a mere flash signal is a
10 07 22 21 sufficient subst tute for indicator. That's a claim
10 07 26 22 construction dispute.
10 07 26 23 THE COURT: Well, no, saying -- well, maybe it
10 07 29 24 is, but I don't think I'm going to be resolving t now.
10 07 37 25 MR. BLUESTONE: All right, Your Honor. And then

51

10 07 41 1 Slide 34 real quick.
10 07 42 2 There was some discussion of the language of
10 07 47 3 configure -- of what the language says with configured to.
10 07 49 4 We would just offer this, and this is in our brief as well,
10 07 52 5 that set up to perform the specified funct on during
10 07 57 6 operation, and to the extent you need a construction for
10 08 02 7 what that is as opposed to capable of is acceptable to us.
10 08 02 8 THE COURT: Yeah. I wasn't going to start just
10 08 05 9 construing things that nobody's actually arguing about.
10 08 09 10 MR. BLUESTONE: Fair enough, Your Honor.
10 08 11 11 THE COURT: I mean, you know, you're throwing
10 08 13 12 around lots of things, means plus function, which I didn't
10 08 19 13 see in the briefing, and so I'm not likely to be just going
10 08 25 14 off on a lark of my own here.
10 08 29 15 MR. BLUESTONE: Fair enough, Your Honor. And I
10 08 30 16 think the point we were trying to make, making now and in
10 08 33 17 the brief is that you can't have a pure functional
10 08 38 18 limitation that isn't tied to some structure. And if you
10 08 43 19 look at claim 1, the ind cator set to ind cate is not
10 08 48 20 claimed as part of the storage locations.
10 08 48 21 So we're trying to say, Your Honor, the issue
10 08 48 22 here is: What is the structure of the indicator? We don't
10 08 53 23 know by the claim out of context.
10 08 56 24 THE COURT: Okay.
10 08 57 25 MR. BLUESTONE: We haven't really gone through

52

10 08 59 1 calculated differently to an extent.
10 09 01 2 THE COURT: Yeah. Well, I'm assuming -- let me
10 09 07 3 check here.
10 09 09 4 MR. BLUESTONE: And I can keep it very brief
10 09 11 5 because we really talked about the context at length to
10 09 14 6 this.
10 09 14 7 THE COURT: Wait a second. I've got this one
10 09 17 8 here.
10 09 18 9 MR. BLUESTONE: Yes, Your Honor.
10 09 37 10 THE COURT: I'm sorry. The calculating, wh ch
10 09 38 11 one is that?
10 09 38 12 MR. BLUESTONE: So that's related with
10 09 41 13 associated with.
10 09 41 14 THE COURT: Oh, right, right. I see it now.
10 09 44 15 Yes.
10 09 44 16 MR. BLUESTONE: So our -- again, you've indulged
10 09 47 17 us grac ously with a little extra time here, so I will keep
10 09 50 18 this brief. This is really analogous to a situation as in
10 09 53 19 that Impulse case that we cite where Judge Burke is saying
10 09 56 20 corresponding, how am I going to construe corresponding?
10 09 59 21 And the plaintiffs say, Look at all the general ways
10 10 01 22 corresponding means. And then he looks at the spec and
10 10 04 23 says, Well, corresponding in this instance is more
10 10 08 24 circumscribed.
10 10 09 25 That's Sl de 22, please. That's what the

Exhibit C
Markman Hearing Transcript (D.I. 59)                    C.A. No. 20-136-RGA-JLH

53

```
10 10 13   1   highlighted language is talking about.  The only time
10 10 15   2   associated w th is used in the spec that's germane to the
10 10 18   3   claims is here where it's talking about calculations.  And I
10 10 23   4   won't overindulge it, but that's kind of the synthesis of
10 10 26   5   why we're saying associated w th can't mean a general,
10 10 28   6   after-the-fact, vague meaning.  We have to look at the
10 10 31   7   particular context in wh ch  t's used in the claim and the
10 10 34   8   spec.
10 10 38   9           THE COURT:  I guess, you know, I don't
10 10 59  10   understand why actually here the plain language isn't just
11 11 02  11   perfectly fine.  If you have the exposure time, the gain are
11 11 05  12   associated w th the first flash dev ce.  You know, the fact
11 11 15  13   that it is connected to the first flash device as opposed
11 11 19  14   to say, the second flash dev ce, you know, it's either
10 11 24  15   going to belong to one or the other.  And you know, if it's
11 11 30  16   just an exposure time and a gain that has no connection to
11 11 34  17   the first flash dev ce, well, then it's not going to be
11 11 37  18   associated w th it.  But if it has some connection to it,
10 11 40  19   why isn't  t associated with it?
10 11 42  20           MR. BLUESTONE:  I guess the question is:  What
10 11 43  21   does some connect on mean?  Like associated with, I'm
10 11 46  22   associated w th my colleague, Mike Educate.  We're
10 11 49  23   associated.
10 11 49  24           THE COURT:  Yeah.
10 11 50  25           MR. BLUESTONE:  There's plenty of ways to say
```

54

```
10 11 52   1   that.  What does it mean?
10 11 53   2           THE COURT:  I think that -- I don't know.  It
11 11 55   3   seems to me, in context, I would think it would be pretty
11 11 59   4   clear whether an exposure time and gain was associated with
12 12 03   5   the first flash dev ce or not.
12 12 07   6           MR. BLUESTONE:  Your Honor, I mean --
12 12 09   7           THE COURT:  I mean, give me an example where I'd
12 12 11   8   say, gee, I can't tell.
12 12 13   9           MR. BLUESTONE:  I think if they try to argue
10 12 14  10   that simply because different exposure time and gain values
10 12 18  11   were used after a different flash device was used, they're
10 12 22  12   going to want to argue to the jury that means it's
10 12 24  13   associated.  Just as a consequence that the numbers are
10 12 27  14   different, stored in the register when you use Xenon or
10 12 30  15   flash, that satisfies the claim.
10 12 32  16           And I don't think that's right.  It's not just
10 12 34  17   that something different happens.  They're associated.
12 12 37  18   There's an active funct on that is performed in the
12 12 41  19   apparatus that  t's configured to.
10 12 42  20           Again, I'm going to get jumped on this.  We're
10 12 45  21   not saying it's a method claim.  We are saying, though,  t
10 12 47  22   is a -- if you have an operation, the operat on has to be
10 12 50  23   configured to perform these acts.
10 12 53  24           So if they're going to say that by virtue is I
10 12 55  25   could look at this and see that I got different values,
```

55

```
10 12 58   1   boom, it's been associated w th, that's overreaching and way
10 13 01   2   broad beyond the scope.  Candidly, that's our concern, Your
10 13 05   3   Honor.
10 13 05   4           THE COURT:  Well, so, you know, I mean, a lot of
10 13 07   5   the things that perhaps both sides, but mostly your side are
10 13 13   6   raising in this brief are, you know, these tricky people on
10 13 16   7   the other s de, they're going to argue this.  They're going
10 13 18   8   to argue that.  We have to rope them in.
10 13 22   9           I don't really think that, generally speaking,
10 13 26  10   that's the point of claim construct on.  You know, claim
10 13 29  11   construction, part cularly when you do it early in a case
10 13 32  12   like this, is it's a kind of abstract thing.  What do the
10 13 36  13   claims mean?
10 13 37  14           And you know, arguments that stretch the claims
10 13 42  15   beyond what there is actually there, you know, that's a good
10 13 46  16   thing to deal with at summary judgment when there's a
10 13 51  17   connect on between the claims and what people are arguing.
10 13 54  18   But right now, you know, I've just got your essentially
14 00 00  19   parade of horribles about what these people are likely to be
14 04 03  20   doing down the road and trying to do claim construct on to
14 04 07  21   guard against the most horrible of the parade.  It doesn't
14 04 11  22   strike me as what I'm supposed to be doing here.
14 04 14  23           MR. BLUESTONE:  I appreciate that, Your Honor,
14 04 14  24   and I think part of that parade was identified at the onset
14 04 19  25   of the case in our motion to dismiss, and some of these
```

56

```
14 04 21   1   issues have been flagged.  And we do know enough to bring it
14 04 24   2   to your attent on the issues that we're conf dent are coming
14 04 26   3   up.  Like flash signal, not to deviate from this point, is
14 04 30   4   something we know is in dispute.  That is actively
14 04 33   5   established right now in dispute.
14 04 35   6           Associated w th, I would want to know what
14 04 38   7   they're going to argue.  We're saying, well, someone could
14 04 41   8   have this situat on.  I would like to know their position on
14 04 45   9   what the boundaries of associated w th are.
14 04 45  10           Take my hypothetical.  Are they saying
14 04 47  11   associated with can encompass simply that what's stored in
14 04 51  12   those registers, the exposure time and gain happen to be
14 04 54  13   different?  Just they happen to be different, that's enough.
14 04 58  14   I would say that that's not consistent with the scope of the
15 01 01  15   claim.  It has to cause a difference based on that, based on
15 01 06  16   that ind cator set, but I fully appreciate your point.
15 01 11  17           THE COURT:  But you would agree that on that
15 01 13  18   particular thing, you are not going with what the plain and
15 01 20  19   ordinary meaning is.  It's not like you have an argument on
15 01 23  20   what the plain and ordinary meaning is.  You want me to
15 01 25  21   change it around quite a bit to get your preferred
15 01 33  22   construction here.
15 01 34  23           MR. BLUESTONE:  Yes, Your Honor.  Our belief in
15 01 34  24   reading the spec is that the proper construction is that
15 01 38  25   they're calculated differently based on which flash device
```

Exhibit C
Markman Hearing Transcript (D.I. 59)                                        C.A. No. 20-136-RGA-JLH

---

**57**

10 15 42  1   is indicated as present.  The secondary position, which I
10 15 45  2   think came up, to some degree, in the briefing, is
10 15 47  3   correlated.  We don't think that's a hundred percent right
10 15 50  4   with t, but at least correlated implies some connection
10 15 53  5   that you can look at within the device.  I think they
10 15 55  6   mentioned it.
10 15 56  7            We said that can be one meaning.  It's certainly
10 15 58  8   better than associated w th.  We don't think it's a hundred
10 16 00  9   percent there, but we do take issue w th associated w th as
10 16 03  10  being understandable in the scope.  We don't think t is.
10 16 07  11           THE COURT:  Okay.
10 16 08  12           MR. BLUESTONE:  Thank you, Your Honor.
10 16 10  13           THE COURT:  Anything more from your s de?  His
10 16 14  14  side?
10 16 16  15           MR. VOWELL:  Your Honor, just briefly on this,
10 16 21  16  on the phrase associated with.  As Your Honor's recognized,
10 16 27  17  the plain and ordinary meaning of that is not limited to
10 16 29  18  calculated differently.  That comes directly from a
10 16 33  19  statement in Column 5 of the patent wh ch then after talks
10 16 37  20  about the parameters being calculated differently.  It says
10 16 41  21  that, Accordingly, the parameters are associated with.
10 16 44  22           But that's just -- the end result is that they
10 16 47  23  are associated w th.  It's not how.  The claim is not
10 16 51  24  concerned with how the exposure time and gain are
10 16 54  25  calculated.  And, in fact, the Defendants even mention that

---

**58**

10 16 57  1   well, in other places in the specificat on, it says they're
10 17 00  2   calculated differently using different formulas.  And
10 17 03  3   certainly that has nothing to do with the plain and ordinary
10 17 05  4   meaning of the word associated w th.
10 17 06  5            And so we would certainly defer to Your Honor,
10 17 09  6   but respectfully suggest this should be just given its plain
10 17 13  7   and ordinary meaning.
10 17 13  8            THE COURT:  All right.  I have a question:  When
10 17 17  9   does this patent expire?
10 17 19  10           MR. VOWELL:  Your Honor, forgive me.  I'm sort
10 17 25  11  of looking at that on the spot.  So t was filed in March of
10 17 29  12  2004, and so 20 years from that date, 2024.
10 17 34  13           THE COURT:  Oh, okay.  I couldn't remember
10 17 36  14  when.  At some point --
10 17 39  15           MR. VOWELL:  Your Honor, sorry.  Let me correct
10 17 47  16  that.  There is, also, under 35 USC Section 154(b) a
10 17 47  17  significant extension of 883 days.  So more than two years
10 17 51  18  is added to the life of that, so that would be 2026 or 2027.
10 17 55  19           THE COURT:  All right.  Okay.  Let me just take
10 18 02  20  a recess for a minute, and I'll be back in five minutes.
10 18 07  21           DEPUTY CLERK:  All rise.
10 18 08  22           (Recess was taken.)
10 37 12  23           DEPUTY CLERK:  All rise.
10 37 13  24           THE COURT:  All right.  Be seated for a minute.
10 37 17  25  So Mr. Bluestone, on the term an indicator set

---

**59**

10 37 25  1   to indicate whether the first flash device or second flash
10 37 30  2   device is present, and I think recognizing that your view is
10 37 41  3   that this is not the same thing as an indicator set or an
10 37 46  4   indicator configured to indicate whether a first flash or
10 37 50  5   second flash device is present, what would you say t does
10 37 55  6   mean?
10 37 58  7            MR. BLUESTONE:  Thank you, Your Honor.  The
10 38 01  8   indicator set to indicate, because t is a stored value,
10 38 04  9   means that value is set.  The key language -- Slide 13,
10 38 08  10  please.  The key language here is ind cator set.
10 38 12  11           THE COURT:  Right, right.  That's what I'm
10 38 14  12  trying to get at is what you think set means.
10 38 17  13           MR. BLUESTONE:  So to be kind of a very general
10 38 21  14  metaphor would be, t has one, it has two.  There's an
10 38 25  15  actual value ascribed that correlates to the presence of a
10 38 30  16  first or second flash device.  It's not some structure that
10 38 33  17  could have a one or two.  There is a one or there is a two.
10 38 37  18           THE COURT:  So basically, at some point when the
10 38 52  19  camera is actually in use, it would have that value?
10 39 00  20           MR. BLUESTONE:  Yes, that's correct, Your Honor.
10 39 02  21  We're not saying the camera necessarily has to be in use,
10 39 05  22  but that value needs to be set.
10 39 08  23           THE COURT:  But if the camera is not in use, how
10 39 14  24  could it make any sense that the value is set?
10 39 17  25           MR. BLUESTONE:  This goes to their point when

---

**60**

10 39 21  1   they were saying, well, could there be a default value?  In
10 39 24  2   theory, you could have something that's indicating it
10 39 27  3   because it knows that t comes with an LED flash, for
10 39 31  4   example, and that's the default value.
10 39 32  5            The question that comes when you turn on the
10 39 34  6   device and it goes to flash mode, will it do those
10 39 37  7   calculations differently based on LED --
10 39 41  8            THE COURT:  So if the indicator in the module
10 39 55  9   says -- is wr tten to say the default is it's a Xenon flash,
10 39 59  10  first flash dev ce, but if X, Y, Z happens then, you know,
10 40 07  11  feel free to do something else, then you'd say t was set to
10 40 11  12  indicate the first flash dev ce is present?
10 40 15  13           MR. BLUESTONE:  Yes.  Yes.  So to elaborate on
10 40 18  14  your example, if I may briefly, Your Honor.  Let's say
10 40 24  15  it's -- this device comes with an LED light and it's preset
10 40 26  16  to say I know t's an LED.  And the functionality also says,
10 40 28  17  well, if you sw tch t out and use t with a Xenon flash,
10 40 31  18  then do these calculations differently.  You've met that
10 40 34  19  indicator set.  It also can be changed to be other things,
10 40 37  20  but it has to have the ability to know wh ch one it is and
10 40 40  21  be set.
10 40 41  22           Is that helpful, Your Honor?  Probably an unfair
10 40 47  23  question to ask at any time.
10 40 48  24           THE COURT:  I guess we will find out.  I forget,
10 40 56  25  Mr. Vowell or Mr. Gunter, whichever one was doing this.

---

---

**Exhibit C**

Markman Hearing Transcript (D.I. 59)                                    C.A. No. 20-136-RGA-JLH

---

61

1        MR. BLUESTONE:  Thank you, Your Honor.

2        THE COURT:  You know, one of the things that's a

3 problem for you in terms of your proposal here is I think

4 you want to quote the plain and ordinary meaning of an

5 indicator set to indicate whether a first flash device or

6 second flash device is present to be an indicator configured

7 to indicate whether a first flash dev ce or second flash

8 device is present.

9        Is that right?

10        MR. GUNTER:  I think configured to captures that

11 dea that would cover, you know, in our example the default

12 values, because it's really focusing on the capability of

13 the indicator itself and not the actual attachment of a

14 flash dev ce.

15        THE COURT:  Okay.  And so you'll agree that set,

16 the normal plain and ordinary meaning of set is not

17 configured to; right?

18        MR. GUNTER:  I think the way that the claim is

19 wr tten currently, as the way t's written, it is more akin

20 to capable of, or configure to or operable to.  It's an

21 indicator set to indicate.

22        THE COURT:  So let's assume for the sake of

23 argument that I disagree w th you on that, what

24 Mr. Bluestone was saying, which maybe has something to do

25 with your default values, is if the code that's the

---

62

1 indicator says the first flash device is present, unless

2 something happens or, you know, unless different information

3 is received, that would be one possible way -- that would

4 meet the requirement that the ind cator set to indicate

5 whether first flash dev ce or second flash device is

6 present, it would meet that; right?

7        MR. GUNTER:  If I follow you right, I believe

8 that's correct because t's focusing on the capability of

9 the indicator and less about the actual attachment of a

10 flash dev ce.

11        THE COURT:  Right.  So if I sa d an indicator

12 set to indicate whether a first flash device or a second

13 flash dev ce is present, and I said, well, the plain meaning

14 of that is the indicator ind cates whether a first flash

15 device or a second flash dev ce is present, is that right?

16        MR. GUNTER:  I think our preference is the plain

17 and ordinary meaning because we think that captures the

18 capability.  I feel like whenever we give active more

19 verb-like language to this, that goes to an argument that

20 t's really transforming this into more of a method, which

21 we have method claims in this patent.  But this is the

22 apparatus talking about the capability, and that's why we

23 think ind cator is set to indicate, just the plain language

24 of that goes to --

25        THE COURT:  You know, it would be one thing if

---

63

1 you argued that and you didn't have all this configured to

2 language elsewhere.  You know, it's kind of hard to argue

3 that the set to indicate -- you know, set means the same

4 thing as configured to when there's plenty of evidence

5 that -- you know, it just goes against the idea of you don't

6 use two different things to say the same thing.

7        MR. GUNTER:  And if that were a cho ce, as

8 what's giving Your Honor the most concern, perhaps we do a

9 different word, operable to rather than configured to.

10        THE COURT:  Yeah, but I mean, in some ways, you

11 know, this is not as important, but there are a whole bunch

12 of different, you know, operable to, capable to, configured

13 to.  And maybe set to is kind of, you know, somewhere in

14 that spectrum of things that are sort of potential more than

15 actual.

16        All right.  Do you have anything further to say

17 about that?

18        MR. GUNTER:  Not at this time, Your Honor.

19        THE COURT:  Okay.  All right.  Well, I'm going

20 to take this under advisement.  You know, I do think a lot

21 of what the Defendant is doing here is just trying to

22 develop infringement and non-infringement arguments for

23 things that are relatively close to being plain and ordinary

24 meaning, if they're not, in fact, plain and ordinary

25 meaning.

---

64

1        But I want to be able to articulate it, at least

2 a little b t, as to why I think this is the case.  And I

3 also want to think about the indicator set to indicate.

4        Is either side familiar at all with using set to

5 as opposed to operable to, configured to, capable of?  And

6 is set to something that appears elsewhere or is this

7 inventor sort of on a frolic of their own?

8        MR. BLUESTONE:  If I may, Your Honor.

9        THE COURT:  Yeah.  You don't have to come

10 forward, just tell me what you want to tell me.

11        MR. BLUESTONE:  This is addressed in Page 22 of

12 the joint brief, the issue you're addressing right now.  Why

13 is the language set to used?  I don't have any case

14 c tations specifically to the use of set, but the answer,

15 the reason why it used set is because there are conditional

16 limitat ons that have to be present.  Otherwise, those

17 cond tional wherein clauses are not limited.

18        THE COURT:  All right.  Well, so yeah, I don't

19 see anything on Page 22 that seems to be -- there's an

20 argument about set to indicate, but I don't see anything

21 about the cases, two cases you cite that suggest that they

22 are actually addressed, set to as opposed to some other

23 language.

24        MR. BLUESTONE:  You're correct, Your Honor.

25 Those cases do not recite set to.  They're just explaining

---

---

**Exhibit C**

Markman Hearing Transcript (D.I. 59)        C.A. No. 20-136-RGA-JLH

65

| | | |
|---|---|---|
| 10:48:29 | 1 | why this claim is using set to to make sure that the wherein |
| 10:48:33 | 2 | clauses two and three are, in fact, limiting. |
| 10:48:36 | 3 | THE COURT:  Okay.  All right. |
| 10:48:38 | 4 | Well, thank you for your time this morning.  I |
| 10:48:41 | 5 | will take this under advisement. |
| 10:48:42 | 6 | Actually, what claims are asserted at this |
| 10:48:48 | 7 | point? |
| 10:48:48 | 8 | MR. GUNTER:  Claim 1, Your Honor -- |
| 10:48:50 | 9 | THE COURT:  That's it? |
| 10:48:51 | 10 | MR. GUNTER:  -- at this point. |
| 10:48:52 | 11 | THE COURT:  Okay.  All right.  We'll be in |
| 10:48:56 | 12 | recess. |
| 10:48:57 | 13 | DEPUTY CLERK:  All rise. |
| 10:48:58 | 14 | (Court was recessed at 10:50 a.m.) |
| | 15 | I hereby certify the foregoing is a true and |
| | 16 | accurate transcript from my stenographic notes in the |
| | 17 | proceeding. |
| | 18 | /s/ Heather M. Triozzi |
| | | Certified Merit and Real-Time Reporter |
| | 19 | U.S. District Court |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                                    C.A. No. 20-136-RGA-JLH

1

| | | | | |
|---|---|---|---|---|
| **/** | **39** [1] - 9:23 | 65:16 | 47:14 | 5:14, 5:18, 6:1, 6:13, 11:1, 18:15, 21:15, |
| /s [1] - 65:18 | **4** | accurately [1] - 47:5 | **ANDREWS** [1] - 1:14 | 22:11, 22:20, 25:8, |
| | | accused [2] - 17:4, | **Andrews** [1] - 2:10 | 25:21, 52:13, 53:2, |
| **0** | **48** [1] - 14:3 | 35:18 | answer [3] - 9:9, 42:2, | 53:5, 53:12, 53:18, |
| | | acknowledge [1] - | 64:14 | 53:19, 53:21, 53:22, |
| **02** [5] - 28:12, 28:16, | **5** | 11:1 | apologize [1] - 13:23 | 53:23, 54:4, 54:13, |
| 35:11, 49:18, 49:22 | | action [1] - 15:3 | apparatus [11] - 4:8, | 54:17, 55:1, 56:6, |
| | **5** [8] - 11:5, 12:24, | active [2] - 54:18, | 7:3, 7:7, 10:5, 45:12, | 56:9, 56:11, 57:8, |
| **1** | 14:3, 14:10, 14:18, | 62:18 | 45:20, 45:21, 45:23, | 57:9, 57:16, 57:21, |
| | 57:19 | actively [1] - 56:4 | 48:18, 54:19, 62:22 | 57:23, 58:4 |
| **1** [20] - 18:5, 18:8, | **50** [1] - 45:19 | acts [1] - 54:23 | appear [1] - 43:6 | assume [2] - 13:2, |
| 32:18, 36:7, 37:8, | **500** [4] - 30:12, 30:13, | actual [11] - 26:23, | **APPEARANCES** [2] - | 61:22 |
| 38:10, 39:4, 39:7, | 47:17, 47:20 | 38:25, 40:10, 40:16, | 1:15, 2:1 | assuming [1] - 52:2 |
| 39:8, 39:12, 39:13, | | 40:18, 41:2, 41:4, | application [1] - 15:9 | attached [23] - 16:9, |
| 39:16, 40:6, 42:23, | **6** | 59:15, 61:13, 62:9, | apply [4] - 15:20, | 18:23, 18:24, 28:25, |
| 43:15, 44:8, 51:19, | | 63:15 | 23:17, 25:25, 28:6 | 29:12, 29:14, 34:14, |
| 65:8 | **6** [13] - 17:13, 17:22, | actuated [1] - 7:19 | applying [1] - 28:7 | 36:20, 36:22, 37:1, |
| **10** [5] - 10:17, 17:1, | 18:6, 28:2, 31:15, | add [2] - 32:14, 48:20 | appreciate [2] - 55:23, | 40:14, 40:16, 40:25, |
| 35:5, 36:18, 37:21 | 31:18, 32:9, 32:19, | added [2] - 32:12, | 56:16 | 41:2, 41:10, 41:12, |
| **100** [1] - 26:20 | 37:9, 38:10, 43:4, | 58:18 | approach [1] - 3:20 | 41:14, 41:17, 41:25, |
| **10:50** [1] - 65:14 | 43:20, 50:18 | additional [1] - 32:11 | appropriate [5] - 5:1, | 46:17, 47:1, 47:12, |
| **11** [2] - 37:7, 50:3 | | address [4] - 13:11, | 5:18, 5:20, 6:15, | 47:23 |
| **114** [1] - 39:11 | **7** | 25:5, 38:17, 49:4 | 6:19 | attaching [1] - 41:6 |
| **13** [2] - 46:12, 59:9 | | addressed [2] - 64:11, | appropriately [1] - | attachment [7] - |
| **14** [1] - 15:17 | **7** [7] - 12:24, 13:19, | 64:22 | 11:16 | 38:25, 40:10, 40:17, |
| **15** [1] - 13:19 | 14:3, 14:10, 28:4, | addressing [2] - 5:24, | approved [1] - 15:10 | 41:2, 41:4, 61:13, |
| **154(b** [1] - 58:16 | 31:13, 38:2 | 64:12 | argue [10] - 24:23, | 62:9 |
| **16** [4] - 9:20, 12:7, | | adopt [2] - 50:15, | 32:16, 33:2, 50:20, | attempt [3] - 4:11, |
| 18:10, 21:21 | **8** | 50:17 | 54:9, 54:12, 55:7, | 37:17, 48:25 |
| **17** [2] - 28:9 | | advisement [2] - | 55:8, 56:7, 63:2 | attention [2] - 46:9, |
| **19** [1] - 1:11 | **8** [8] - 16:22, 31:15, | 63:20, 65:5 | argued [3] - 20:23, | 56:2 |
| | 31:25, 32:20, 38:2, | after-the-fact [1] - | 35:4, 63:1 | auto [1] - 26:21 |
| **2** | 49:6 | 53:6 | arguing [5] - 16:13, | automatically [1] - |
| | **844** [1] - 1:10 | ago [2] - 39:2, 49:13 | 31:4, 41:9, 51:9, | 7:15 |
| **2** [2] - 43:17, 44:8 | **883** [1] - 58:17 | agree [14] - 8:16, | 55:17 | avoid [1] - 35:6 |
| **20** [2] - 13:9, 58:12 | | 20:17, 23:25, 28:14, | argument [23] - 10:1, | |
| **20-136-RGA-JLH** [1] - | **9** | 35:23, 42:6, 42:14, | 10:3, 17:3, 17:17, | **B** |
| 1:5 | | 43:5, 45:10, 47:25, | 26:1, 26:7, 28:24, | |
| **2004** [1] - 58:12 | **9** [9] - 13:19, 14:3, | 48:1, 49:14, 56:17, | 30:24, 31:12, 33:6, | background [1] - 35:4 |
| **2021** [1] - 1:11 | 14:10, 17:12, 31:12, | 61:15 | 33:10, 33:11, 34:5, | **BARACK** [1] - 2:4 |
| **2024** [1] - 58:12 | 31:13, 33:5, 35:14, | agreed [1] - 29:4 | 34:10, 36:16, 38:9, | **Barack** [1] - 3:3 |
| **2026** [1] - 58:18 | 50:1 | agreeing [1] - 28:13 | 40:14, 43:6, 47:1, | based [7] - 16:8, |
| **2027** [1] - 58:18 | **9:01** [1] - 1:12 | agreement [1] - 48:3 | 56:19, 61:23, 62:19, | 32:17, 34:9, 56:15, |
| **22** [8] - 10:15, 10:24, | | ahead [2] - 4:4, 9:7 | 64:20 | 56:25, 60:7 |
| 47:4, 52:25, 64:11, | **A** | airspeed [1] - 47:15 | arguments [4] - 16:6, | basis [3] - 11:13, |
| 64:19 | | akin [1] - 61:19 | 37:20, 55:14, 63:22 | 32:21, 46:16 |
| **23** [3] - 13:9, 25:9, | **a.m** [2] - 1:12, 65:14 | all-Farnan [1] - 2:16 | array [3] - 11:14, | **BEFORE** [1] - 1:14 |
| 47:4 | ability [1] - 60:20 | allow [1] - 38:18 | 27:19, 45:15 | beginning [2] - 36:22, |
| **26** [1] - 22:6 | able [2] - 42:2, 64:1 | allowability [1] - 46:10 | art [4] - 15:25, 16:7, | 49:8 |
| | absolutely [5] - 15:16, | allowance [4] - 15:3, | 46:15, 46:19 | behalf [3] - 2:19, 3:1, |
| **3** | 19:8, 35:19, 36:6, | 15:8, 15:19, 15:22 | articulate [1] - 64:1 | 3:15 |
| | 36:7 | almost [2] - 28:12, | ascribed [2] - 28:8, | belief [1] - 56:23 |
| **3** [2] - 37:8, 43:14 | abstract [1] - 55:12 | 30:18 | 59:15 | believes [1] - 23:16 |
| **30** [1] - 14:3 | acceptable [1] - 51:7 | alternatives [1] - 46:1 | ascribes [1] - 29:4 | belong [1] - 53:15 |
| **33** [1] - 43:14 | access [1] - 14:5 | amount [2] - 14:13, | aside [1] - 34:1 | best [2] - 37:17, 48:25 |
| **34** [1] - 51:1 | accompanying [1] - | 14:17 | asserted [2] - 50:19, | better [1] - 57:8 |
| **35** [2] - 19 18  58:16 | 27:17 | amplifier [2] - 27:20, | 65:6 | between [7] - 4 24 |
| **36** [1] - 43 14 | Accordingly [1] - | 45:16 | asserting [1] - 32:19 | 10:20  22 14  25:24, |
| **37** [1] - 14 4 | 57:21 | analogous [1 - 52:18 | assess [1] - 30:6 | 26:13  46 19  55:17 |
| | accurate [2] - 47:21, | analogy [2] - 30:6, | associated [34] - 4 20, | |

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                                                    C.A. No. 20-136-RGA-JLH

**beyond** [2] - 55:2, 55:15
**big** [1] - 14:16
**bit** [4] - 23:17, 39:2, 56:21, 64:2
**blah** [6] - 3:9, 3:10
**blue** [5] - 13:11, 13:23, 25:11, 31:22, 50:5
**BLUESTONE** [92] - 2:5, 9:15, 9:18, 10:12, 12:15, 12:19, 13:1, 13:8, 13:13, 13:16, 13:18, 14:25, 15:11, 15:16, 16:21, 17:16, 18:4, 18:7, 18:10, 18:14, 19:8, 19:12, 19:18, 20:6, 20:11, 20:17, 20:21, 21:6, 21:14, 21:17, 21:20, 22:6, 23:11, 25:4, 25:17, 25:19, 26:7, 26:15, 27:8, 27:11, 27:14, 27:16, 27:24, 28:2, 28:20, 28:25, 29:17, 30:5, 30:10, 30:23, 31:9, 31:11, 32:4, 32:11, 32:25, 33:12, 33:20, 34:3, 34:16, 36:5, 36:17, 38:13, 46:24, 48:16, 49:16, 49:20, 49:24, 50:14, 50:25, 51:10, 51:15, 51:25, 52:4, 52:9, 52:12, 52:16, 53:20, 53:25, 54:6, 54:9, 55:23, 56:23, 57:12, 59:7, 59:13, 59:20, 59:25, 60:13, 61:1, 64:8, 64:11, 64:24
**Bluestone** [9] - 3:2, 25:3, 39:1, 41:3, 42:14, 43:3, 46:23, 58:25, 61:24
**Boggs** [1] - 1:9
**boom** [1] - 55:1
**bottom** [2] - 12:3, 39:11
**boundaries** [1] - 56:9
**bounds** [1] - 48:23
**brief** [14] - 20:23, 23:16, 25:5, 28:9, 37:14, 45:19, 47:4, 49:13, 51:4, 51:17, 52:4, 52:18, 55:6, 64:12
**briefing** [6] - 10:17, 33:17, 45:2, 46:11, 51 13 57:2
**briefly** [3] - 46:8,

57:15, 60:14
**briefs** [1] - 3:5
**bright** [2] - 10:20, 14:16
**bring** [1] - 56:1
**broad** [1] - 55:2
**broader** [2] - 48:13, 48:14
**broken** [1] - 8:25
**brown** [5] - 12:14, 12:15, 19:13, 28:4, 39:10
**brownish** [1] - 31:21
**bullet** [2] - 11:17, 43:11
**bunch** [1] - 63:11
**buried** [1] - 50:12
**Burke** [1] - 52:19
**burst** [2] - 14:14, 38:3
**bust** [1] - 14:16
**buying** [1] - 10:3
**BY** [6] - 1:16, 1:19, 1:19, 2:2, 2:5, 2:5

## C

**C.A** [1] - 1:5
**calculate** [4] - 7:15, 11:10, 12:5, 22:15
**calculated** [11] - 8:2, 8:3, 8:5, 26:18, 27:4, 52:1, 56:25, 57:18, 57:20, 57:25, 58:2
**calculates** [1] - 34:23
**calculating** [6] - 11:23, 12:10, 14:11, 18:16, 41:7, 52:10
**calculation** [6] - 4:14, 10:19, 12:21, 14:8, 14:21, 22:13
**calculations** [5] - 15:4, 25:10, 53:3, 60:7, 60:18
**Caleb** [1] - 1:9
**camera** [28] - 4:9, 5:21, 5:22, 9:2, 10:18, 11:7, 12:1, 13:5, 22:3, 22:13, 24:20, 26:19, 26:21, 27:10, 27:11, 27:13, 27:17, 36:20, 36:22, 39:7, 39:9, 42:16, 42:19, 46:16, 59:19, 59:21, 59:23
**cameras** [2] - 39:25, 42:22
**candidly** [1] - 55:2
**cannot** 1] - 33 7
**capabilities** [1] - 24 1
**capability** [26] - 4 16

7:5, 7:8, 7:10, 7:18, 8:6, 8:20, 10:6, 10:7, 21:10, 24:8, 24:9, 38:20, 38:24, 39:17, 40:11, 44:17, 45:12, 45:16, 45:17, 46:4, 61:12, 62:8, 62:18, 62:22
**capable** [13] - 8:21, 19:22, 20:19, 24:9, 44:12, 44:14, 44:22, 45:5, 45:22, 51:7, 61:20, 63:12, 64:5
**captured** [1] - 16:19
**captures** [2] - 61:10, 62:17
**care** [1] - 17:15
**case** [12] - 17:2, 17:9, 17:13, 32:21, 32:22, 48:11, 49:8, 52:19, 55:11, 55:25, 64:2, 64:13
**cases** [3] - 64:21, 64:25
**causes** [1] - 4:14
**center** [1] - 43:10
**certain** [1] - 8:22
**certainly** [3] - 57:7, 58:3, 58:5
**Certified** [1] - 65:18
**certify** [1] - 65:15
**cetera** [3] - 6:22, 15:15, 50:16
**chance** [1] - 3:8
**change** [8] - 13:13, 30:18, 34:4, 35:2, 35:22, 36:10, 42:11, 56:21
**changed** [1] - 60:19
**check** [1] - 52:3
**choice** [1] - 63:7
**chunk** [3] - 11:13, 11:14
**circuitry** [3] - 8:9, 48:19, 48:21
**circuits** [1] - 44:10
**circumscribed** [1] - 52:24
**circumstance** [2] - 18:19, 32:7
**circumstances** [1] - 13:20
**citations** [1] - 64:14
**cite** [2] - 52:19, 64:21
**cited** [1] - 47:13
**claim** [105] - 4:7, 4:8, 4:13, 4:16, 4:18, 7:3, 7 23, 8:1, 8:23 9 24 10:5, 16:19 17 2 17:13, 17:18 17 21

17:22, 18:5, 18:6, 18:8, 21:13, 22:17, 23:6, 23:19, 23:22, 27:18, 28:3, 28:17, 29:3, 31:18, 31:23, 32:2, 32:3, 32:5, 32:6, 32:8, 32:9, 32:12, 32:13, 32:18, 32:19, 33:3, 33:5, 33:8, 33:10, 34:12, 34:20, 35:8, 35:9, 35:10, 35:12, 35:19, 35:25, 36:2, 36:3, 36:5, 36:7, 37:11, 38:10, 39:4, 39:5, 39:8, 39:12, 39:13, 39:15, 39:16, 40:6, 40:21, 42:8, 42:23, 43:4, 43:6, 43:7, 43:20, 44:13, 45:6, 45:11, 45:20, 46:3, 48:18, 49:10, 50:1, 50:9, 50:17, 50:18, 50:21, 51:19, 51:23, 53:7, 54:15, 54:21, 55:10, 55:20, 56:15, 57:23, 61:18, 65:1, 65:8
**claimed** [1] - 51:20
**claims** [17] - 7:7, 10:2, 27:6, 27:7, 33:14, 34:1, 35:8, 38:23, 42:14, 42:24, 53:3, 55:13, 55:14, 55:17, 62:21, 65:6
**clause** [2] - 19:20, 45:4
**clauses** [3] - 18:22, 64:17, 65:2
**clear** [3] - 49:20, 49:25, 54:4
**clearly** [3] - 9:21, 35:12, 49:7
**CLERK** [5] - 2:9, 3:24, 58:21, 58:23, 65:13
**close** [1] - 63:23
**closed** [1] - 26:22
**closer** [1] - 42:2
**cloudy** [1] - 10:20
**code** [1] - 61:25
**colleague** [1] - 53:22
**color** [4] - 12:16, 13:13, 28:4, 31:21
**colors** [1] - 12:17
**Column** [12] - 11:5, 13:19, 14:3, 37:8, 43:14, 43:17, 57:19
**combining** [1] - 35 17
**coming** [2] - 11:6, 56 2

**compatibility** [1] - 30:18
**compatible** [2] - 31:5, 48:4
**compensate** [1] - 11:24
**components** [1] - 4:9
**computer** [3] - 41:24, 42:1, 47:15
**concede** [1] - 16:2
**concept** [1] - 16:7
**concern** [3] - 31:2, 55:2, 63:8
**concerned** [3] - 5:25, 18:9, 57:24
**concert** [1] - 10:23
**condition** [3] - 30:7, 30:14, 30:15
**conditional** [5] - 18:22, 21:21, 23:5, 64:15, 64:17
**conditions** [1] - 25:15
**confident** [1] - 56:2
**configurability** [2] - 44:17, 46:4
**configuration** [1] - 46:4
**configure** [2] - 51:3, 61:20
**configured** [20] - 4:19, 19:20, 19:22, 20:4, 20:21, 37:9, 45:3, 45:5, 51:3, 54:19, 54:23, 59:4, 61:6, 61:10, 61:17, 63:1, 63:4, 63:9, 63:12, 64:5
**confusion** [3] - 16:23, 17:25, 46:11
**conjunction** [2] - 6:6, 6:10
**connected** [2] - 24:4, 53:13
**connection** [5] - 53:16, 53:18, 53:21, 55:17, 57:4
**consequence** [1] - 54:13
**consistent** [1] - 56:14
**construction** [31] - 4:6, 4:14, 17:3, 31:23, 33:5, 33:10, 34:20, 35:8, 35:9, 36:18, 37:21, 38:9, 42:8, 43:6, 43:7, 45:6, 48:23, 49:11, 50:1, 50:7, 50:10, 50:12 50 18 50:22, 51:6 55 10 55:11, 55:20 56 22 56:24

**Exhibit C**
Markman Hearing Transcript (D.I. 59)

**constructions** [2] - 26:6, 36:14
**construe** [3] - 4:2, 35:10, 52:20
**construed** [2] - 4:23, 44:21
**construing** [1] - 51:9
**consumer** [1] - 42:21
**context** [7] - 21:15, 29:2, 35:4, 51:23, 52:5, 53:7, 54:3
**CONTINUED** [1] - 2:1
**control** [6] - 14:12, 14:13, 14:20, 43:15, 44:9
**converse** [1] - 48:17
**convert** [3] - 9:24, 10:2, 17:18
**Cooke** [1] - 2:20
**COOKE** [1] - 1:18
**copies** [2] - 3:20, 9:15
**copy** [1] - 46:13
**Corby** [2] - 2:20, 3:14
**CORBY** [1] - 1:19
**correct** [10] - 8:8, 21:20, 25:17, 27:14, 42:5, 47:13, 58:15, 59:20, 62:8, 64:24
**correlated** [2] - 57:3, 57:4
**correlates** [1] - 59:15
**corresponding** [4] - 52:20, 52:22, 52:23
**counsel** [1] - 25:6
**couple** [1] - 43:10
**course** [2] - 12:19, 21:6
**Court** [5] - 2:9, 38:18, 39:20, 65:14, 65:19
**COURT** [146] - 1:1, 2:11, 2:23, 3:4, 3:18, 3:22, 4:3, 5:5, 5:23, 6:8, 6:20, 7:5, 7:17, 7:23, 8:4, 8:11, 8:19, 9:4, 9:6, 9:11, 9:14, 9:17, 10:1, 12:13, 12:17, 12:25, 13:2, 13:12, 13:14, 13:17, 14:24, 15:7, 15:12, 16:11, 17:14, 18:2, 18:5, 18:8, 18:13, 19:4, 19:11, 19:13, 19:25, 20:10, 20:12, 20:20, 21:4, 21:7, 21:16, 21:18, 22:1, 23:9, 23:13, 23:25, 24:13, 24:21, 24:24, 25 2, 25 14, 25:18, 26 5, 26 10, 27:6, 27 9, 27 12, 27:15,

27:22, 28:1, 28:19, 28:22, 29:8, 29:21, 30:9, 30:21, 31:7, 31:10, 32:1, 32:10, 32:23, 33:9, 33:19, 33:25, 34:9, 35:23, 36:12, 38:12, 38:14, 38:16, 40:13, 40:18, 40:24, 41:8, 42:9, 42:18, 42:24, 43:2, 43:22, 44:2, 44:11, 44:20, 44:25, 45:14, 46:6, 46:22, 48:9, 49:12, 49:19, 49:22, 50:6, 50:23, 51:8, 51:11, 51:24, 52:2, 52:7, 52:10, 52:14, 53:9, 53:24, 54:2, 54:7, 55:4, 56:17, 57:11, 57:13, 58:8, 58:13, 58:19, 58:24, 59:11, 59:18, 59:23, 60:8, 60:24, 61:2, 61:15, 61:22, 62:11, 62:25, 63:10, 63:19, 65:9, 64:18, 65:3, 65:9, 65:11
**Court's** [1] - 46:9
**Courthouse** [1] - 1:9
**cover** [2] - 33:14, 61:11
**covered** [1] - 8:1
**covers** [1] - 48:15
**current** [2] - 13:24, 25:11, 25:25

## D

**data** [1] - 22:8
**date** [1] - 58:12
**Dave** [1] - 2:19
**DAVE** [1] - 1:19
**DAVID** [1] - 2:5
**David** [1] - 3:2
**daylight** [2] - 12:2, 22:24
**days** [1] - 58:17
**deal** [1] - 55:16
**dealing** [1] - 13:20
**decides** [1] - 34:14
**default** [24] - 7:13, 7:20, 7:21, 7:24, 8:18, 10:13, 10:22, 16:12, 17:23, 18:18, 18:25, 22:23, 26:8, 26:9, 26:10, 26:11, 26:12, 39:20, 60:1, 60:4, 60:9, 61:11, 61:25
**defendant** [1] - 25:2

**Defendant** [6] - 1:8, 2:6, 23:19, 41:19, 46:12, 63:21
**Defendant's** [1] - 4:6
**Defendants** [7] - 4:2, 4:23, 6:7, 6:9, 24:25, 38:21, 57:25
**defer** [2] - 30:24, 58:5
**defined** [1] - 10:7
**degree** [1] - 57:2
**DELAWARE** [1] - 1:2
**Delaware** [1] - 1:10
**DEMANDED** [1] - 1:6
**dependent** [6] - 17:13, 17:22, 31:18, 32:2, 32:6, 32:8, 32:13, 35:25
**DEPUTY** [5] - 2:9, 3:24, 58:21, 58:23, 65:13
**describes** [2] - 4:9, 4:18
**determining** [1] - 16:8
**develop** [1] - 63:22
**developed** [1] - 24:7
**deviate** [1] - 56:3
**device** [101] - 4:20, 4:24, 5:4, 5:13, 5:14, 5:20, 5:21, 6:4, 6:16, 6:18, 6:21, 6:24, 8:9, 8:12, 9:2, 12:6, 13:4, 13:6, 15:4, 16:16, 17:8, 17:10, 17:15, 17:18, 18:15, 18:18, 18:24, 20:13, 20:14, 20:15, 20:16, 21:11, 24:3, 24:4, 25:21, 29:11, 29:12, 30:16, 30:17, 33:4, 34:2, 34:14, 34:17, 35:17, 35:24, 35:25, 36:6, 36:19, 38:21, 38:22, 39:5, 39:11, 39:15, 39:18, 39:21, 41:6, 41:7, 41:17, 41:22, 41:25, 42:1, 43:4, 43:24, 46:17, 46:19, 47:6, 47:7, 47:10, 48:7, 53:12, 53:13, 53:14, 53:17, 54:5, 54:11, 56:25, 57:5, 59:1, 59:2, 59:5, 59:16, 60:6, 60:10, 60:12, 60:15, 61:5, 61:6, 61:7, 61:8, 61:14, 62:1, 62:5, 62:10, 62:12, 62:13, 62:15
**devices** [13] - 7:14, 7 22, 16:9, 24 12

24:17, 24:18, 30:20, 36:3, 39:24, 42:21, 46:20, 47:2, 47:8
**DI-11** [2] - 17:1, 35:5
**DI-52** [1] - 28:9
**DI-9** [1] - 10:17
**difference** [1] - 56:15
**different** [25] - 7:13, 7:22, 13:3, 13:20, 19:21, 23:4, 24:12, 24:17, 25:7, 36:14, 38:4, 45:9, 45:13, 54:10, 54:11, 54:14, 54:17, 54:25, 56:13, 58:2, 62:2, 63:6, 63:9, 63:12
**differentiation** [2] - 43:8, 43:9
**differently** [9] - 12:10, 18:16, 52:1, 56:25, 57:18, 57:20, 58:2, 60:7, 60:18
**digital** [4] - 10:18, 22:13, 42:16, 42:18
**directed** [6] - 4:16, 19:9, 19:11, 19:15, 38:23, 39:16
**directly** [1] - 57:18
**disagree** [2] - 32:4, 61:23
**disclaimer** [1] - 16:2
**disclaiming** [1] - 15:14
**disconnect** [2] - 38:19, 40:9
**discussed** [1] - 28:3
**discussion** [3] - 3:17, 23:18, 51:2
**dismiss** [4] - 10:16, 17:1, 34:19, 55:25
**dispute** [17] - 28:17, 29:6, 29:9, 32:24, 33:16, 35:12, 41:12, 49:7, 49:21, 50:1, 50:9, 50:12, 50:13, 50:22, 56:4, 56:5
**disputed** [1] - 4:15
**disputes** [1] - 31:8
**distinction** [1] - 46:18
**distinguishing** [1] - 46:15
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 65:19
**done** [5] - 4:10, 6:7, 6:9, 8:7, 22:19
**down** [3] - 39:11, 46:21, 55:20
**drawing** [1] - 46:18
**during** [1] - 51:5

## E

**early** [1] - 55:11
**EDUCATE** [1] - 2:5
**Educate** [2] - 3:3, 53:22
**effectuate** [2] - 35:2, 36:10
**effectuating** [2] - 35:21, 37:4
**either** [2] - 53:14, 64:4
**elaborate** [1] - 60:13
**electronic** [1] - 42:22
**element** [2] - 32:6, 33:3
**elements** [2] - 4:7, 4:11
**elsewhere** [2] - 63:2, 64:6
**embodiment** [4] - 8:1, 39:9, 44:6, 48:11
**embodiments** [1] - 39:7
**enabled** [1] - 37:10
**encompass** [2] - 43:12, 56:11
**encompassing** [1] - 35:7
**end** [4] - 8:20, 10:9, 36:21, 57:22
**entertain** [1] - 33:13
**entire** [1] - 46:13
**environment** [6] - 10:21, 11:7, 13:24, 25:11, 25:22, 47:21
**equivalent** [2] - 11:25, 13:5
**eraser** [1] - 32:14
**espouse** [1] - 19:21
**ESQUIRE** [6] - 1:16, 1:19, 1:19, 2:2, 2:5, 2:5
**essentially** [6] - 4:6, 4:7, 14:25, 16:25, 17:17, 28:16, 41:23, 55:18
**established** [1] - 56:5
**et** [3] - 6:22, 15:15, 50:16
**event** [1] - 3:12
**events** [1] - 41:5
**evidence** [3] - 15:24, 32:20, 63:4
**exactly** [5] - 14:4, 25:22, 32:25, 45:24, 46:11
**examiner** [7] - 15:2, 15:19 29 1 46:10, 46:14 46 18
**example** [18] - 7 13,

**Exhibit C**
Markman Hearing Transcript (D.I. 59)        C.A. No. 20-136-RGA-JLH

12:24, 14:18, 24:17,
27:19, 32:9, 39:6,
39:8, 39:19, 43:13,
44:19, 46:1, 46:2,
48:14, 54:7, 60:4,
60:14, 61:11
**examples** [5] - 4:21,
43:10, 43:11, 43:15,
44:8
**except** [1] - 20:17
**exclusion** [1] - 43:19
**excuse** [1] - 46:17
**existing** [1] - 32:8
**expire** [1] - 58:9
**explain** [4] - 18:2,
18:8, 21:8, 30:24
**explained** [1] - 21:9
**explaining** [3] - 14:4,
15:14, 64:25
**exposure** [40] - 3:9,
4:19, 4:25, 5:2, 5:13,
6:15, 6:22, 6:25,
7:19, 8:13, 10:18,
11:9, 11:18, 11:23,
14:13, 14:19, 16:8,
16:14, 18:14, 22:4,
22:14, 22:15, 22:22,
23:2, 24:3, 24:5,
25:9, 25:10, 26:15,
26:17, 27:4, 27:20,
34:4, 34:23, 53:11,
53:16, 54:4, 54:10,
56:12, 57:24
**extension** [1] - 58:17
**extent** [8] - 20:18,
47:11, 47:22, 50:8,
51:6, 52:1
**extra** [1] - 52:17

**F**

**fact** [7] - 13:4, 39:17,
53:6, 53:12, 57:25,
63:24, 65:2
**fair** [4] - 15:16, 36:17,
51:10, 51:15
**familiar** [1] - 64:4
**far** [1] - 42:10
**FARNAN** [5] - 1:16,
1:16, 2:2, 2:18, 2:23
**Farnan** [5] - 2:16,
2:17, 2:19, 2:24, 3:1
**fast** [1] - 30:8
**feeding** [1] - 47:16
**FERRAZZANO** [1] -
2:4
**Ferrazzano** [1] - 3:3
**few** [1] - 38 17
**Figure** [9] - 14 10
14 18  31:15, 38:2,

**figure** [2] - 6:1, 38:2
**Figures** [1] - 12:24
**figuring** [1] - 26:21
**filed** [1] - 58:11
**film** [1] - 12:1
**finder** [2] - 11:5
**fine** [5] - 36:23, 37:1,
48:1, 48:2, 53:11
**FINGER** [1] - 2:2
**Finger** [1] - 3:1
**first** [46] - 2:15, 6:2,
6:4, 6:21, 6:24, 8:12,
13:22, 14:2, 15:3,
15:8, 15:19, 15:22,
17:1, 18:15, 18:17,
18:24, 19:2, 20:13,
20:15, 22:9, 24:25,
28:11, 29:10, 32:24,
36:19, 45:15, 47:2,
47:6, 47:7, 47:9,
48:7, 53:12, 53:13,
53:17, 54:5, 59:1,
59:4, 59:16, 60:10,
60:12, 61:5, 61:7,
62:1, 62:5, 62:12,
62:14
**five** [1] - 58:20
**flagged** [1] - 56:1
**flash** [154] - 4:20, 4:24,
5:1, 5:3, 5:10, 5:13,
5:14, 5:19, 5:20, 6:4,
6:16, 6:18, 6:19,
6:21, 6:24, 7:14,
7:22, 8:9, 8:12, 9:2,
9:5, 11:12, 11:19,
11:24, 12:1, 12:6,
12:23, 13:4, 13:25,
14:6, 14:14, 14:20,
15:4, 16:9, 16:16,
16:24, 17:8, 17:10,
17:11, 17:15, 17:19,
17:20, 17:23, 17:24,
18:15, 20:13, 20:15,
21:11, 21:24, 24:2,
24:12, 24:17, 25:21,
26:2, 29:10, 29:11,
30:16, 30:20, 31:15,
31:20, 31:22, 32:10,
32:11, 32:17, 32:18,
32:23, 33:4, 33:7,
33:14, 33:18, 33:19,
33:20, 33:21, 33:24,
34:1, 34:6, 34:7,
34:10, 34:17, 34:21,
35:14, 36:19, 37:4,
37:5, 37:10, 37:22,
37:25, 38:3, 38:4,
38:11  38 21  38:22,
39:5, 39 11  39 15,

39:18, 40:3, 41:6,
41:7, 41:16, 43:3,
43:24, 46:17, 46:19,
46:20, 47:6, 47:7,
47:8, 47:10, 48:8,
49:4, 49:10, 50:8,
50:20, 53:12, 53:13,
53:14, 53:17, 54:5,
54:11, 54:15, 56:3,
56:25, 59:1, 59:4,
59:5, 59:16, 60:3,
60:6, 60:9, 60:10,
60:12, 60:17, 61:5,
61:6, 61:7, 61:14,
62:1, 62:5, 62:10,
62:12, 62:13, 62:14,
62:15
**flash's** [1] - 25:9
**flash-enabled** [1] -
37:10
**flash-type** [1] - 37:10
**flashes** [1] - 25:7
**flight** [3] - 30:12,
47:15, 47:16
**focus** [3] - 14:22,
38:19, 38:21
**focusing** [3] - 40:17,
61:12, 62:8
**follow** [1] - 62:7
**following** [1] - 19:4
**FOR** [1] - 1:2
**foregoing** [1] - 65:15
**forget** [1] - 60:24
**forgive** [1] - 58:10
**format** [1] - 38:7
**formulas** [1] - 58:2
**forth** [1] - 31:2
**forward** [1] - 64:10
**free** [1] - 60:11
**FRIEDMAN** [1] - 1:18
**Friedman** [1] - 2:20
**frolic** [1] - 64:7
**front** [1] - 13:14
**fruit** [1] - 31:12
**fully** [2] - 2:12, 56:16
**function** [4] - 48:25,
51:5, 51:12, 54:18
**functional** [4] - 20:24,
20:25, 48:2, 51:17
**functionality** [1] -
60:16
**future** [3] - 29:5,
30:19, 30:22

**G**

**gain** [39] - 3:9, 4:20,
4 25, 5:2, 5:14  6 15
6 22, 7:1, 7:19  8 13
11:9, 11:23  14 22

16:8, 16:14, 18:14,
22:4, 22:14, 22:16,
22:22, 23:2, 24:4,
24:5, 25:9, 25:10,
26:16, 26:17, 27:4,
27:19, 27:20, 34:4,
34:23, 45:16, 53:11,
53:16, 54:4, 54:10,
56:12, 57:24
**gee** [1] - 54:8
**general** [4] - 33:25,
52:21, 53:5, 59:13
**generally** [3] - 18:6,
45:10, 55:9
**generically** [1] - 12:5
**germane** [1] - 53:2
**given** [3] - 4:21, 48:14,
58:6
**glean** [2] - 32:15, 33:1
**gleaned** [1] - 33:16
**graciously** [1] - 52:17
**grammar** [1] - 31:23
**great** [1] - 13:16
**ground** [2] - 47:16,
47:19
**guard** [1] - 55:21
**guess** [17] - 6:6, 8:21,
16:11, 19:1, 19:14,
23:9, 26:11, 29:8,
29:13, 29:25, 30:21,
34:9, 43:23, 44:11,
53:9, 53:20, 60:24
**GUNTER** [27] - 1:19,
2:21, 38:15, 38:17,
40:16, 40:20, 41:1,
42:5, 42:17, 42:20,
43:1, 43:5, 44:1,
44:4, 44:16, 44:23,
45:10, 45:25, 46:8,
61:10, 61:18, 62:7,
62:16, 63:7, 63:18,
65:8, 65:10
**Gunter** [4] - 2:19,
38:14, 48:9, 60:25
**guy** [1] - 14:15

**H**

**hand** [1] - 16:22
**hanging** [1] - 31:12
**happy** [4] - 9:8, 30:24,
32:19, 33:12
**hard** [3] - 13:10,
13:23, 63:2
**hear** [1] - 9:11
**heard** [2] - 41:3, 48:5
**hearing** [1] - 47:23
**Hearing** [1] - 11:2
**Heather** [1] - 65:18
**help** [1] - 16 3

**helpful** [2] - 22:7,
60:22
**hereby** [1] - 65:15
**high** [3] - 38:3, 44:18,
44:20
**highlighted** [5] - 12:3,
14:2, 16:5, 39:10,
53:1
**highlighting** [1] -
31:14
**highly** [3] - 11:2,
15:23, 16:1
**hit** [1] - 40:12
**hold** [1] - 9:6
**honest** [1] - 15:17
**Honor** [91] - 2:18,
2:21, 2:22, 2:25,
3:14, 3:16, 3:20,
3:25, 6:5, 7:2, 7:11,
8:25, 9:8, 9:13, 9:15,
9:19, 11:20, 12:10,
14:2, 14:23, 19:10,
19:24, 21:14, 22:12,
23:11, 23:15, 23:23,
24:22, 25:1, 25:4,
25:13, 26:1, 27:3,
27:8, 27:25, 28:20,
29:18, 30:5, 30:23,
31:16, 32:5, 32:17,
32:20, 32:25, 33:12,
34:19, 35:12, 35:15,
36:17, 36:23, 37:17,
37:19, 38:2, 38:13,
38:15, 39:24, 42:6,
42:17, 42:20, 43:1,
46:8, 46:24, 47:25,
49:3, 49:17, 49:24,
50:14, 50:25, 51:10,
51:15, 51:21, 52:9,
54:6, 55:3, 55:23,
56:23, 57:12, 57:15,
58:5, 58:10, 58:15,
59:7, 59:20, 60:14,
60:22, 61:1, 63:8,
63:18, 64:8, 64:24,
65:8
**Honor's** [1] - 57:16
**HONORABLE** [1] -
1:14
**Honorable** [1] - 2:10
**horrible** [1] - 55:21
**horribles** [1] - 55:19
**hundred** [2] - 57:3,
57:8
**hypothetical** [5] -
20:9, 34:16, 35:17,
39:20, 56:10
**hypothetically** [3] -
20:7  34 6  34 20

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                    C.A. No. 20-136-RGA-JLH

## I

i.e [1] - 49:10
ID [2] - 1:4, 2:14
idea [2] - 61:11, 63:5
identified [2] - 24:6, 55:24
identify [1] - 37:5
identifying [5] - 36:19, 37:3, 38:7, 41:7, 50:13
if-then [1] - 23:6
ignore [2] - 15:21, 16:6
illumination [2] - 11:15, 25:23
Image [1] - 2:14
image [4] - 11:12, 27:19, 45:15
IMAGE [1] - 1:4
imagine [2] - 11:14, 20:1
impact [1] - 13:4
implied [1] - 9:1
implies [1] - 57:4
important [3] - 16:7, 31:16, 63:11
imported [1] - 4:13
importing [1] - 23:20
improper [2] - 42:7, 49:9
improved [1] - 12:16
Impulse [1] - 52:19
IN [1] - 1:1
INC [1] - 1:7
include [2] - 36:3, 48:17
included [3] - 4:12, 39:11, 46:13
includes [3] - 4:1, 36:6, 39:15
including [1] - 4:10
increased [1] - 11:24
independent [4] - 32:3, 36:2, 36:3, 36:5
indicate [57] - 5:3, 5:12, 6:14, 6:17, 9:2, 18:12, 19:3, 19:19, 19:21, 19:23, 20:2, 20:13, 20:22, 22:10, 24:11, 29:10, 29:13, 29:14, 37:5, 38:25, 39:17, 39:18, 39:23, 40:4, 40:7, 40:22, 40:24, 41:21, 43:24, 44:3, 44:5, 44:14, 44:16, 44:22, 44:24, 45:5, 45:22, 46:5, 47:6, 47:9, 48:1,

50:16, 51:19, 59:1, 59:4, 59:8, 60:12, 61:5, 61:7, 61:21, 62:4, 62:12, 62:23, 63:3, 64:3, 64:20
indicated [1] - 57:1
indicates [6] - 6:23, 20:5, 20:24, 24:2, 30:3, 62:14
indicating [15] - 6:3, 6:20, 7:18, 8:7, 8:11, 12:12, 18:17, 21:10, 30:8, 34:14, 43:16, 44:12, 44:15, 45:23, 60:2
indication [1] - 21:12
indicator [128] - 5:3, 5:12, 5:15, 6:3, 6:17, 6:20, 6:23, 7:12, 7:14, 7:17, 8:3, 8:7, 8:11, 8:17, 9:1, 12:12, 12:20, 12:22, 13:3, 16:14, 16:25, 17:8, 18:12, 18:17, 19:2, 19:5, 19:9, 19:16, 19:19, 19:21, 20:5, 20:8, 20:12, 20:14, 21:3, 21:9, 21:12, 21:23, 21:24, 22:2, 22:9, 22:18, 24:2, 24:11, 27:24, 29:10, 30:3, 30:6, 30:11, 30:13, 30:17, 31:19, 31:22, 32:24, 33:3, 33:8, 33:18, 34:12, 34:13, 35:20, 36:8, 37:3, 37:10, 37:15, 37:16, 38:20, 38:24, 39:16, 39:23, 40:4, 40:7, 40:22, 41:15, 41:21, 43:4, 43:12, 43:19, 43:23, 44:3, 44:5, 44:7, 44:14, 44:16, 44:18, 44:22, 44:24, 45:21, 45:22, 46:5, 47:5, 47:8, 47:15, 47:19, 47:22, 48:2, 48:6, 48:12, 48:18, 48:24, 50:15, 50:21, 51:19, 51:22, 56:16, 58:25, 59:3, 59:4, 59:8, 59:10, 60:8, 60:19, 61:5, 61:6, 61:13, 61:21, 62:1, 62:4, 62:9, 62:11, 62:14, 62:23, 64:3
indulged [1] - 52:16
inform [1] - 15:25
information [2] -

34:22, 62:2
infringe [1] - 32:16
infringement [5] - 17:6, 32:17, 50:4, 63:22
initial [1] - 32:21
innovation [1] - 15:5
insight [1] - 15:20
instance [4] - 10:17, 30:1, 33:21, 52:23
instances [1] - 49:25
instead [2] - 23:20, 39:15
instructions [1] - 43:16
interceding [1] - 22:14
interest [1] - 5:24
interested [3] - 4:4, 10:8, 10:10
interesting [1] - 22:2
interpolate [2] - 25:23, 26:13
interpolation [1] - 10:19
interrelationship [1] - 4:23
intrinsic [1] - 15:24
invention [8] - 10:24, 12:4, 15:2, 16:1, 17:9, 18:21, 23:3
inventor [4] - 15:8, 41:11, 42:11, 64:7
involves [1] - 7:8
irrelevant [2] - 17:25, 23:1
irrespective [1] - 27:5
ISO [1] - 26:20
issue [10] - 9:22, 9:23, 16:22, 22:24, 29:20, 33:17, 35:11, 46:16, 49:4, 49:7, 49:9, 50:2, 50:18, 51:21, 57:9, 64:12
issues [4] - 23:12, 28:5, 56:1, 56:2
itself [2] - 26:2, 61:13

## J

job [1] - 11:16
joined [1] - 3:2
joint [2] - 47:4, 64:12
Judge [1] - 52:19
judgment [2] - 33:10, 55:16
jump [1] - 3:16
jumped [1] - 54:20
JURY [1] - 1 6
jury [4] - 31:3, 31:4, 33:2, 54:12

## K

keep [8] - 11:25, 14:17, 21:21, 23:15, 26:22, 26:25, 52:4, 52:17
keeping [1] - 40:20
keeps [1] - 47:11
Kelly [1] - 2:25
KELLY [1] - 2:2
key [3] - 28:5, 59:9, 59:10
kind [22] - 10:5, 10:19, 11:14, 13:3, 13:6, 14:1, 15:18, 16:6, 16:16, 18:11, 24:5, 34:8, 35:11, 39:3, 42:1, 45:7, 53:4, 55:12, 59:13, 63:2, 63:13
kinds [2] - 29:16, 45:6
King [1] - 1:10
KIRSCHBAUM [1] - 2:4
knots [4] - 30:12, 30:13, 47:17, 47:20
knowing [1] - 10:20
knowledge [1] - 37:4
knows [1] - 60:3

## L

language [25] - 4:22, 5:16, 5:18, 10:25, 12:9, 28:3, 31:19, 40:14, 40:22, 44:13, 45:1, 45:7, 46:9, 48:2, 51:2, 51:3, 53:1, 53:10, 59:9, 59:10, 62:19, 62:23, 63:2, 64:13, 64:23
laptops [1] - 42:22
larger [4] - 4:1, 4:16, 5:10, 6:2
lark [1] - 51:14
last [2] - 3:8, 16:5
law [2] - 9:24, 33:5
lawyer [1] - 15:18
Layton [1] - 3:1
LAYTON [1] - 2:2
least [5] - 7:16, 30:3, 45:4, 57:4, 64:1
leaving [1] - 34:1
LED [16] - 4:21, 12:23, 13:22, 14:16, 14:20, 16:15, 34:22, 38:4, 40:3, 40:4, 40:6, 40 8, 60:3, 60:7, 60 15, 60:16
left [1] - 47 19

legally [1] - 33:7
length [1] - 52:5
lens [1] - 27:18
less [1] - 62:9
level [2] - 44:19, 44:21
life [1] - 58:18
light [17] - 11:15, 11:24, 13:21, 13:22, 14:12, 14:17, 14:22, 26:24, 26:25, 33:22, 34:24, 35:7, 36:8, 36:9, 38:8, 60:15
lighting [8] - 10:21, 11:7, 13:24, 22:24, 25:11, 25:15, 25:22, 25:25
lights [1] - 36:11
likely [2] - 51:13, 55:19
limit [1] - 4:13
limitation [16] - 4:14, 4:16, 10:6, 10:8, 16:20, 19:2, 20:24, 21:22, 23:5, 30:4, 32:12, 39:5, 39:13, 45:13, 46:3, 51:18
limitations [3] - 23:21, 35:18, 64:16
limited [5] - 23:20, 27:7, 27:17, 57:17, 64:17
limiting [1] - 65:2
Line [3] - 14:3
lines [1] - 37:8
Lines [2] - 37:8, 43:14
listed [1] - 43:16
listen [1] - 48:21
LLC [1] - 1:4
LLP [2] - 1:16, 2:4
locations [5] - 4:17, 4:19, 37:13, 45:18, 51:20
Look [2] - 35:6, 52:21
look [11] - 5:9, 6:12, 13:18, 17:12, 21:2, 39:6, 50:3, 51:19, 53:6, 54:25, 57:5
looked [1] - 3:5
looking [4] - 29:22, 33:3, 48:7, 58:11
looks [1] - 52:22
lookup [1] - 13:5
loops [1] - 34:22
lost [1] - 17:14
low [1] - 31:12
low-hanging [1] - 31:12

**Exhibit C**
Markman Hearing Transcript (D.I. 59)
C.A. No. 20-136-RGA-JLH

## M

mail [1] - 15:9
main [2] - 34:10, 43:11
management [1] - 12:16
manner [2] - 14:11, 22:16
manufacture [1] - 40:1
manufactured [1] - 39:21
March [1] - 58:11
Markman [2] - 1:12, 2:14
mask [1] - 2:13
matter [7] - 24:6, 33:4, 33:8, 33:25, 35:8, 40:14, 47:20
matters [1] - 40:6
mean [33] - 5:6, 5:7, 10:3, 22:2, 25:14, 26:10, 26:11, 27:9, 27:12, 31:18, 32:2, 34:9, 36:2, 36:13, 40:13, 41:12, 41:23, 42:18, 44:3, 45:8, 45:18, 48:10, 49:13, 51:11, 53:5, 53:21, 54:1, 54:6, 54:7, 55:4, 55:13, 59:6, 63:10
meaning [40] - 19:21, 23:17, 23:19, 23:22, 24:25, 28:7, 28:13, 28:15, 28:17, 28:18, 29:2, 29:3, 29:5, 29:7, 31:1, 31:2, 31:3, 31:6, 31:17, 33:1, 35:13, 36:15, 37:24, 40:21, 50:15, 50:17, 53:6, 56:19, 56:20, 57:7, 57:17, 58:4, 58:7, 61:4, 61:16, 62:13, 62:17, 63:24, 63:25
means [16] - 6:9, 15:8, 18:16, 20:14, 21:15, 28:10, 29:2, 37:2, 48:3, 48:25, 51:12, 52:22, 54:12, 59:9, 59:12, 63:3
means-plus-function [1] - 48:25
meant [1] - 44:11
measurement [2] - 25:25, 26:24
meet [3] - 16:19, 62:4, 62 6
meeting [1 - 30:4
meets [1] - 8:22

memory [1] - 27:21
mention [1] - 57:25
mentioned [1] - 57:6
mere [1] - 50:20
merely [5] - 20:18, 34:17, 34:24, 35:2, 36:10
Merit [1] - 65:18
merits [1] - 35:6
met [2] - 35:18, 60:18
metaphor [1] - 59:14
method [9] - 4:8, 4:12, 7:3, 7:6, 9:24, 10:2, 54:21, 62:20, 62:21
Michael [2] - 2:18, 3:2
MICHAEL [2] - 1:16, 2:5
Micro [5] - 28:12, 28:16, 35:11, 49:18, 49:23
might [7] - 3:17, 10:19, 11:13, 22:7, 28:19, 28:20, 50:11
Mike [4] - 10:15, 12:7, 15:17, 53:22
mind [4] - 12:8, 41:1, 41:2, 48:16
minimum [2] - 21:13, 35:13
minute [5] - 5:11, 21:5, 39:2, 58:20, 58:24
minutes [1] - 58:20
mobile [1] - 27:7
mode [6] - 11:5, 14:8, 22:23, 26:21, 60:6
modifying [1] - 32:8
module [14] - 4:9, 5:21, 5:22, 9:3, 27:11, 27:13, 27:18, 29:23, 36:20, 36:22, 39:8, 39:9, 44:3, 60:8
moment [1] - 3:19
morning [10] - 2:18, 2:21, 2:22, 2:23, 2:25, 3:4, 3:14, 38:15, 38:16, 65:4
most [6] - 3:7, 3:17, 4:3, 5:24, 55:21, 63:8
mostly [1] - 55:5
motion [3] - 10:16, 34:18, 55:25
moving [1] - 47:19
MR [145] - 2:18, 2:21, 2:22, 3:14, 3:19, 3:23, 3 25  4 5  5 9, 6:5, 6:12  7 2  7 11, 7:20, 7:25  8 8  8 15,

8:24, 9:5, 9:8, 9:13, 9:15, 9:18, 10:12, 12:15, 12:19, 13:1, 13:8, 13:13, 13:16, 13:18, 14:25, 15:11, 15:16, 16:21, 17:16, 18:4, 18:7, 18:10, 18:14, 19:8, 19:12, 19:18, 20:6, 20:11, 20:17, 20:21, 21:6, 21:14, 21:17, 21:20, 22:6, 23:11, 23:15, 24:10, 24:16, 24:22, 25:1, 25:4, 25:17, 25:19, 26:7, 26:15, 27:8, 27:11, 27:14, 27:16, 27:24, 28:2, 28:20, 28:25, 29:17, 30:5, 30:10, 30:23, 31:9, 31:11, 32:4, 32:11, 32:25, 33:12, 33:20, 34:3, 34:16, 36:5, 36:17, 38:13, 38:15, 38:17, 40:16, 40:20, 41:1, 42:5, 42:17, 42:20, 43:1, 43:5, 44:1, 44:4, 44:16, 44:23, 45:10, 45:25, 46:8, 46:24, 48:16, 49:16, 49:20, 49:24, 50:14, 50:25, 51:10, 51:15, 51:25, 52:4, 52:9, 52:12, 52:16, 53:20, 53:25, 54:6, 54:9, 55:23, 56:23, 57:12, 57:15, 58:10, 58:15, 59:7, 59:13, 59:20, 59:25, 60:13, 61:1, 61:10, 61:18, 62:7, 62:16, 63:7, 63:18, 64:8, 64:11, 64:24, 65:8, 65:10
MS [1] - 2:25
multitude [1] - 42:21
must [2] - 47:6, 47:9

## N

NAGELBERG [1] - 2:4
named [1] - 24:7
narrow [1] - 28:14
narrowed [1] - 36:1
nearly [1] - 2:16
necessarily [2] - 32:2, 59:21
need [12] - 4:17, 11:18, 12:21, 12:22, 13:25, 17:2  20 18, 25:10, 33:21  35 9

35:13, 51:6
needs [8] - 11:14, 12:16, 14:8, 21:1, 21:22, 21:23, 25:24, 59:22
negative [1] - 15:21
never [5] - 12:17, 22:24, 22:25, 47:2, 47:18
nevertheless [1] - 7:7
next [4] - 11:11, 13:8, 13:9, 14:7
Nikon [1] - 26:20
nobody's [1] - 51:9
non [3] - 33:17, 50:4, 63:22
non-infringement [2] - 50:4, 63:22
non-responsiveness [1] - 33:17
nonce [1] - 48:24
none [1] - 42:24
normal [5] - 11:10, 23:1, 23:4, 29:5, 61:16
normally [1] - 11:10
North [1] - 1:10
note [1] - 42:13
noted [1] - 42:6
notes [1] - 65:16
nothing [9] - 6:21, 9:24, 11:8, 17:9, 29:25, 32:18, 45:15, 45:16, 58:3
notice [1] - 46:10
nowhere [1] - 16:7
numbers [2] - 27:3, 54:13

## O

obviously [4] - 12:15, 17:4, 28:21, 48:12
occur [3] - 6:25, 8:4, 8:12
occurring [1] - 7:9
October [1] - 1:11
OF [1] - 1:2
off-on [1] - 20:1
offend [1] - 49:18
offer [1] - 51:4
office [4] - 15:3, 15:8, 15:19, 15:22
old [3] - 14:14, 26:19, 26:20
old-school [1] - 26:19
Omnivision [2] - 2:15, 3 2
OMNIVISION [1] - 1 7
once [8] - 7 14, 16:17,

21:12, 35:24, 36:1, 36:4, 36:6, 45:19
one [51] - 3:7, 3:8, 4:11, 7:9, 7:25, 9:6, 13:9, 13:21, 18:23, 18:24, 19:1, 19:3, 19:5, 19:6, 19:7, 20:8, 21:22, 22:2, 22:9, 22:18, 22:25, 23:8, 25:3, 25:4, 28:6, 30:16, 31:10, 31:11, 32:8, 37:4, 39:4, 39:6, 39:8, 44:5, 45:7, 46:19, 47:12, 49:25, 52:7, 52:11, 53:15, 57:7, 59:14, 59:17, 60:20, 60:25, 61:2, 62:3, 62:25
one's [1] - 23:7
onset [1] - 55:24
open [3] - 12:1, 26:22, 26:25
operability [1] - 46:20
operable [6] - 9:3, 46:2, 61:20, 63:9, 63:12, 64:5
operation [2] - 22:23, 24:19, 51:6, 54:22
operations [1] - 22:8
opposed [4] - 51:7, 53:13, 64:5, 64:22
option [1] - 29:18
options [1] - 29:16
orange [2] - 28:4, 31:21
order [8] - 4:11, 8:22, 8:25, 9:2, 13:10, 22:18
Order [1] - 31:3
ordered [1] - 7:4
ordinary [16] - 15:25, 23:17, 23:18, 23:21, 24:25, 40:21, 56:19, 56:20, 57:17, 58:3, 58:7, 61:4, 61:16, 62:17, 63:23, 63:24
organization [1] - 22:17
otherwise [1] - 64:16
output [3] - 34:21, 36:11, 49:10
outputting [1] - 34:18
outside [1] - 27:1
overindulge [1] - 53:4
overreaching [2] - 38:10, 55:1
own [3] - 49 8  51:14, 64:7

**Exhibit C**
Markman Hearing Transcript (D.I. 59)

C.A. No. 20-136-RGA-JLH

**P**

P.A [1] - 2:2
Page [3] - 28:9, 64:11, 64:19
Pages [1] - 47:4
paired [6] - 28:10, 29:19, 30:25, 36:25, 40:5, 48:4
parade [3] - 55:19, 55:21, 55:24
parameters [2] - 57:20, 57:21
pardon [1] - 31:13
part [13] - 4:3, 4:4, 4:15, 12:3, 12:20, 15:22, 19:13, 36:13, 38:18, 39:12, 43:7, 51:20, 55:24
particular [10] - 4:11, 4:20, 5:3, 5:19, 5:20, 6:16, 21:10, 30:1, 53:7, 56:18
particularly [2] - 43:8, 55:11
patent [12] - 3:6, 4:21, 11:8, 13:14, 15:18, 33:23, 38:2, 46:20, 48:12, 57:19, 58:9, 62:21
patentee [3] - 15:12, 15:14, 45:2
patience [1] - 11:20
pencil [2] - 32:13, 32:14
people [4] - 49:22, 55:6, 55:17, 55:19
percent [2] - 57:3, 57:9
perfectly [1] - 53:11
perform [2] - 51:5, 54:23
performed [1] - 54:18
perhaps [3] - 16:15, 55:5, 63:8
person [2] - 15:25, 48:6
phone [1] - 42:19
phones [3] - 27:7, 39:25, 42:22
phrase [12] - 4:1, 4:13, 4:15, 4:22, 5:10, 5:24, 6:2, 6:3, 21:11, 24:15, 43:23, 57:16
phrases [1] - 6:13
physical [1] - 37:11
pick [1] - 25:2
picked [1] - 42:11
picture [3] - 26 4
26 18  26:23

pink [2] - 12:11, 12:13
place [2] - 45:7, 45:8
places [1] - 58:1
plain [38] - 23:16, 23:18, 23:21, 24:24, 28:7, 28:13, 28:15, 28:17, 28:18, 29:1, 29:3, 29:5, 29:7, 31:1, 31:2, 31:3, 31:6, 31:17, 33:1, 35:12, 36:15, 40:21, 50:15, 50:17, 53:10, 56:18, 56:20, 57:17, 58:3, 58:6, 61:4, 61:16, 62:13, 62:16, 62:23, 63:23, 63:24
plainly [1] - 47:8
Plaintiff [11] - 1:5, 1:20, 2:19, 3:15, 23:16, 24:23, 28:6, 29:4, 29:18, 47:11, 48:13
Plaintiff's [8] - 16:6, 16:23, 25:6, 33:13, 35:5, 45:25
plaintiffs [1] - 52:21
plane [2] - 30:10, 47:19
plausible [1] - 31:1
pleadings [1] - 17:2
plenty [3] - 53:25, 63:4
plurality [3] - 4:17, 37:13, 45:17
plus [2] - 48:25, 51:12
point [40] - 6:6, 9:1, 10:9, 10:12, 11:17, 18:21, 18:25, 24:23, 25:5, 25:20, 26:1, 27:3, 28:11, 29:22, 29:23, 29:24, 30:25, 32:10, 35:15, 35:16, 37:20, 37:22, 39:4, 39:24, 42:1, 43:11, 46:9, 46:14, 49:3, 49:16, 51:16, 55:10, 56:3, 56:16, 58:14, 59:18, 59:25, 65:7, 65:10
pointed [1] - 45:1
pointing [1] - 46:12
points [1] - 38:18
portion [1] - 10:25
portions [2] - 13:19, 14:2
position [10] - 16:23, 27:16, 28:12, 31:14, 32:16, 33:4, 33:13, 33:15  35 5  36 24, 46:1, 47 2  47 3
47:13  47 24  49:5,

50:4, 56:8, 57:1
possible [2] - 26:3, 62:3
potential [1] - 63:14
powder [1] - 14:15
practical [1] - 26:17
practicality [1] - 25:23
pre [4] - 17:18, 18:20, 20:8, 25:20
pre-program [2] - 17:18, 18:20
pre-programmed [1] - 20:8
pre-stored [1] - 25:20
precluded [1] - 33:7
prefer [1] - 9:9
preference [1] - 62:16
preferred [4] - 39:7, 39:8, 44:6, 56:21
prepared [2] - 24:23, 48:4
presence [12] - 6:3, 6:21, 6:24, 8:12, 12:12, 18:17, 21:10, 24:2, 38:22, 40:19, 47:9, 59:15
present [47] - 8:10, 10:21, 20:14, 28:8, 28:10, 28:23, 29:2, 29:4, 29:11, 29:12, 29:14, 29:25, 30:2, 30:3, 30:14, 31:5, 34:14, 36:23, 36:24, 37:1, 40:13, 40:18, 40:23, 41:10, 41:11, 41:14, 41:17, 41:22, 42:11, 43:25, 44:2, 47:7, 48:1, 48:3, 57:1, 59:2, 59:5, 60:12, 61:6, 61:8, 62:1, 62:6, 62:13, 62:15, 64:16
presentation [2] - 2:16, 9:20, 49:6
presented [1] - 29:18
preset [1] - 60:15
presiding [1] - 2:10
pretty [1] - 54:3
principles [1] - 45:6
problem [1] - 61:3
proceeding [1] - 65:17
PROCEEDINGS [1] - 2:8
processed [1] - 11:15
product [2] - 20:7, 35:19
products [2] - 17:4, 42:22
program [6] - 16:18, 17:18, 18:20  19 6

41:24, 42:1
programmed [1] - 20:8
proper [2] - 9:3, 56:24
proposal [2] - 33:1, 61:3
proposed [4] - 36:13, 43:7, 50:7, 50:10
proposing [2] - 29:3, 41:19
provided [1] - 43:9
pure [1] - 51:17
purely [1] - 20:23
purported [4] - 12:4, 15:2, 15:5, 23:3
purpose [2] - 16:10, 35:21
purposes [1] - 40:6
put [10] - 4:11, 8:16, 10:15, 15:12, 17:19, 22:22, 31:13, 37:21, 47:7, 49:1
putting [2] - 23:2, 47:16

**Q**

questions [3] - 9:9, 23:24, 25:13
quick [2] - 16:22, 51:1
quite [3] - 23:17, 39:2, 56:21
quote [1] - 61:4

**R**

raise [1] - 49:17
raised [4] - 9:22, 18:1, 25:6, 35:15
raising [1] - 55:6
rather [2] - 32:17, 63:9
reaction [1] - 20:5
read [4] - 3:5, 13:17, 13:23, 17:21
reading [3] - 28:23, 43:21, 56:24
Real [1] - 65:18
real [4] - 16:22, 44:19, 47:21, 51:1
Real-Time [1] - 65:18
real-world [2] - 44:19, 47:21
reality [1] - 26:17
really [24] - 5:23, 10:3, 15:20, 16:6, 18:25, 19:15, 29:21, 30:11, 31:11, 38:23, 40:10, 42 6  42:10, 43:6, 45 12  45:14, 46:3
50 6  51:25, 52:5,

52:18, 55:9, 61:12, 62:20
reason [5] - 12:11, 17:16, 20:22, 34:1, 64:15
received [1] - 62:3
recess [2] - 58:20, 65:12
Recess [1] - 58:22
recessed [1] - 65:14
recite [1] - 64:25
recognized [1] - 57:16
recognizing [1] - 59:2
record [1] - 8:25
red [1] - 39:10
referencing [1] - 49:18
referring [5] - 14:9, 14:10, 41:22, 41:23
regardless [1] - 31:16
register [10] - 21:1, 21:2, 22:22, 37:9, 37:12, 37:14, 37:16, 43:20, 44:7, 54:14
registers [3] - 22:3, 44:7, 56:12
rejections [1] - 15:20
relate [1] - 37:20
related [1] - 52:12
relates [2] - 4:23, 35:1
relating [1] - 21:15
relationship [2] - 5:5, 6:2
relatively [1] - 63:23
relevant [5] - 11:2, 15:23, 16:1, 19:16, 34:19
remember [3] - 22:12, 28:23, 58:13
reorder [1] - 4:7
reordering [1] - 39:3
Reporter [1] - 65:18
require [4] - 4:12, 38:25, 39:14, 42:15
required [3] - 21:11, 21:13, 47:8
requirement [1] - 62:4
requires [4] - 35:19, 36:7, 41:2, 47:22
requiring [1] - 47:12
resolve [2] - 49:9, 50:9
resolving [1] - 50:24
respectfully [1] - 58:6
response [29] - 3:10, 4:4, 5:2, 5:6, 5:8, 5:15, 5:25, 6:10, 6:13, 9:21, 11:2, 12:8, 12:11, 16:4, 18:11  18 17  19:7, 19:9  21 12  21:19, 22:4  22 10  22:19,

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                                        C.A. No. 20-136-RGA-JLH

23:5, 23:14, 24:3,
24:15, 26:8, 35:1
**responsiveness** [1] -
33:17
**rest** [2] - 8:8, 8:22
**result** [4] - 5:17, 6:14,
34:3, 57:22
**resulting** [1] - 6:14
**return** [1] - 15:9
**Richard** [1] - 2:10
**RICHARD** [1] - 1:14
**Richards** [1] - 3:1
**RICHARDS** [1] - 2:2
**rise** [4] - 2:9, 58:21,
58:23, 65:13
**road** [1] - 55:20
**rolling** [1] - 11:13
**room** [1] - 41:16
**rope** [1] - 55:8
**ruling** [1] - 35:6
**run** [1] - 47:18
**running** [1] - 10:1

## S

**sake** [1] - 61:22
**salmon** [1] - 12:15
**satisfies** [1] - 54:15
**satisfy** [2] - 19:1, 33:2
**saw** [1] - 40:9
**scenario** [1] - 48:25
**scene** [2] - 10:20
**school** [2] - 14:14,
26:19
**scope** [5] - 33:8, 36:1,
55:2, 56:14, 57:10
**scored** [1] - 49:1
**screen** [2] - 39:10,
43:10
**seated** [2] - 2:11,
58:24
**second** [31] - 6:3, 6:4,
6:21, 8:12, 9:6,
11:17, 15:7, 18:24,
20:13, 20:15, 22:10,
29:11, 36:19, 43:11,
43:24, 47:2, 47:6,
47:7, 47:9, 47:25,
48:8, 52:7, 53:14,
59:1, 59:5, 59:16,
61:6, 61:7, 62:5,
62:12, 62:15
**secondary** [1] - 57:1
**section** [2] - 11:4,
16:5
**Section** [1] - 58:16
**sections** [1] - 14:9
**see** [22] - 2 15 3 15,
13 10 16:11, 23:13
36 12 38:1, 39:9,

40:16, 42:10, 43:8,
43:18, 43:20, 45:13,
47:4, 48:7, 49:16,
51:13, 52:14, 54:25,
64:19, 64:20
**seeing** [1] - 11:6
**seem** [1] - 33:9
**sees** [1] - 39:3
**sense** [3] - 3:12,
10:23, 59:24
**Sensing** [1] - 2:14
**SENSING** [1] - 1:4
**sensor** [4] - 11:12,
26:24, 27:19
**sensory** [1] - 45:15
**sent** [1] - 15:9
**separate** [1] - 31:20
**separately** [1] - 4:2
**sequential** [1] - 9:25
**series** [1] - 41:5
**serve** [2] - 36:8, 37:15
**session** [1] - 2:10
**set** [91] - 5:3, 5:12,
6:17, 7:12, 7:14, 8:2,
8:3, 8:10, 8:17, 9:2,
18:12, 19:3, 19:9,
19:16, 19:19, 19:21,
19:22, 20:2, 20:8,
20:12, 20:22, 21:22,
21:24, 22:2, 22:9,
22:18, 24:11, 24:18,
29:10, 31:2, 34:12,
38:24, 39:16, 39:22,
39:23, 40:3, 40:4,
40:7, 40:22, 40:24,
41:21, 43:14, 43:16,
43:23, 44:3, 44:5,
44:14, 44:16, 45:21,
46:5, 47:5, 47:9,
47:18, 47:20, 47:22,
50:15, 51:5, 51:19,
56:16, 58:25, 59:3,
59:8, 59:9, 59:10,
59:12, 59:22, 59:24,
60:11, 60:19, 60:21,
61:5, 61:15, 61:16,
61:21, 62:4, 62:12,
62:23, 63:3, 63:13,
64:3, 64:4, 64:6,
64:13, 64:14, 64:15,
64:20, 64:22, 64:25,
65:1
**setting** [2] - 17:20,
40:2
**settings** [1] - 47:17
**several** [4] - 4:1, 4:10,
16:9, 44:4
**shape** [1] - 38 5
**show** [1] - 33 24
**showed** [1] - 46 19

**showing** [1] - 35:14
**shown** [3] - 14:18,
43:14, 44:8
**shows** [3] - 4:5, 31:4,
39:7
**shutter** [5] - 11:13,
12:1, 26:22, 26:25,
27:2
**side** [7] - 9:12, 42:13,
55:5, 55:7, 57:13,
57:14, 64:4
**sides** [1] - 55:5
**signal** [36] - 16:24,
17:4, 17:5, 17:11,
17:19, 17:23, 31:15,
31:20, 31:23, 32:11,
32:18, 32:23, 33:3,
33:7, 33:15, 33:18,
33:19, 33:20, 33:24,
34:2, 34:6, 34:10,
34:17, 34:21, 35:7,
35:14, 36:11, 37:22,
38:11, 44:9, 49:4,
49:10, 50:20, 56:3
**signals** [6] - 38:4,
43:9, 43:13, 43:15,
44:10, 50:9
**significance** [2] -
24:14, 30:1
**significant** [1] - 58:17
**simple** [1] - 21:21
**simply** [3] - 25:8,
54:10, 56:11
**simulator** [2] - 30:12,
47:16
**single** [1] - 26:18
**sit** [1] - 46:21
**situation** [3] - 7:12,
52:18, 56:8
**skill** [1] - 15:25
**skip** [1] - 21:4
**slices** [1] - 11:15
**slide** [5] - 4:5, 10:16,
11:18, 13:8, 33:24
**Slide** [35] - 9:20, 9:23,
10:15, 10:24, 12:7,
13:9, 15:17, 16:22,
17:12, 18:10, 19:18,
21:20, 22:6, 25:9,
28:2, 28:4, 31:12,
31:13, 31:25, 32:20,
33:5, 35:14, 36:18,
37:6, 37:21, 38:1,
46:12, 49:6, 50:1,
50:3, 51:1, 52:25,
59:9
**slides** [1] - 3:21
**slightly** [1] - 13:9
**slower** [1] - 27:2
**SLR** [1] - 26 19

**small** [1] - 15:5
**snapshot** [1] - 27:5
**snark** [1] - 15:18
**software** [2] - 8:9,
8:16
**solely** [1] - 25:21
**someone** [1] - 56:7
**somewhat** [1] - 16:23
**somewhere** [4] -
15:10, 41:16, 41:24,
63:13
**sorry** [10] - 5:10, 13:1,
14:23, 15:6, 19:12,
25:12, 32:22, 35:5,
52:10, 58:15
**sort** [5] - 10:9, 24:7,
58:10, 63:14, 64:7
**sorts** [1] - 45:9
**sound** [2] - 8:24,
45:22
**sounds** [1] - 45:23
**speaking** [3] - 20:7,
34:6, 55:9
**spec** [7] - 21:2, 31:19,
49:1, 52:22, 53:2,
53:8, 56:24
**special** [1] - 11:8
**specific** [5] - 5:19,
6:16, 42:23, 42:25,
48:11
**specifically** [2] -
30:16, 64:14
**specification** [7] -
4:18, 15:13, 43:12,
43:13, 44:9, 48:12,
58:1
**specified** [1] - 51:5
**spectrum** [1] - 63:14
**speed** [1] - 27:2
**speedometer** [1] -
30:7
**spot** [1] - 58:11
**square** [1] - 11:14
**stage** [2] - 32:21, 42:8
**standing** [1] - 26:19
**standpoint** [2] - 11:3,
25:8
**start** [3] - 16:14,
36:21, 51:8
**started** [1] - 18:12
**statement** [3] - 25:6,
46:13, 57:19
**statements** [2] -
15:13, 46:15
**STATES** [1] - 1:1
**stenographic** [1] -
65:16
**step** [3] - 11:11, 23:2,
23 8
**stepping** [1] - 23 7

**steps** [4] - 4:12, 9:25,
39:3, 39:4
**still** [3] - 19:4, 30:12,
50:16
**stop** [1] - 15:7
**storage** [5] - 4:17,
4:19, 37:13, 45:17,
51:20
**store** [3] - 3:9, 4:19,
37:9
**stored** [24] - 5:1, 5:17,
8:18, 24:7, 24:10,
24:14, 24:18, 25:15,
25:20, 26:14, 26:15,
36:18, 37:6, 37:12,
37:13, 37:17, 37:22,
38:6, 43:19, 48:19,
54:14, 56:11, 59:8
**stores** [3] - 8:13, 21:2,
22:22
**storing** [3] - 6:22,
6:25, 7:18
**Street** [1] - 1:10
**stretch** [1] - 55:14
**strike** [1] - 55:22
**strobe** [3] - 17:3, 17:5,
35:7
**structure** [13] - 20:25,
21:1, 27:17, 35:19,
37:11, 37:18, 48:6,
48:22, 49:1, 49:2,
51:18, 51:22, 59:16
**stuff** [4] - 12:11,
12:13, 20:4, 31:21
**subject** [1] - 34:18
**substitute** [1] - 50:21
**substituting** [2] -
16:24, 42:9
**substitution** [1] -
42:9
**SUDER** [1] - 1:18
**Suder** [1] - 2:20
**sufficient** [2] - 17:20,
50:21
**suggest** [3] - 45:7,
58:6, 64:21
**suggested** [1] - 3:17
**summary** [2] - 33:10,
55:16
**sunny** [1] - 27:1
**supported** [1] - 4:18
**supporting** [1] - 31:19
**supports** [1] - 48:20
**suppose** [1] - 29:10
**supposed** [1] - 55:22
**switch** [8] - 20:2,
33:23, 34:25, 35:7,
36:8, 38:8, 60:17
**synonym** [2] - 37:6
41:20
**synthesis** [1] - 53 4

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                    C.A. No. 20-136-RGA-JLH

**system** [6] - 34:23, 34:25, 35:2, 36:10, 37:4, 47:17

**T**

**tables** [1] - 13:5
**tablet** [3] - 40:2, 40:5, 42:19
**tablets** [2] - 39:25, 42:22
**talks** [3] - 14:8, 43:13, 57:19
**technical** [3] - 10:23, 11:3, 25:7
**technically** [1] - 26:3
**Technologies** [1] - 2:15
**TECHOLOGIES** [1] - 1:7
**ten** [1] - 2:16
**term** [7] - 3:16, 3:25, 23:24, 32:24, 48:13, 48:15, 58:25
**terms** [6] - 4:1, 4:10, 24:23, 34:13, 43:22, 61:3
**terrific** [1] - 13:18
**test** [1] - 30:18
**THE** [148] - 1:1, 1:2, 1:14, 2:11, 2:23, 3:4, 3:18, 3:22, 4:3, 5:5, 5:23, 6:8, 6:20, 7:5, 7:17, 7:23, 8:4, 8:11, 8:19, 9:4, 9:6, 9:11, 9:14, 9:17, 10:1, 12:13, 12:17, 12:25, 13:2, 13:12, 13:14, 13:17, 14:24, 15:7, 15:12, 16:11, 17:14, 18:2, 18:5, 18:8, 18:13, 19:4, 19:11, 19:13, 19:25, 20:10, 20:12, 20:20, 21:4, 21:7, 21:16, 21:18, 22:1, 23:9, 23:13, 23:25, 24:13, 24:21, 24:24, 25:2, 25:14, 25:18, 26:5, 26:10, 27:6, 27:9, 27:12, 27:15, 27:22, 28:1, 28:19, 28:22, 29:8, 29:21, 30:9, 30:21, 31:7, 31:10, 32:1, 32:10, 32:23, 33:9, 33:19, 33:25, 34:9, 35:23, 36:12, 38:12, 38:14, 38:16, 40:13, 40 18, 40:24, 41:8, 42 9, 42 18, 42:24,

43:2, 43:22, 44:2, 44:11, 44:20, 44:25, 45:14, 46:6, 46:22, 48:9, 49:12, 49:19, 49:22, 50:6, 50:23, 51:8, 51:11, 51:24, 52:2, 52:7, 52:10, 52:14, 53:9, 53:24, 54:2, 54:7, 55:4, 56:17, 57:11, 57:13, 58:8, 58:13, 58:19, 58:24, 59:11, 59:18, 59:23, 60:8, 60:24, 61:2, 61:15, 61:22, 62:11, 62:25, 63:10, 63:19, 64:9, 64:18, 65:3, 65:9, 65:11
**themselves** [1] - 27:7
**theory** [5] - 18:20, 26:16, 32:17, 34:5, 60:2
**thereafter** [3] - 15:10, 21:13, 24:3
**therefore** [1] - 5:2
**they've** [2] - 4:10, 4:12
**thinks** [1] - 23:19
**third** [1] - 49:3
**thread** [1] - 17:15
**three** [6] - 22:21, 22:25, 23:2, 39:4, 45:4, 65:2
**throwing** [1] - 51:11
**tie** [2] - 21:19, 36:15
**tied** [2] - 26:2, 51:18
**together** [2] - 6:13, 6:14
**top** [1] - 11:4
**towards** [4] - 38:23, 39:16, 44:17, 46:3
**transcript** [1] - 65:16
**transforming** [1] - 62:20
**TRIAL** [1] - 1:6
**tricky** [1] - 55:6
**trigger** [3] - 33:22, 34:15, 38:3
**Triozzi** [1] - 65:18
**true** [2] - 8:15, 65:15
**try** [4] - 17:17, 37:1, 44:19, 54:9
**trying** [18] - 4:7, 6:1, 9:23, 10:2, 10:4, 10:10, 17:24, 19:23, 21:7, 28:14, 30:18, 32:15, 37:17, 51:16, 51:21, 55:20, 59:12, 63:21
**Tuesday** [1] - 1 11
**turn** [8] - 4:8, 25 12, 33:22  37 23  38:1,

38:4, 60:5
**turning** [4] - 17:24, 33:21, 35:3, 38:8
**turns** [4] - 17:7, 17:10, 17:15, 33:3
**two** [33] - 4:21, 5:6, 6:5, 7:13, 7:22, 18:22, 19:3, 19:5, 21:24, 22:19, 22:25, 24:17, 25:24, 26:13, 28:5, 30:17, 31:8, 31:20, 31:24, 37:5, 38:6, 39:4, 45:8, 46:1, 46:20, 58:17, 59:14, 59:17, 63:6, 64:21, 65:2
**type** [18] - 4:20, 4:24, 5:1, 5:10, 5:13, 5:19, 5:20, 6:16, 6:17, 6:19, 9:5, 12:6, 14:6, 15:4, 34:7, 36:9, 37:10, 40:3
**types** [4] - 7:13, 7:22, 24:12, 24:17

**U**

**U.S** [1] - 65:19
**U.S.D.C.J** [1] - 1:14
**ultimately** [15] - 4:12, 4:24, 5:13, 5:17, 6:18, 9:3, 28:10, 29:19, 30:25, 36:25, 39:24, 40:5, 40:8, 48:4
**under** [5] - 28:16, 32:15, 58:16, 63:20, 65:5
**understandable** [1] - 57:10
**understood** [2] - 28:24, 29:3
**unfair** [2] - 39:14, 60:22
**UNITED** [1] - 1:1
**unless** [3] - 23:23, 62:1, 62:2
**unnecessary** [1] - 39:14
**unsure** [1] - 3:8
**up** [13] - 5:11, 5:16, 9:16, 10:15, 23:12, 31:13, 34:12, 37:22, 39:10, 44:11, 51:5, 56:3, 57:2
**USC** [1] - 58:16

**V**

**vaccinated** [1] - 2:12

**vague** [1] - 53:6
**value** [22] - 18:18, 18:25, 21:3, 25:16, 26:12, 36:18, 37:6, 37:14, 37:17, 37:18, 37:22, 43:19, 48:19, 49:1, 59:8, 59:9, 59:15, 59:19, 59:22, 59:24, 60:1, 60:4
**values** [39] - 5:17, 6:15, 6:18, 7:13, 7:21, 7:22, 7:24, 8:10, 8:17, 8:18, 9:5, 10:13, 10:23, 16:12, 17:24, 22:21, 24:12, 24:16, 24:19, 25:7, 25:8, 25:14, 25:20, 25:24, 26:2, 26:8, 26:9, 26:10, 26:11, 26:14, 26:16, 38:6, 39:21, 54:10, 54:25, 61:12, 61:25
**various** [2] - 10:7, 48:10
**venture** [1] - 50:16
**verb** [2] - 24:6, 62:19
**verb-like** [1] - 62:19
**versus** [3] - 40:10, 43:4, 46:19
**via** [1] - 50:18
**view** [9] - 10:11, 11:5, 23:20, 24:24, 41:21, 45:11, 46:3, 59:2
**virtue** [3] - 31:18, 31:23, 54:24
**voltage** [1] - 37:24
**VOWELL** [28] - 1:19, 2:22, 3:14, 3:19, 3:23, 3:25, 4:5, 5:9, 6:5, 6:12, 7:2, 7:11, 7:20, 7:25, 8:8, 8:15, 8:24, 9:5, 9:8, 9:13, 23:15, 24:10, 24:16, 24:22, 25:1, 57:15, 58:10, 58:15
**Vowell** [9] - 2:20, 3:15, 7:6, 9:7, 9:14, 10:9, 23:13, 39:19, 60:25
**Vowell 's** [1] - 16:13
**vs** [1] - 2:14

**W**

**wait** [1] - 52:7
**walk** [1] - 41:5
**walking** [1] - 39:2
**wants** [2] - 23:14, 41:4
**waveform** [2] - 37 23
**ways** [4] - 44:4, 52 21  53 25  63:10

**whereas** [2] - 22:23, 38:20
**wherein** [6] - 18:22, 19:20, 32:13, 45:4, 64:17, 65:1
**whichever** [2] - 25:3, 60:25
**whole** [5] - 15:2, 16:9, 43:9, 45:11, 63:11
**wholly** [1] - 17:25
**Wilmington** [1] - 1:10
**wishes** [1] - 12:10
**word** [6] - 22:2, 37:2, 41:13, 48:24, 58:4, 63:9
**words** [7] - 5:7, 19:15, 19:25, 29:7, 42:7, 42:10, 49:8
**workable** [1] - 10:23
**works** [1] - 42:12
**world** [2] - 44:19, 47:21
**written** [6] - 4:17, 23:22, 40:21, 60:9, 61:19

**X**

**Xenon** [15] - 4:21, 12:23, 13:21, 14:12, 14:16, 14:21, 16:15, 16:18, 17:20, 34:2, 37:25, 38:3, 54:14, 60:9, 60:17

**Y**

**year** [1] - 49:13
**years** [3] - 2:16, 58:12, 58:17
**yellow** [3] - 12:8, 13:11, 14:2

**Exhibit C**
Markman Hearing Transcript (D.I. 59)                C.A. No. 20-136-RGA-JLH

# EXHIBIT D

**"Indicator Set to Indicate" Contentions Demonstrative**

### June 15, 2021:  Initial Infringement Contentions (Ex. A at 9)



Lists table of possible register values**.**

### March 22, 2022:  Supplemental Infringement Contentions (Ex. A at 19)



On November 9, 2021, Court ruled that "'set to indicate' is not 'configured to indicate' or 'capable of indicating.'" (D.I. 60 at 4.) "'Set to indicate' requires something more than mere future capability; this term relates to the present condition of the indicator." (*Id.*)

IIS does not address the Court's construction.

No analysis of anything set in accused product.

## June 15, 2021:  Initial Infringement Contentions (Ex. A at 9)



Lists table of possible register values**.**

## March 22, 2022:  Supplemental Infringement Contentions (Ex. N at 10)



On November 9, 2021, Court ruled that "'set to indicate' is not 'configured to indicate' or 'capable of indicating.'" (D.I. 60 at 4.) "'Set to indicate' requires something more than mere future capability; this term relates to the present condition of the indicator." (*Id.*)

IIS does not address the Court's construction.

No analysis of anything set in accused product.

# EXHIBIT E

**"In Response To" Contentions Demonstrative**

**June 15, 2021:  Initial Infringement Contentions (Ex. A at 19)**



No theory disclosing what occurs is is "in response to" an indicator indicating the presence of a first or second flash device.

No theory disclosing how exposure time or gain are associated with a LED (or Xenon)

Nothing mentioning "gain"

**March 22, 2022:  Supplemental Infringement Contentions (Ex. A at 19)**



No further analsyis.

**June 15, 2021:  Initial Infringement Contentions (Ex. A at 19)**



No theory disclosing what occurs is is "in response to" an indicator indicating the presence of a first or second flash device.

No theory disclosing how exposure time or gain are associated with a LED (or Xenon)

Nothing mentioning "gain"

**March 22, 2022:  Supplemental Infringement Contentions (Ex. N at 20)**



No further analysis.

# EXHIBIT F

**IIS March 22, 2022 Infringement Contentions Exhibit N**

Plaintiff's Claim Chart

Exhibit N

U.S. Pat. No. 7,333,145

"Camera Module"

Defendant:
Omnivision ("Defendant" or "Omnivision")



Accused Products:
Omnivision OV2736 Image Sensor
Representative of all products listed on slide 2

| Representative Product |
| Accused Product |

This claim chart specifically addresses infringement of claim 1 ("Asserted Claim" of U.S. Patent No. 7,333,145 ("the '145 Patent") by Omnivision's OV2736 model of image sensors.

Omnivision's OV2736 sensor (collectively referred to herein as the "Accused Product") are representative of Omnivision's infringement of the Asserted Claim. This chart specifically addresses the functionality of the listed product. However, these infringement contentions are illustrative rather than exhaustive. They are representative of, and apply to, all products using this sensor and all products comprising similar features, functions, and/or characteristics to those shown and described herein. This chart is being provided as an Initial Infringement Contention pursuant to the schedule in this case, and Plaintiff specifically reserves all rights to amend or supplement this claim chart with evidence obtained during the course of discovery. Plaintiff expressly reserves all rights to assert additional claims.

This claim chart is representative of the architecture and functionality of all of the accused products which are listed on the next slide.

1

**List of Accused Products**

| | | |
|---|---|---|
| OV02B | OV5648 | OV21840 |
| OV13A10 | OV5640 | OV21850 |
| OV13A20 | OV5642 | OV21880 |
| OV13A30 | OV5645 | OV23850 |
| OV13A1Q | OV5670 | OV26850 |
| OV16B10 | OV5690 | OV13551 |
| OV16E10 | OV5693 | OV16850 |
| OV16A10 | OV8858 | OV48B10 |
| OV24A10 | OV8358 | OS08A20 |
| OV24A1B | OV8865 | OS08A1S |
| OV24A1Q | OV8365 | OS05A20 |
| OV24A | OV12870 | OV12C10 |
| OV24B10 | OV12890 | OV2241 |
| OV2281 | OV13351 | OV2740 |
| OV2655 | OV13554 | OV12D10 |
| OV2732 | OV 13850 | OV48C10 |
| OV2736 | OV13853 | OV12D10 |
| OV3640 | OV13855 | OV64A10 |
| OV4686 | OV13860 | OVFUJI |
| OV4688 | OV13870 | OV32B10 |
| OV4689 | OV16860 | OV4685 |
| OV4690 | OV16880 | OV50C10 |
| OV04880 | OV16885 | OV48E10 |
| OV5148 | OV20880 | OV32A10 |
| | | OH08A10 |

2

| '145 Patent |
| --- |
| Claim: 1 |

**[Preamble]** A camera module comprising:

**[Element A]** an image sensor array;

**[Element B]** a gain amplifier;

**[Element C]** an indicator set to indicate whether a first flash device or a second flash device is present; and

**[Element D]** a plurality of storage locations;

**[Element E(i)]** wherein the plurality of storage locations is configured to store an exposure time and a gain,

**[Element E(ii)]** wherein the exposure time and the gain are associated with the second flash device in response to the indicator indicating the presence of the second flash device,

**[Element E(iii)]** wherein the exposure time and the gain are associated with the second flash device in response to the indicator indicating the presence of the second flash device,

**[Element E(iv)]** wherein the image sensor array is configured to capture an image using the exposure time, and wherein the gain amplifier is configured to perform processing on the image using the gain.

3

| '145 Patent |
|---|
| Claim: 1 –Preamble[1] |
| A camera module comprising: |
| • The Accused Product comprises a camera module.<br>• Omnivision's OV2736 is a camera module facilitating the capturing and processing of images.<br><br>. |
| 4 |



[1]By charting the preamble, we do not concede that the preamble is a limitation and reserve the right to contend that the preamble is not a limitation of the claim.

We have relied upon publicly available information, and the limited information provided to date by Omnivision, for support for the claim elements. Some information and materials that may be necessary to conclusively establish Infringement are not publicly available. While this chart cites to documentation for only the Representative Products, it is intended to be indicative of how all Accused Products infringe the '145 Patent.

| '145 Patent |
| --- |
| Claim: 1 –Preamble[1] |
| A camera module comprising: |

- The Accused Product comprises a camera module.
- Omnivision's OV2736 is a camera module facilitating the capturing and processing of images.

5



| '145 Patent |
| Claim: 1 – Element (A) |
| an image sensor array; |

- The Accused Product includes an image sensor array, highlighted in green to the right.
- The image sensor array captures images for processing by the camera module.

6

Claim 1, Element A - The Accused Products literally infringe this claim element. Alternatively, the limitations of this claim element are present under the Doctrine of Equivalents because to the extent there are any differences between the Accused Product and this claim element, such differences are insubstantial. Further, equivalency may be shown by the fact that the Accused Product performs substantially the same function in substantially the same way to achieve substantially the same result as recited in this claim element.

| '145 Patent |
| --- |
| Claim: 1 – Element (A) |

an image sensor array;

- The Accused Product includes an image sensor array.
- The OV2736 sensor's image array is shown to the right.

7



| '145 Patent |
| --- |
| Claim: 1 – Element (B) |

a gain amplifier;

- The Accused Product includes a gain amplifier, shown in yellow to the right.
- The OV2736's gain amplifier receives input from the image input from the image array and the gain control, which it uses to modify the image data with the corresponding gain to prepare it for output as a 12-bit image data.
- Exposure time and gain may be set automatically and manually.

8



Claim 1, Element (B) - The Accused Products literally infringe this claim element. Alternatively, the limitations of this claim element are present under the Doctrine of Equivalents because to the extent there are any differences between the Accused Product and this claim element, such differences are insubstantial. Further, equivalency may be shown by the fact that the Accused Product performs substantially the same function in substantially the same way to achieve substantially the same result as recited in this claim element.

| '145 Patent |
|---|
| Claim: 1 – Element (C) |
| an indicator set to indicate whether a first flash device or a second flash device is present; and |

- The Accused Products include an indicator that is set to indicate whether a first type of flash device or a second type of flash device is present.
- The OV2736's architecture includes a timing generator and system control logic and strobe indicator, highlighted in red to the right.
- The strobe flash control signal is described as an indicator that is programmable and supports both LED and Xenon flash modes (the first and second types of flash devices.)

9



Claim 1, Element (C) - The Accused Products literally infringe this claim element.  Alternatively, the limitations of this claim element are present under the Doctrine of Equivalents because to the extent there are any differences between the Accused Product and this claim element, such differences are insubstantial.  Further, equivalency may be shown by the fact that the Accused Product performs substantially the same function in substantially the same way to achieve substantially the same result as recited in this claim element.

| '145 Patent |
| --- |
| Claim: 1 – Element (C) |

an indicator set to indicate whether a first flash device or a second flash device is present; and

- The strobe indicator in the OV2736 supports two types of flash device: LED and Xenon.
- This indicator is set to indicate which of the two types of flash devices is connected to the camera module.

10



| '145 Patent |
| Claim: 1 – Element (C) |

an indicator set to indicate whether a first flash device or a second flash device is present; and

- The timing control, and by extension the exposure time and gain, is affected by the status of the strobe indicator indicating the presence of a first or second type of flash device.

11



| '145 Patent |
| --- |
| Claim: 1 – Element (D) |

a plurality of storage locations;

- The Accused Product includes a plurality of storage locations.
- The control register bank shown in blue to the right is one example of a plurality of storage locations.
- The control register bank contains multiple sub-registers which store data and information relevant to image taking and processing.

12



Claim 1, Element (D) - The Accused Products literally infringe this claim element. Alternatively, the limitations of this claim element are present under the Doctrine of Equivalents because to the extent there are any differences between the Accused Product and this claim element, such differences are insubstantial. Further, equivalency may be shown by the fact that the Accused Product performs substantially the same function in substantially the same way to achieve substantially the same result as recited in this claim element.

| '145 Patent |
| --- |
| Claim: 1 – Element (D) |

a plurality of storage locations;

- The system control registers, which can be found in the control register bank, contain multiple storage locations, such as the locations shown to the right.

- By way of example, these three registers contain information which configure OV2736's settings related to exposure time.

13



| '145 Patent |
| --- |
| Claim: 1 – Element (E(i)) |

wherein the plurality of storage locations is configured to store an exposure time and a gain,

- The Accused Product's plurality of storage locations are configured to store an exposure time and a gain.
- The storage registers described in Table 4-9 are exemplary of the registers used to store exposure time and gain.

14



Claim 1, Element (E(i)) - The Accused Products literally infringe this claim element. Alternatively, the limitations of this claim element are present under the Doctrine of Equivalents because to the extent there are any differences between the Accused Product and this claim element, such differences are insubstantial. Further, equivalency may be shown by the fact that the Accused Product performs substantially the same function in substantially the same way to achieve substantially the same result as recited in this claim element.

| '145 Patent |
| --- |
| Claim: 1 – Element (E(i)) |

wherein the plurality of storage locations is configured to store an exposure time and a gain,

- The Accused Product's plurality of storage locations are configured to store an exposure time and a gain.
- The storage registers described in Table 4-9 are exemplary of the registers used to store exposure time and gain.

15



| '145 Patent |
| --- |
| Claim: 1 – Element (E(ii)) |

wherein the exposure time and the gain are associated with the first flash device in response to the indicator indicating the presence of the first flash device,

- The exposure time and gain are associated with a first type of flash device, such as LED flash.
- The exposure time and gain are associated with the first flash device in response to the timing generator and system control logic, including through the use of the strobe indicator specifying the presence of the first flash device.

16

Claim 1, Element (E(ii)) - The Accused Products literally infringe this claim element.  Alternatively, the limitations of this claim element are present under the Doctrine of Equivalents because to the extent there are any differences between the Accused Product and this claim element, such differences are insubstantial. Further, equivalency may be shown by the fact that the Accused Product performs substantially the same function in substantially the same way to achieve substantially the same result as recited in this claim element.

| '145 Patent |
| --- |
| Claim: 1 – Element (E(ii)) |

wherein the exposure time and the gain are associated with the first flash device in response to the indicator indicating the presence of the first flash device,

- All required image processing functions are programmable through the SCCB interface.
- The Accused Product's datasheet confirms there is a programmable indicator that specifies which type of flash device is present.
- The camera module software makes the determination of what particular data to store in the memory registers for exposure time and gain.

17



| '145 Patent |
| --- |
| Claim: 1 – Element (E(ii)) |

wherein the exposure time and the gain are associated with the first flash device in response to the indicator indicating the presence of the first flash device,

- The exposure time may be controlled by adjusting the time interval between precharging and sampling.
- After the data of the pixels in the row has been sampled, it is processed through analog circuitry to correct the offset and multiply the data with the corresponding gain.
- The exposure time and gain are associated with each other.

18

| '145 Patent |
|---|
| Claim: 1 – Element (E(ii)) |

wherein the exposure time and the gain are associated with the first flash device in response to the indicator indicating the presence of the first flash device,

- The flash module may be triggered by the strobe signal, and the corresponding exposure time and gain will be tailored to the type of flash device that is present (e.g., LED or Xenon shown on this slide and the next).
- The sensor will trigger the strobe to indicate the start of exposure time for the type of flash device that is present (such as Xenon).
- In response to at least the strobe signal and corresponding control logic programmed for a Xenon flash, the exposure time and corresponding gain are associated with a Xenon device.

19



| '145 Patent |
| --- |
| Claim: 1 – Element (E(ii)) |

wherein the exposure time and the gain are associated with the first flash device in response to the indicator indicating the presence of the first flash device,

- The flash module may be triggered by the strobe signal, and the corresponding exposure time and gain will be tailored to the type of flash device that is present.
- The sensor will trigger the strobe to indicate the start of exposure time for the type of flash device that is present (such as LED).
- In response to at least the strobe signal and corresponding control logic programmed for an LED flash, the exposure time and corresponding gain are associated with an LED device.

20



| '145 Patent |
| --- |
| Claim: 1 – Element (E(iii)) |

wherein the exposure time and the gain are associated with the second flash device in response to the indicator indicating the presence of the second flash device,

- The exposure time and gain are associated with a second type of flash device, such as a xenon flash.
- The exposure time and gain are associated with the second flash device in response to the timing generator and system control logic, including through the use of the strobe indicator, specifying the presence of the second flash device.

21



Claim 1, Element (E(iii)) - The Accused Products literally infringe this claim element. Alternatively, the limitations of this claim element are present under the Doctrine of Equivalents because to the extent there are any differences between the Accused Product and this claim element, such differences are insubstantial. Further, equivalency may be shown by the fact that the Accused Product performs substantially the same function in substantially the same way to achieve substantially the same result as recited in this claim element.

| '145 Patent |
| --- |
| Claim: 1 – Element (E(iii)) |

wherein the exposure time and the gain are associated with the second flash device in response to the indicator indicating the presence of the second flash device,

- All required image processing functions are programmable through the SCCB interface.
- The Accused Product's datasheet confirms there is a programmable indicator that specifies which type of flash device is present.
- The camera module software makes the determination of what particular data to store in the memory registers for exposure time and gain.

22



| '145 Patent |
|---|
| Claim: 1 – Element (E(iii)) |

wherein the exposure time and the gain are associated with the second flash device in response to the indicator indicating the presence of the second flash device,

- The exposure time may be controlled by adjusting the time interval between precharging and sampling.
- After the data of the pixels in the row has been sampled, it is processed through analog circuitry to correct the offset and multiply the data with the corresponding gain.
- The exposure time and gain are associated with each other.

23



| '145 Patent |
| --- |
| Claim: 1 – Element (E(iii)) |

wherein the exposure time and the gain are associated with the second flash device in response to the indicator indicating the presence of the second flash device,

- The flash module may be triggered by the strobe signal, and the corresponding exposure time and gain will be tailored to the type of flash that is present (e.g., LED or Xenon shown on this slide and the next).
- The sensor will trigger the strobe to indicate the start of exposure time for the type of flash device that is present (such as Xenon).
- In response to at least the strobe signal and corresponding control logic programmed for a Xenon flash, the exposure time and corresponding gain are associated with a Xenon flash device.

24

| '145 Patent |
| --- |
| Claim: 1 – Element (E(iii)) |

wherein the exposure time and the gain are associated with the second flash device in response to the indicator indicating the presence of the second flash device,

- The flash module may be triggered by the strobe signal, and the corresponding exposure time and gain will be tailored to the type of flash that is present.
- The sensor will trigger the strobe to indicate the start of exposure time for the type of flash device that is present (such as LED).
- In response to at least the strobe signal and corresponding control logic programmed for an LED flash, the exposure time and corresponding gain are associated with an LED flash device.

25



| '145 Patent |
| --- |
| Claim: 1 – Element (E(iv)) |

wherein the image sensor array is configured to capture an image using the exposure time, and wherein the gain amplifier is configured to perform processing on the image using the gain.

- The Accused Product's image sensor array is configured to capture an image using the exposure time.
- The OV2736's gain amplifier is configured to perform processing on the image using the gain control.

26

Claim 1, Element (E(iv)) - The Accused Products literally infringe this claim element. Alternatively, the limitations of this claim element are present under the Doctrine of Equivalents because to the extent there are any differences between the Accused Product and this claim element, such differences are insubstantial. Further, equivalency may be shown by the fact that the Accused Product performs substantially the same function in substantially the same way to achieve substantially the same result as recited in this claim element.

| '145 Patent |
| --- |
| Claim: 1 – Element (E(iv)) |

wherein the image sensor array is configured to capture an image using the exposure time, and wherein the gain amplifier is configured to perform processing on the image using the gain.

- Among other capabilities, the OV2736's image sensor array can control exposure time through adjusting the time interval between precharging and sampling the rows of its arrays.
- It can also process the image using gain and the gain amplifier, which the OV2736 users to manipulate and multiply gain for creation of a 12-bit image data.

27

# EXHIBIT G

**IIS Supplemental Responses to Second Set of Interrogatories**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ID IMAGE SENSING LLC, | |
| Plaintiff, | C.A. No. 20-136-RGA |
| v. | JURY TRIAL DEMANDED |
| OMNIVISION TECHNOLOGIES, INC., | |
| Defendant. | |

**PLAINTIFF ID IMAGE SENSING LLC'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT'S SECOND SET OF INTERROGATORIES**

Pursuant to Rules 33 and 26 of the Federal Rules of Civil Procedure, Plaintiff ID IMAGE SENSING LLC ("Plaintiff" or "IIS") hereby serves the following supplemental objections and responses to Defendant OMNIVISION TECHNOLOGIES, INC.'S ("Defendant" or "Omnivision") Second Set of Interrogatories IIS reserves the right to further amend and supplement its objections and responses pursuant to Fed. R. Civ. P. 26(e).

**GENERAL OBJECTIONS**

1.      IIS objects to each instruction, definition, or interrogatory that seeks to impose obligations inconsistent with the Federal Rules of Civil Procedure or the Local Rules for the District of Delaware.

2.      IIS objects to each instruction, definition, or interrogatory that seeks information in advance of the applicable deadlines provided by the Federal Rules of Civil Procedure or the Local Rules for the District of Delaware.

3.      IIS objects to each instruction, definition, or interrogatory to the extent it calls for disclosure of information protected by the attorney-client privilege, the work product doctrine, or other

1

applicable privilege(s), exemption(s) from production, or is otherwise protected under the Federal Rules of Civil Procedure or other applicable rules.

4.      IIS objects to each interrogatory to the extent that it is overly broad, unduly burdensome, and/or would require undue expense to answer.

5.      IIS objects to each interrogatory to the extent that it seeks information not proportional to the needs of the case or is otherwise not relevant to a claim or defense of any party.

6.      IIS objects to each interrogatory to the extent it calls for a legal conclusion and/or seeks expert testimony. Expert testimony will not be provided until the date set forth in the Court's Scheduling Order.

7.      IIS objects to each interrogatory to the extent it is a premature contention interrogatory.

8.      IIS objects to each interrogatory as uncertain, overbroad, and unduly burdensome to the extent it is not limited to a definite time period and accordingly is not limited to events and facts relevant to any party's claim or defense in the above-captioned action.

9.      IIS objects to these Interrogatories to the extent they purport to be directed at any entity other than ID Image Sensing LLC.

10.     IIS objects to these Interrogatories to the extent that they purport to require the disclosure of information that is not within IIS' possession, custody, or control.

11.     IIS objects to these Interrogatories to the extent that they purport to require IIS to disclose information that IIS is required to maintain in confidence pursuant to an agreement or understanding with any third party. IIS will not disclose such information, except pursuant to an appropriate release from any such third party or an appropriate court order.

12.     IIS objects to these Interrogatories to the extent they seek information not readily available to IIS or that would be no easier for IIS to derive or ascertain from documentary records than it would

be for IIS to do so itself. IIS will respond to such interrogatories to the extent and in the manner required by Rule 33(d) of the Federal Rules of Civil Procedure.

13.     The following responses are based on information and documents available as of the date of this response. Discovery is continuing and the responses accordingly are subject to change. Further discovery, independent investigation, and analysis may supply additional facts and add meaning to known facts, all of which may lead to additions to, changes to, or variations from the information herein set forth. IIS reserves the right to change, amend, or supplement the responses herein as additional facts are ascertained. The responses contained herein are made in a good faith effort to comply with the provisions of Rule 33, but are in no way deemed to be to the prejudice of IIS in relation to further discovery, investigation, and analysis.

14.     The applicable foregoing General Objections are incorporated into each of the Specific Objections and responses that follow as if set forth fully therein. The stating of a specific objection or response shall not be construed as a waiver of these General Objections.


## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 6:** For each Asserted Claim of the Asserted Patent, identify and describe in detail the conception and reduction to practice, actual and constructive, of the alleged invention covered by each Asserted Claim, including the facts and circumstances surrounding the conception and reduction to practice, the date of conception and the date of reduction to practice for that claim, the identity of all individuals who contributed toward or participated in any such conception or reduction to practice, and all documents by production number that you contend corroborate each such conception and reduction to practice, and all persons who you contend can corroborate each such conception and reduction to practice.

3

**RESPONSE:**

Subject to the General Objections, Plaintiff responds as follows:

Each of the claims of the Asserted Patent were constructively reduced to practice at least as early as March 5, 2004 when the application leading to the Asserted Patent was filed. Plaintiff is currently unaware of any additional facts supporting an earlier date of conception or reduction to practice. The named inventor, Dwight D. Poplin, conceived of and constructively reduced to practice the invention.

**INTERROGATORY NO. 7:** Identify and describe in detail the date of first sale or public disclosure of any commercial embodiment of the Asserted Patent.

**RESPONSE:**

Plaintiff objects to this interrogatory as overly broad and unduly burdensome to the extent that it seeks information in the possession of, known to, or otherwise equally available to the Defendant. Subject to the General Objections, Plaintiff responds as follows:

Plaintiff is currently unaware of the date of first sale or public disclosure of any commercial embodiment of the Asserted Patent other than when Omnivision first sold one of the Accused Products.

**INTERROGATORY NO. 8:** Describe in detail any investigation and evaluation, whether conducted by you or any other person, regarding the valuation, validity, patentability, enforceability, scope, and infringement of the Asserted Patent or Related Patents of which you are aware.

4

**RESPONSE:**

Plaintiff objects to this interrogatory vague and ambiguous as the Interrogatory as written contradicts itself. Subject to the foregoing objections, Plaintiff responds as follows:

Plaintiff interprets this interrogatory as requesting IIS' contention as to whether any of the references cited in Omnivision's Invalidity Contentions were not published, filed, or publicly available early enough to actually constitute prior art to the Asserted Patent. Based on the facts and information Plaintiff has at this time regarding conception and reduction to practice of the claims of the Asserted Patent, Plaintiff does not currently contest that the references cited in Omnivision's Invalidity Contentions are early enough to constitute prior art. However, Plaintiff contends that none of the references anticipate or render obvious the asserted claim of the Asserted Patent.

**INTERROGATORY NO. 9 (ACTUALLY NOS. 9-16):** To the extent that you contend that any prior art reference or prior art combination identified by Omnivision in its invalidity contentions fails to anticipate or render obvious the Asserted Claim, specifically identify each limitation of each Asserted Claim that you assert is not disclosed in each prior art reference or prior art combination and explain why Omnivision's identification of such a limitation as being disclosed in the reference(s) is erroneous.

**RESPONSE:**

Plaintiff objects to this Interrogatory as containing 8 discrete subparts corresponding to facts pertaining to each prior art reference and combination of prior art references charted in Omnivision's Invalidity Contentions. Each rests on independent factual contentions such that it is improper to include all within a single interrogatory. Consequently, Interrogatory No. 9 is actually 8 separate interrogatories that will each count toward Omnivision's limit in this litigation. Plaintiff

5

further objects to this interrogatory as prematurely seeking expert testimony and information that is properly the subject of IIS' rebuttal report on validity. IIS will comply with all applicable rules and orders entered by the Court, including any orders regarding the timing of expert reports. Subject to the foregoing objections, Plaintiff responds as follows:

Below is a chart listing the elements from claim 1 of the '145 patent that are not disclosed in the patents and patent applications asserted in the validity charts in Omnivision's Invalidity Contentions. Plaintiff contends that at least these claim elements are not disclosed in the cited references but reserves the right to supplement this response with additional information.

| Patent / Application | Name | Claim Elements Not Disclosed |
|---|---|---|
| 6,359,651 | Yokonuma | "an indicator set to indicate whether a first flash device or a second flash device is present"<br><br>"wherein the exposure time and the gain are associated with the first flash deice in response to the indicator indicating the presence of the first flash device"<br><br>"wherein the exposure time and the gain are associated with the second flash deice in response to the indicator indicating the presence of the first flash device" |
| US 2003/0133021 | Hamamura | "an indicator set to indicate whether a first flash device or a second flash device is present"<br><br>"wherein the exposure time and the gain are associated with the first flash deice in response to the indicator indicating the presence of the first flash device"<br><br>"wherein the exposure time and the gain are associated with the second flash deice in response to the indicator indicating the presence of the first flash device" |
| 6,718,135 | Kawasaki | "an image sensor array"<br><br>"a gain amplifier"<br><br>"wherein the image sensor array is configured to capture an |

6

| | | image using the exposure time" "wherein the gain amplifier is configured to perform processing on the image using the gain" |
|---|---|---|
| 7,522,210 | Shimada | "an indicator set to indicate whether a first flash device or a second flash device is present" "wherein the exposure time and the gain are associated with the first flash deice in response to the indicator indicating the presence of the first flash device" "wherein the exposure time and the gain are associated with the second flash deice in response to the indicator indicating the presence of the first flash device" |
| 5,610,654 | Parulski | "an indicator set to indicate whether a first flash device or a second flash device is present" "wherein the exposure time and the gain are associated with the first flash deice in response to the indicator indicating the presence of the first flash device" "wherein the exposure time and the gain are associated with the second flash deice in response to the indicator indicating the presence of the first flash device" |
| 5,559,552 | Inuiya | "an indicator set to indicate whether a first flash device or a second flash device is present" "wherein the exposure time and the gain are associated with the first flash deice in response to the indicator indicating the presence of the first flash device" "wherein the exposure time and the gain are associated with the second flash deice in response to the indicator indicating the presence of the first flash device" |
| 5,528,333 | Lee | "an image sensor array" "a gain amplifier" "wherein the image sensor array is configured to capture an image using the exposure time" "wherein the gain amplifier is configured to perform |

7

| | | processing on the image using the gain" |
|---|---|---|

For the following combinations of references that Omnivision charted for purposes of obviousness, each combination involves one reference that is a digital camera system and a second reference that is an analog camera system that uses film (Kawasaki and Lee). There is no motivation to combine an analog camera system using film with a digital camera system to arrive at the patented invention.

Obviousness Combinations Asserted by Omnivision

Kawasaki and Shimada

Kawasaki and Parulski

Hamamura and Kawasaki

Inuiya and Lee

Lee and Parulski

Yokonuma and Kawasaki

**INTERROGATORY NO. 10 (ACTUALLY NO. 17):** Identify your objective evidence of secondary considerations of non-obviousness for any Asserted Claim and describe in detail all facts and considerations supporting your answer, including but not limited to the identity of all persons with knowledge of those facts or considerations and the documents relevant to those facts or considerations.

**RESPONSE:**

Plaintiff objects to this interrogatory as prematurely seeking information that is properly the subject of IIS' rebuttal report on validity. IIS will comply with all applicable rules and orders entered by the Court, including any orders regarding the timing of expert reports. Subject to the

8

foregoing objections, Plaintiff responds as follows:

The apparatus claimed in the '145 Patent has been copied by Defendant which uses the claimed invention in its image sensor products. Omnivision's infringing products have achieved commercial success in the image sensor industry.

**INTERROGATORY NO. 11 (ACTUALLY NO. 18):** Identify each component or components in the Accused Products that constitute an "indicator set to indicate whether a first flash device or a second flash device is present," a "flash signal," and a "control circuit [that] is configured to generate a flash signal" in sufficient detail to set forth which components constitute each of the above claim limitations individually and to explain why the components that you assert constitute an "indicator set to indicate whether a first flash device or a second flash device is present" are neither a "flash signal" nor a "control circuit [that] is configured to generate a flash signal."

**RESPONSE (ORIGINAL):**

Plaintiff objects to this Interrogatory as premature given that Omnivision just recently in the past few weeks produced over 100,000 pages of documents, most of which should have been produced as part of its core technical documents much earlier in the case and in no event later than the date for its responses to Plaintiff's First Set of Requests for Production. As such, Plaintiff expressly reserves the right to amend and/or supplement this response. Subject to the foregoing objections, Plaintiff responds as follows:

In its Disclosure of Initial Claim Charts (hereby incorporated by reference), Plaintiff provided a claim chart for each of the Omnivision products presently accused in this case. The claim charts provide a comprehensive and element-by-element analysis of the accused products and demonstrate how each infringes the asserted claim. The claim charts also include excerpts

from the product specifications produced by Omnivision that demonstrate how the accused products meet each claim limitation as well as the bates numbers for the excerpts.

**RESPONSE (SUPPLEMENTAL):**

Subject to the foregoing objections, Plaintiff responds as follows:

In its Disclosure of Initial Claim Charts (hereby incorporated by reference), Plaintiff provided a claim chart for each of the Omnivision products previously accused in this case. Plaintiff served its Amended Disclosure of Claim Charts (Infringement Contentions) on Omnivision on March 22, 2022 which are hereby incorporated by reference and which includes a list of all Accused Products. The claim charts provide a comprehensive and element-by-element analysis of the accused products and demonstrate how each infringes the asserted claim.  The claim charts also include excerpts from the product specifications produced by Omnivision that demonstrate how the accused products meet each claim limitation as well as the bates numbers for the excerpts.

**INTERROGATORY NO. 12 (ACTUALLY NO. 19):** Describe in detail the measure and proper calculation of any and all damages and harm claimed against Defendant in this litigation, including without limitation the measure and proper calculation, if any, of a reasonable royalty, royalty base, royalty rate, lost profits, and price erosion, or any other remedies sought, including the facts you intend to rely on for those alleged damages.

**RESPONSE:**

Plaintiff objects to this interrogatory as prematurely seeking expert testimony and information that is properly the subject of IIS' expert report on damages. IIS will comply with all applicable rules and orders entered by the Court, including any orders regarding the timing of expert reports. IIS further objects to this request as premature given that Omnivision has only

recently in the past few weeks provided financial and sales related information. As such, Plaintiff expressly reserves the right to amend and/or supplement this response.  Subject to the foregoing objections, Plaintiff responds as follows:

Plaintiff incorporates by reference the portion of its Initial Disclosures which address its potential damages and damages model. Plaintiff reserves the right to supplement this interrogatory as discovery progresses.

**INTERROGATORY NO. 13 (ACTUALLY NO. 20):** Describe all facts and circumstances relating to any ownership or licensing of the Asserted Patent or offer to sell or license the Asserted Patent, including each person who has ever owned, licensed, or been offered a license to the Asserted Patent, the identification of any license, settlement, or other agreements, including any draft agreements, relating to the ownership or licensing of the Asserted Patent, the dates of any ownership, licensing, or offers, the amounts of any sale of the Asserted Patent, royalties, or other payments exchanged.

**RESPONSE:**

Plaintiff objects to this interrogatory to the extent that it Subject to the foregoing objections, Plaintiff responds as follows:

Pursuant to Rule 33(d), facts responsive to this Interrogatory can be found in documents already produced by Plaintiff at the following bates range:  IDIS-000102 – IDIS-000726. Plaintiff is not aware of any other settlement agreements, licenses, or offers to license the '145 Patent other than that identified in IDIS-000102 - IDIS-000116.

**INTERROGATORY NO. 14 (ACTUALLY NO. 21):** Identify all individuals with knowledge of your allegations in the Amended Complaint, your responses in your Answer to Defendant's

11

Counterclaims, your Infringement Contentions, and your responses to each of Omnivision's Interrogatories and Requests for Admissions served in this Action, including their name, position, relationship to IIS, and the allegations and responses of which they have knowledge.

**RESPONSE:**

Subject to the foregoing objections, Plaintiff responds as follows:

Plaintiff identifies the following individuals with knowledge responsive to this interrogatory: Eric Lucas is former in-house counsel for Acacia Research Group LLC ("ARG") and IIS. Mr. Lucas was also formerly an officer of IIS and has general knowledge of the allegations in the Amended Complaint, the responses in IIS' Answer to Defendant's Counterclaims, and IIS' Infringement Contentions. Charlie Raasch was an employee of ARG with technical knowledge of IIS' Infringement Contentions. Craig Yudell is in-house counsel for ARG and IIS. Mr. Yudell is also an officer of IIS and has general knowledge with respect to the categories of information identified in this Interrogatory. Marc Booth is the President of ARG and has knowledge with respect to the categories of information identified in this Interrogatory.

DATED:  April 4, 2022                              */s/ Corby R. Vowell*

                                                 Brian E. Farnan (Bar No. 4089)
                                                 Michael J. Farnan (Bar No. 5165)
                                                 FARNAN LLP
                                                 919 Market Street, 12th Floor
                                                 Wilmington, DE 19801
                                                 T: 302-777-0300
                                                 F: 302-777-0301
                                                 bfarnan@farnanlaw.com
                                                 mfarnan@farnanlaw.com

                                                 Of Counsel:
                                                 Jonathan T. Suder (*pro hac vice*)
                                                 Corby R. Vowell
                                                 Dave R. Gunter (*pro hac vice*)
                                                 FRIEDMAN, SUDER & COOKE

12

Tindall Square Warehouse No. 1
604 East 4th Street, Suite 200
Fort Worth, Texas 76102
Telephone:  (817) 334-0400
Facsimile:  (817) 334-0401
Email:  jts@fsclaw.com
Email:  vowell@fsclaw.com
Email:  gunter@fsclaw.com

ATTORNEYS FOR PLAINTIFF,
ID IMAGE SENSING LLC

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 4, 2022, a true copy of the foregoing was served via electronic mail to the following:

Kelly E. Farnan – farnan@rlf.com

David H. Bluestone – David.bluestone@bfkn.com

Michael D. Educate – michael.educate@bfkn.com

DATED:  April 4, 2021                    */s/ Corby R. Vowell*

ATTORNEYS FOR PLAINTIFF,
ID IMAGE SENSING LLC

13

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 6, 2022, true and correct copies of the foregoing document were caused to be served on all counsel of record via the Court's CM/ECF system.

*/s/ Kelly E. Farnan*